# EXHIBITS TO DECLARATION OF MARK SCHLACHET

1. Exhibit 1: Copy of Defendant William Fikhman's Notice of Motion and Motion to Dismiss Third Amended Complaint; Memorandum of Points and Authorities filed in " in *Vivo Per Lei, Inc., a Nevada corporation v. Gadi Bruchim, an individual, William Fikhman, an individual, et al,* CV11-05169GW (CDCA 2011) …………………………………………………X-1

2. Exhibit 2: Copy of Amazon Expert Chris McCabe's Declaration In *Johnson v. Incopro, Inc. et al,* 1:18-cv-00689 (E.D. VA) (With Accompanying Exhibits)……………………………………………………………………..X-16

3. Exhibit 3: Copy of a Transcript of Proceedings of May 23, 2019 in *Eternity Mart, Inc. v. Nature's Sources, LLC* 1:19-cv-02436 (N.D. IL 2019)………………………………………………………………………X-83

4. Exhibit 4: Copy of a Transcript of Motions Hearing of January 18, 2019 in *Johnson v. Incopro, Inc. et al,* 1:18-cv-00689 (E.D.VA)………………X-99

5. Exhibit 5: Copy of defendant Amazzia's Amazon Seller Profile on amazon.comcom as of January 20, 2020………………………………X-106

6. Exhibit 6: Copy of defendant Amazzia's online seller rating posted by Marketplace Rating………………………………………………………..X-109

7. Exhibit 7: Copy of Auction Brothers, Inc. dba Amazzia's personnel solicitation LinkedIn, as of January 20, 2020…………………………X-111

8. Exhibit 8: Copy of a page from Amazon Seller Central advising that most account reviews conclude within 30 days, but Amazon retains discretion to extend that time frame in its discretion………………………………...X-113

# EXHIBIT 1

**Copy of Defendant William Fikhman's Notice of Motion and Motion to Dismiss Third Amended Complaint; Memorandum of Points and Authorities filed in " in *Vivo Per Lei, Inc., a Nevada corporation v. Gadi Bruchim, an individual, William Fikhman, an individual, et al,* CV11- 05169GW (CDCA 2011)**



**VEATCH CARLSON, LLP**
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
700 SOUTH FLOWER STREET, 22nd FLOOR
LOS ANGELES, CALIFORNIA 90017-4209
TELEPHONE (213) 381-2861
FACSIMILE (213) 383-6370

(SPACE BELOW FOR FILING STAMP ONLY)

**KEITH G. WILEMAN, State Bar No. 111225**
kwileman@veatchfirm.com
**XIAOYI YAO, State Bar No. 261290**
syao@veatchfirm.com
Attorneys for **Defendant, WILLIAM FIKHMAN**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIVO PER LEI, INC., a NEVADA corporation | CASE NO.:  CV11-05169GW(JCGX) |
| Plaintiff, | **DEFENDANT WILLIAM FIKHMAN'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| GADI BRUCHIM, an individual, WILLIAM FIKHMAN, an individual, AMAZON.COM, INC., a Delaware Corporation, and Does 1-10, inclusive | [Filed Concurrently with Proposed Order] |
| | **DATE** :January 23, 2012 |
| Defendants. | **TIME** :8:30 a.m. |
| | **DEPT** :"10" |
| | **COMPLAINT FILED** : 06/21/2011 |
| | **TRIAL DATE** : NONE SET |

TO THE COURT, AND TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 23, 2012, at 8:30 a.m., or as soon thereafter as counsel may be heard, in Courtroom "10" of the above entitled court, located at 312 North Spring Street, Los Angeles, CA, Defendant WILLIAM FIKHMAN ("Defendant") will, and hereby does move the Court pursuant to Rule

- 1 -

FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 1**

1  12(b)(6) of the *Federal Rules of Civil Procedure* to dismiss the Third Amended

2  Complaint ("TAC") of Plaintiff VIVO PER LEI, INC. ("Plaintiff").

3        This motion is made following the conference of counsel pursuant to L.R. 7-3

4  which took place on December 1, 2011, and will be based on the following grounds:

5  1.     The cause of action for copyright infringement fails to allege that Defendant

6  used any copyrightable text on Plaintiff's website.

7  2.     The cause of action for trademark infringement fails to allege a likelihood of

8  confusion by Defendant's conduct and is barred by the "first sale" doctrine.

9  3.     The cause of action for false designation of origin and false representation fails

10 to allege any false statement by Defendant.

11 4.     The state law cause of action for unfair business practices is equally flawed as

12 the Lanham Act claims or preempted by the Copyright Act.

13       This motion is and will be based upon this Notice of Motion and Motion, the

14 attached Memorandum of Points and Authorities, the pleadings and records on file in

15 this action, and upon such additional authorities and arguments as may properly be

16 presented to the Court at or before the time of the hearing hereon.

17

18 DATED:        December 6, 2011              Respectfully submitted,

19                                            **VEATCH CARLSON, LLP**

20
                                   By:_____/s/ Xiaoyi Yao_____
21                                            **KEITH G. WILEMAN**
                                              **XIAOYI YAO**
22                                            Attorneys for **Defendant**
                                              **WILLIAM FIKHMAN**
23

24
   I:\WP\12638876\MTN-MTD TAC.wpd
25

26

27

28

- 2 -
FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 2**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**INTRODUCTION**

According to the Third Amended Complaint ("TAC"), Plaintiff Vivo Per Lei, Inc. ("Plaintiff") manufactures beauty and skin care products, including moisturizers, masks, serums, creams, and cleansers, under the logo "OROGOLD," to which Plaintiff owns a federally registered trademark. Plaintiff distributes its Orogold products through its own specialty stores, website, and third party distributors and resellers, who agree, *inter alia*, not to resell these products in a wholesale fashion.

Defendant William Fikhman ("Defendant") is a California resident who operates an Amazon.com storefront under the name "Super Duper Deals." The TAC alleges Defendant sold Orogold products through his Amazon store, which products Defendant allegedly purchased from one of Plaintiff's distributors or resellers, who is further claimed sold the products to Defendant in violation of its agreement with Plaintiff.

Seeking to eliminate any "diversion" to unauthorized resellers, Plaintiff brings this action against Defendant for trademark infringement, notwithstanding the fact that Defendant is alleged to have done nothing with the Orogold mark other than reselling genuine Orogold products bearing a true Orogold mark. Plaintiff also accuses Defendant of false advertising under the Lanham Act and California *Bus. & Prof. Code* §17500, but fails to plead any false statement made by Defendant.

In addition, Plaintiff alleges that Defendant utilized the photographs and text appeared on Plaintiff's website in connection with his resale of Orogold products on his Amazon store, and is therefore liable for copyright infringement. In the original complaint, Plaintiff, however, failed to allege that any purported creative work was registered with the Copyright Office, a precondition for bringing an infringement action under the Copyright Act.

Purporting to cure the registration deficiency, Plaintiff has filed three amended pleadings, in which the meritless trademark infringement and false advertising

- 3 -
FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 3**

1    allegations remain unchanged.  The sole amendments are the additional allegations

2    that the photographs and text of Plaintiff's website are now purportedly registered

3    with the Copyright Office.  Registration alone, however, fails to salvage the copyright

4    claim, where Defendant's Amazon storefront has simply not used any copyrightable

5    text on Plaintiff's website.

6                                    **ARGUMENT**

7    **I.      THE LEGAL STANDARD FOR RULE 12(b)(6).**

8         Rule 12(b)(6) allows a party to bring a motion to dismiss for failure to state a

9    claim upon which relief can be granted.  "While a complaint attacked by a Rule

10   12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

11   obligation to prove the 'grounds' of his 'entitlement to relief' requires more than

12   labels and conclusions, and a formulaic recitation of the elements of a cause of action

13   will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (Citations

14   omitted).  Rather, the allegations in the complaint "must be enough to raise a right to

15   relief above the speculative level." *Id.*  In other words, the allegations must be

16   plausible on the face of the complaint. *See Ashcroft v. Iqbal*, 129 S. Ct.1937, 1949

17   (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it

18   asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a

19   complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops

20   short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

21   (Citations and internal quotations omitted).

22   **II.    THE FIRST CAUSE OF ACTION FOR COPYRIGHT INFRINGEMENT**

23           **FAILS TO ALLEGE COPYING OF THE SUBJECT TEXT.**

24        To establish copyright infringement, a plaintiff must plead and prove: (1)

25   ownership of a valid copyright, and (2) copying of constituent elements of the work

26   that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

27        Plaintiff in this action alleges that Defendant has infringed Plaintiff's

28   copyrights in the photographs and text appeared on its website.  The TAC, however,

---

- 4 -

**Exhibit 1 to Declaration of Mark Schlachet – page 4**

1   fails to show that such text was used by Defendant.  The only text on Defendant's
2   storefront were the names of the Orogold products, according to Exhibit "D," pp. 78-
3   80, which are alleged to be printouts of web pages of Defendant's Amazon storefront,
4   Super Duper Deals.  Pages 90-99 of Exhibit "D" are plainly printouts of web pages of
5   Amazon, as the title "AMAZON LISTINGS" speaks for itself, for which Defendant
6   cannot be hold responsible.  The names of the Orogold products are, however,
7   uncopyrightable subject matter, and therefore cannot be the basis of infringement.

8       To be copyrightable, a work must meet the requirement of originality. *Feist*
9   *Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).  Originality means
10   independent creation plus ***some minimal level of creativity***. *Id.* at 345.  The amount of
11   creativity required is not high, but "it is not negligible." *Satava v. Lowry*, 323 F.3d
12   805, 810 (9th Cir. 2003); *Feist Publ'ns, Inc.*, 499 U.S. at 346 (explaining that
13   "originality requires independent creation plus a modicum of creativity").  No
14   copyright protection is accorded to a work "in which the creative spark is utterly
15   lacking or so trivial as to be virtually nonexistent." *Urantia Found. v. Maaherra*, 114
16   F.3d 955, 959 (9th Cir. 1997) (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 359; quotation
17   marks omitted).

18       Examples of such uncopyrightable work are listed in 37 CFR §202.1, which
19   include "[w]ords and short phrases such as ***names***, titles, and slogans; familiar
20   symbols or designs; mere variations of typographic ornamentation, lettering or
21   coloring; ***mere listing of ingredients or contents***." 37 CFR §202.1(a) (emphasis
22   added).

23       Accordingly, a product name or a mere description of the content of a product
24   is simply uncopyrightable. *Planesi v. Peters*, 2005 U.S. App. LEXIS 17425 (9th Cir.
25   2005) (the name of Plaintiff's board game is not entitled to copyright protection);
26   *Ets-Hokin v. Skyy Spirits*, 225 F.3d 1068, 1080-1081 (9th Cir. 2000) ("relating to
27   commercial prints and labels: [b]rand names, trade names, slogans, and other short
28   phrases or expressions cannot be copyrighted, even if they are distinctively arranged

FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 5**

1   or printed") (quotation marks omitted), citing *Nimmer* § 2.08[G][2], at 2-136;

2   *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir. 1959)

3   (descriptive text on product label not copyrightable).

4       Here, the only text Defendant allegedly used on its Amazon storefront were the

5   names of the Orogold products, which consisted of the trade name Orogold and a

6   mere description of the content of the product, for example, "Oro Gold 24K Gold

7   Anti-Aging Eye Serum."  As the Code and case law have made clear, such names are

8   simply not subject to copyright protection.  Since these uncopyrightable names were

9   the only text of Plaintiff's website allegedly "copied" by Defendant, Plaintiff's

10   copyright infringement claim based on its website text is unsustainable.

11   **III.**    **THE SECOND CAUSE OF ACTION FOR TRADEMARK**

12           **INFRINGEMENT IS DEFEATED BY THE FIRST SALE DOCTRINE.**

13       Plaintiff alleges that Defendant's resale of Orogold products through an

14   Amazon.com storefront was without Plaintiff's authorization, and therefore infringed

15   Plaintiff's property rights in its federally registered trademark "OROGOLD."

16   Accordingly, Plaintiff purports to bring a cause of action for trademark infringement

17   under the Lanham Act.  However, as Defendant merely sold genuine, unaltered

18   Orogold products, which Plaintiff concedes, there is simply no actionable trademark

19   infringement claim under the first sale doctrine. *Sebastian Int'l, Inc. v. Longs Drug*

20   *Stores Corp.*, 53 F.3d 1073 (9th Cir. 1995).

21       The facts here mirror those in *Sebastian*, where the plaintiff/trademark holder

22   improperly attempted to control the downstream distribution of its products by

23   bringing a trademark infringement claim against "unauthorized" resellers. *Id.* at 1075.

24   In *Sebastian*, plaintiff allegedly sold its Sebastian products only to "salons and

25   distributors who [we]re members of the [Sebastian Collective Membership Program]

26   and ha[d] agreed not to resell to non-Collective members like [defendant]." *Id.* at

27   1074.  The defendant *Longs Drug* nonetheless purchased and resold Sebastian

28   products. *Id.*  The court found that defendant "presumably purchased Sebastian

- 6 -

FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 6**

1  products from a salon or distributor who [sold] the product to [defendant] in violation

2  of its agreement with Sebastian." *Id.*

3      Plaintiff in *Sebastian* alleged that defendant's unauthorized resale constituted

4  trademark infringement. *Id.*  The district court granted preliminary injunction for

5  plaintiff.  The Ninth Circuit court disagreed.  In reversing, the Ninth Circuit found

6  defendant's resale was protected by the first sale doctrine, and it was therefore not

7  liable for trademark infringement as a matter of law. *Id.*

8      In so holding, the Ninth Circuit court stated:

9          courts have consistently held that, with certain well-defined exceptions,

10         the right of a producer to control distribution of its trademarked product

11         does not extend beyond the first sale of the product.  ***Resale by the first***

12         ***purchaser of the original article under the producer's trademark is***

13         ***neither trademark infringement nor unfair competition***.

14  (Emphasis added).

15      The court found plaintiff there, in an attempt to eliminate "diversion to

16  unauthorized retailers," had sought to "avoid the first sale rule," which the court

17  found unwarranted. *Id.* at 1075 (internal quotations omitted).

18      The court rejected plaintiff's claim that defendant's resale had "in fact confused

19  consumers into believing falsely that there [wa]s some type of affiliation, association,

20  or approval between [defendant] and [plaintiff]," finding:

21         [Plaintiff's] premise is false.  The "first sale" rule is not rendered

22         inapplicable merely because consumers erroneously believe the reseller is

23         affiliated with or authorized by the producer.  It is the essence of the

24         "first sale" doctrine that a purchaser who does no more than stock,

25         display, and resell a producer's product under the producer's trademark

26         violates no right conferred upon the producer by the Lanham Act.  ***When***

27         ***a purchaser resells a trademarked article under the producer's***

28         ***trademark, and nothing more, there is no actionable misrepresentation***

- 7 -

**Exhibit 1 to Declaration of Mark Schlachet – page 7**

1         ***under the statute***.

2   *Id.* (Emphasis added).

3        The Ninth Circuit has thus made clear that the mere resale of genuine products

4   is not trademark infringement, regardless lack of consent from the marker owner. *See*

5   *also NEC Elecs. v. Cal Circuit ABCO*, 810 F.2d 1506, 1509 (9th Cir. 1987) (the first

6   sale doctrine limits the producer's power to control the resale of "genuine goods

7   bearing a true mark even though such sale is without the mark owner's consent.");

8   *Denbicare U.S.A. v. Toys "R" Us*, 84 F.3d 1143, 1151 (9th Cir. 1996) ([defendant's]

9   resale of the diapers would not in itself infringe [plaintiff]'s trademark."); *Chanel Inc.*

10   *v. Pacini*, 2008 U.S. Dist. LEXIS 120583 (N.D. Cal. 2008) ("a distributor who resells

11   trademarked goods without change is not liable for trademark infringement.");

12   *Conwest Res., Inc. v. Playtime Novelties, Inc.*, 2006 U.S. Dist. LEXIS 85461 (N.D.

13   Cal. 2006) ("Defendants allegedly continue to sell products which bear Plaintiff's

14   mark, [but] they are, in fact, Plaintiff's products. Plaintiff does not contend that

15   Defendants have changed or repackaged the products in any way.")

16        The Ninth Circuit precedents dictate that Plaintiff's trademark infringement

17   claim must fail.  As Plaintiff itself concedes, Defendant merely resold genuine,

18   unaltered Orogold products. (TAC, p. 5, heading "Defendants Unauthorized Sales of

19   Orogold Products.")  Such resale, regardless lack of consent of Plaintiff, is simply

20   shielded from liability under the first sale doctrine.

21        To be clear, the term "Unauthorized Products" Plaintiff uses in the TAC merely

22   refers to Orogold products sold without Plaintiff's consent. (TAC, p. 6, ¶19).  It does

23   not imply that the products themselves were in any way different from genuine

24   Orogold products.  Nowhere in the TAC does Plaintiff allege that Defendant altered

25   the Orogold products or even their packages in any way.

26   ///

27   ///

28   ///

FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 8**

## IV.   THE SECOND CAUSE OF ACTION FOR TRADEMARK INFRINGEMENT MUST BE DISMISSED ON THE ADDITIONAL GROUND OF FAILURE TO ALLEGE LIKELIHOOD OF CONFUSION.

As an additional ground for dismissal, Plaintiff has also failed to plead facts to show a likelihood of confusion to support a cause of action for trademark infringement.  15 U.S.C. §1114 which governs trademark infringement claims provides, in pertinent part, as follows:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is ***likely to cause confusion, or to cause mistake, or to deceive***

... shall be liable in a civil action ....

(Emphasis added).

Accordingly, to prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must plead and prove that it "holds a protectable mark, and that the alleged infringer's imitating mark is similar enough to cause confusion, or to cause mistake, or to deceive." *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 630 (9th Cir. 2005).

Plaintiff fails to allege that Defendant's resale of Orogold products was likely to cause confusion, or to cause mistake, or to deceive.  Nor would the facts imply the same, as confusion simply does not exist where, as here, a defendant sells genuine Orogold products bearing a true Orogold mark. *See NEC Elecs., supra,* 810 F.2d at 1509 ("Trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.")  For this additional reason, Plaintiff's trademark infringement claim cannot survive a Rule 12(b)(6) challenge.

- 9 -

**Exhibit 1 to Declaration of Mark Schlachet – page 9**

1   **V.      THE THIRD CAUSE OF ACTION FOR FALSE DESIGNATION OF**

2   **ORIGIN AND FALSE REPRESENTATION FAILS TO ALLEGE ANY**

3   **FALSE STATEMENT BY DEFENDANT.**

4       Section 43 of the Lanham Act, 15 U.S.C §1125 (a), is the vehicle for the

5   assertion of two distinct types of "unfair competition": infringement of unregistered

6   marks under §1125(a)(1)(A), and false advertising under §1125(a)(1)(B). *5 J.*

7   *McCarthy on Trademarks and Unfair Competition*, §27:10, 27-23 (2011).  To the

8   extend that Plaintiff alleges a duplicative infringement claim under §1125(a)(1)(A),

9   such claim is unsustainable for reasons set forth in sections III and IV.  15 U.S.C.

10  §1125 (a)(1)(B), which governs false advertising claims, provides, in pertinent part, as

11  follows:

12          (a) Civil action. (1) Any person who, on or in connection with any goods

13          or services, or any container for goods, uses in commerce any word, term,

14          name, symbol, or device, or any combination thereof, or *any false*

15          *designation of origin, false or misleading description of fact, or false or*

16          *misleading representation of fact*, which--

17          ... (B) in commercial advertising or promotion, misrepresents the nature,

18          characteristics, qualities, or geographic origin of his or her or another

19          person's goods, services, or commercial activities,

20          shall be liable in a civil action by any person who believes that he or she

21          is or is likely to be damaged by such act.

22  (Emphasis added.)

23      To prevail on a claim under 15 U.S.C. §1125 (a)(1)(B), a plaintiff must plead

24  and prove:

25          (1) *a false statement of fact* by the defendant in a commercial

26          advertisement about its own or another's product; (2) the statement

27          actually deceived or has the tendency to deceive a substantial segment of

28          its audience; (3) the deception is material, in that it is likely to influence

**Exhibit 1 to Declaration of Mark Schlachet – page 10**

1    the purchasing decision; (4) the defendant caused its false statement to

2    enter interstate commerce; and (5) the plaintiff has been or is likely to be

3    injured as a result of the false statement, either by direct diversion of

4    sales from itself to defendant or by a lessening of the goodwill associated

5    with its products. [Citations].

6  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)

7  (emphasis added).

8    To demonstrate falsity within the meaning of the Lanham Act, a plaintiff must

9  show that "the statement was literally false, either on its face or by necessary

10  implication, or that the statement was literally true but likely to mislead or confuse

11  consumers." *Id.*

12    Plaintiff here has not pleaded any false statement.  Plaintiff merely accuses

13  Defendant of reselling its products without its consent, but fails to allege that

14  Defendant made any false statement in connection with such resales.  Instead, Plaintiff

15  erroneously alleges that the resale in itself is sufficient for such claim. (TAC, p. 13,

16  ¶60).  Without any false statement, however, there can be no viable action of false

17  advertising under the Lanham Act.

18  **VI.**   **THE STATE LAW CAUSE OF ACTION FOR UNFAIR BUSINESS**

19       **PRACTICES SUFFERS THE SAME FATE AS THE LANHAM ACT**

20       **CLAIMS OR IS PREEMPTED BY THE COPYRIGHT ACT.**

21    The Ninth Circuit has held that claims brought under California unfair

22  competition law are "substantially congruent" to claims brought under the Lanham

23  Act, because the ultimate test under both is whether the public is likely to be deceived

24  or confused. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994).  As such,

25  where the Lanham Act claims fail, courts have consistently found the related

26  California unfair competition claims also fail. *Appliance Recycling Ctrs. of Am., Inc.*

27  *v. JACO Envtl., Inc.*, 378 Fed. Appx. 652, 656 (9th Cir. 2010) ("the 'substantially

28  congruent' state claim failed on the merits" where the related federal claim failed.);

- 11 -

FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 11**

1    *Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 875 (9th Cir. 2002)

2    ("[Plaintiff]'s California unfair competition claim fails because its related Lanham Act

3    claims fail."); *Denbicare U.S.A. v. Toys "R" Us*, 84 F.3d 1143, 1152 (9th Cir. 1996)

4    (dismissal of plaintiff's §17200 and §17500 claims were proper since plaintiff's

5    Lanham Act claim was properly dismissed.)

6          Here, Plaintiff brings a claim for unfair business practices under *Cal.Bus. &*

7    *Prof. Code* §§17200 and 17500, alleging nothing but Defendant's resale of genuine,

8    unaltered Orogold products, the same purported wrongdoing upon which Plaintiff

9    bases its Lanham Act claims.  Since Plaintiff has failed to properly plead the related

10   Lanham Act claims, Plaintiff's California unfair business practices claim is equally

11   flawed.

12         To the extent that Plaintiff's state law claim relies on the copyright infringement

13   allegations, such claim is deemed preempted by the Copyright Act. *Ryan v. Editions*

14   *Ltd. West, Inc.*, 417 Fed. Appx. 699, 701 (9th Cir. 2011) ("The Copyright Act therefore

15   preempts [plaintiff's] unfair competition claim."); *Jules Jordan Video, Inc. v. 144942*

16   *Canada Inc.*, 617 F.3d 1146, 1154-1155 (9th Cir. 2010) (If a plaintiff asserts a state

17   claim that is the equivalent of a claim for infringement of a copyrightable work, that

18   state claim is preempted).

19                                    **CONCLUSION**

20         For the forgoing reasons, Defendant respectfully requests that the Court grant

21   this Motion to Dismiss in its entirety without leave to amend.

22

23   DATED: December 6, 2011              Respectfully submitted,

24                                        **VEATCH CARLSON, LLP**

25                               By:    /s/ Xiaoyi Yao
                                        **KEITH G. WILEMAN**
26                                      **XIAOYI YAO**
                                        Attorneys for Defendant
27                                      WILLIAM FIKHMAN

28

                                    - 12 -

**Exhibit 1 to Declaration of Mark Schlachet – page 12**

**CERTIFICATE OF SERVICE**

I hereby certify the following: I am over the age of 18 years and am not a party to the above-captioned action.  I am a registered user of the CM/ECF system for the United States District Court for the Southern District of California.

On December 6, 2011, I electronically filed the foregoing **DEFENDANT WILLIAM FIKHMAN'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** with the Clerk of the Court using the CM/ECF system.  To the best of my knowledge, all counsel to be served in this action is registered CM/ECF users and will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

/s/ Xiaoyi Yao
XIAOYI YAO, 261290

- 13 -
FIKHMAN'S RULE 12(b)(6) MOTION TO DISMISS TAC

**Exhibit 1 to Declaration of Mark Schlachet – page 13**

# EXHIBIT 2

**Copy of Amazon Expert Chris McCabe's Declaration In *Johnson v. Incopro, Inc. et al,* 1:18-cv-00689 (E.D. VA) (With Accompanying Exhibits)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

CYNTHIA JOHNSON
dba The Little Surf Shack

                Plaintiff,    Case No. 1:18-cv-00689-LMB-TCB

v.

JOHN DOE(S)

              Defendants.

### DECLARATION OF CHRIS MCCABE

Under penalty of perjury, I hereby state and declare the following:

1.  I was an employee of Amazon.com, Inc. from November 2006 until June 2012 where I evaluated seller account performance and enforced Amazon's policies. After leaving Amazon, I became a consultant and launched ecommerceChris where I teach sellers how to think like Amazon, protect their accounts, and appeal listing restrictions and suspensions.

2.  At Amazon, I initially held the position of Claims Investigator on Buyer Protection teams and then transitioned to Investigation Specialist, Level Two, Merchant Risk Investigation. I was later promoted up a level where I trained investigators and audited the quality of their investigations.  In these roles, I worked extensively within Amazon's procedures to investigate buyer refund claims and achieve fair and accurate resolutions, verify merchant compliance with prevailing laws and policies, establish advanced fraud protection, implement risk assessments on high-volume merchants

**Exhibit 2 to Declaration of Mark Schlachet – page 1**

showing deficiencies, and, when necessary, implement account restrictions or limited disbursement access to enforce compliance.

3.      I have owned and operated my business as an Ecommerce Consultant since August 2014 using my intimate knowledge of internal Amazon teams to help sellers think like Amazon investigators do, to protect their accounts, and continue to sell on Amazon. My company helps sellers address Amazon Marketplace abuse, manipulation, fraud, account closures, funds holds, IP violations, buyer-seller disputes, feedback, authenticity and compliance with Amazon's quality standards. We offer services that include account protection, full account audits, performance metric assessment and recommendations for improvements, seller support case creation and follow ups, quality warning handling, listing hijacking avoidance, and counterfeit product reporting.

4.      I am knowledgeable about the processes used to create product detail pages ("listings") and the policies that Amazon has in place to ensure an orderly collection and presentation of product offerings.

5.      Amazon has published a detailed set of rules for its product detail pages. See, McCabe Exhibit 1. For example, product detail pages can be created that link the product to its universal product code (UPC) typically the bar code and numbers printed on the product package.

6.      Once a product detail page exists for an item, other sellers who have that same item to sell are prohibited from creating a different product

2

**Exhibit 2 to Declaration of Mark Schlachet – page 2**

X-18

detail page for the same product. This rule is embodied in Amazon's ASIN Creation Policy (McCabe Exhibit 2).

7.      I am knowledgeable about the procedures in place at Amazon for handling counterfeit and IP violation complaints received from owners of patents, trademarks, and copyrights.

8.      Amazon handles a great number of IP infringement notices on any given day. To handle and review these notices for completeness, Amazon directs that work to its Notice teams in the Merchant Risk Investigation team who can be located anywhere in the world at an Amazon office attached to its worldwide network. It would not be unusual that a team in India would receive and process and IP infringement notice received from a rights owner in the US.

9.      The Notice team folks who receive and review infringement notices tend to handle each very quickly. They typically handle several investigations per hour and are rated partially based on the speed with which they can process notices.

10.      Amazon's Notice teams long ago got away from simple warnings and listing removals when they receive claims of infringement. Given the extreme number of Notice claims they receive every hour, both legitimate and false claims often lead to fast processing with aggressive enforcement actions. These enforcement actions often occur without input from the accused seller. We've come to expect this as a fact of life for resellers.

3

**Exhibit 2 to Declaration of Mark Schlachet – page 3**

11.    Sellers who have been wrongly accused have Amazon's Notice-Dispute process to redeem their accounts. This Notice-Dispute system is very different than a lawsuit before a court. It does not have a formal, published set of operating procedures. The reseller cannot confront her accuser before an Amazon magistrate and cross examine them on their accusations and evidence. Despite its internal procedures, the accuser does not even necessarily need to provide evidence of a test buy for a seller to be blocked from a listing. Often, the allegation itself sufficient. Amazon is not governed by the Federal Rules of Evidence.

12.    Now more than ever, brands and their designated compliance agents seem ready to do whatever they can to limit who can sell their items on Amazon.

13.    Whenever there's a dispute between a brand owner and resellers, Amazon won't mediate or interfere unless the claim can be disputed and proven to be false. Every other claim whether it relates to patent, trademark, or copyright must be resolved by the reseller to Amazon's satisfaction. That means the seller must obtain a retraction from the rights owner (or their agent) and have the rights owner contact Amazon directly to withdraw the claim against the seller.

14.    Amazon's policy of abstaining from mediating legal conflict as it pertains to IP disputes has led to a growing rate of abuses that harm sellers and reduce faith in the integrity of the Marketplace. We've seen a lot of sellers

4

**Exhibit 2 to Declaration of Mark Schlachet – page 4**

accused of selling counterfeits who have sourced the items from authorized distributors.

15.    I wrote an updated article on this issue for WebRetailer.com on April 11, 2018 entitled "False Claims of Infringement are Rife on Amazon, 2nd edition" (McCabe Exhibit 3). In that article, I note that IP abuses are on the rise because Amazon does not independently verify that the information on the form is correct. The Amazon investigators merely check the form to make sure that the right content is in the right places then they take down the named product listings and send off the seller notifications. The rest is up to the seller, even if the submitted information is incorrect or false, unless a court compels Amazon to act.

16.    The net effect of Amazon's policy of non-mediation undermines a seller's sense of legal protection or faith that they will be treated fairly.

17.    Another effect of Amazon's lack of intervention is that false claims of IP infringement and counterfeit products can be filed by anyone alleging infringement of their rights ownership. The product listing is taken down from the Marketplace and the seller's account tarnished with the allegations with the immediate need to disprove the false allegations.

18.    My article (McCabe Exhibit 3) notes the increasing use of false IP complaints by competitors to harm their competition for sales of a product. The article on the Brushes4Less case (McCabe Exhibit 4) reports that someone created a fake law firm and successfully persuaded Amazon to take down a listing just before its Prime Day event costing the company $200,000

5

**Exhibit 2 to Declaration of Mark Schlachet – page 5**

in lost sales. The Verge article in McCabe Exhibit 5 details another way bad actors can abuse Amazon's well-meaning rules and fraud detection systems against competitors with no consequences, unless there's a seller account that can be suspended because it filed false Notice claims.

19.    On its website, Amazon publishes a document titled "Intellectual Property for Rights Owners." A true and accurate copy is attached hereto as McCabe Exhibit 6. This document contains instructions for the required content of an IP infringement notice and how Amazon will respond to such notices.

20.    One very important set of information in Exhibit 6 is found under the heading "Best Practices" (Exh. 6, pp. 2-3) where Amazon directs that only one type of IP infringement should be submitted per notice (Exh. 6, p. 2 bottom). If more than one type of issue is presented, Amazon may act on only the first listed issue. Separate notices must be filed for the other issues (Exh. 6, p. 3 top).

21.    Amazon often cannot interpret the intent or desires of the notice submitter in a notice that contains more than one type of infringement issue.

Dated: January 10, 2019

*Chris McCabe*
Chris McCabe (Jan 10, 2019)
_____
Chris McCabe

6

**Exhibit 2 to Declaration of Mark Schlachet – page 6**

amazon seller central

| English | Sign in | **Sell on Amazon** |

This article applies to selling in: **United States**

Help / Policies and agreements / Selling Policies and Seller Code of Conduct / Product detail page rules

# Product detail page rules

Customers will first learn about your offers on a product detail page. The policies below ensure each product detail page covers a single unique item. This helps give customers a clear and consistent buying experience.

## Policies for writing listings

- Comply with the relevant style guide for the product you're listing. You can find general rules that apply to all products in the Amazon Services Quick Start Style Guide. Some types of product have extra style guidelines. You can find the full set in the Templates for Specific Categories.
- Don't use HTML, JavaScript, or other types of code in your product detail pages. As a special case, you can use line breaks </br> in the description.
- None of the following are allowed in product detail page titles, descriptions, bullet points, or images:
  - Pornographic, obscene, or offensive content.
  - Phone numbers, addresses, e-mail addresses, or website URLs.
  - Details of availability, price, or condition.
  - Links to other websites for placing orders, or alternative shipping offers, such as free shipping.
  - Spoilers on Books, Music, and Video or DVD (BMVD) listings. This includes giving away plot details crucial to the suspense or surprise ending of a story.
  - Reviews, quotes, or testimonials.
  - Requests for positive customer reviews.
  - Adverts, promotional material, or watermarks on images, photos, or videos.

**Exhibit 2 to Declaration of Mark Schlachet – page 7**

X-23

- Time-sensitive information, such as dates of tours, seminars, or lectures.
- Product titles must not have more than 200 characters, including spaces. This upper limit applies to all categories. Some categories might have a limit of even fewer characters. See the Templates for Specific Categories for details.
- Comply with Amazon listing standards for any product sold on Amazon. Failure to do so creates a negative customer experience and may result in your selling privileges being temporarily or permanently removed. This includes but is not limited to the following:
  - All products must be accurately categorized. To learn more about classifying your products correctly, see our help pages on Product Classifier and Browse Tree Guide.
  - Product titles, product descriptions, and bullets must be clearly written and help customers understand the product.
  - Product images must meet Amazon image standards, as well as any category-specific image guidelines. To learn more, see the Product image requirements.

## Policies for adding detail pages

- You must not use Add a Product, inventory files, and Amazon Marketplace Web Services (Amazon MWS) listing APIs for any purpose other than listing products on Amazon.
- You must not use false product identification information in product detail pages. This includes UPC codes and publication dates.
- You must not create a product detail page for a product already in Amazon's catalog.
- You must not use product detail pages to cross-merchandise or cross-promote a product.
- For Books, Music, Videos, and DVDs (BMVD), you must not use a single product detail page to advertise more than one product. BMVD-only product bundles must be defined by the publisher or manufacturer and have a single ISBN, UPC, or EAN that is different from the product identifier of any single item in the bundle.
- Detail pages must not contain Restricted Products.
- All products listed on Amazon must meet North America product safety standards. Learn more about Choking Hazard Warning Requirements (CPSIA).
- You must not use an existing listing for a new version of a product. This includes changes in color, size, material, features, and product name. Instead, create a new product detail page for each new version. For

**Exhibit 2 to Declaration of Mark Schlachet – page 8**

X-24

example, a manufacturer updates its streaming media player by adding a
new remote control with four buttons instead of two. This is materially
different from the older version. It must be listed as a new ASIN.

Was this article helpful?    ○ Yes    ○ No



**Related articles**

Category, product, and listing
restrictions

**Product detail page rules**

Prohibited seller activities and
actions

Prohibited Content

Condition guidelines

Drop Shipping Policy

ASIN creation policy

Supply Chain Standards

Standards for Brands Selling in
the Amazon Store

Imaging and Video Services
Terms and Conditions

Japanese Consumption Tax

**Need more help?**

See more on Seller Central

**Exhibit 2 to Declaration of Mark Schlachet – page 9**

Visit Seller Forums



**Reach Hundreds of Millions of Customers**

Start Selling On Amazon

© 1999-2019, Amazon.com, Inc. or its affiliates

**Exhibit 2 to Declaration of Mark Schlachet – page 10**

X-26

**amazon** seller central

| English |    | Sign in |    Sell on Amazon

This article applies to selling in: **United States**

Help / Policies and agreements / Selling Policies and Seller Code of Conduct / **ASIN creation policy**

# ASIN creation policy

To sell a product available in the Amazon catalog, you need to match it to the existing ASIN by creating an offer. If your product is not in the Amazon catalog, you will have to create a single new ASIN for the product.

## ASIN creation limit

To protect the onsite shopping experience for our customers, we limit the number of listings (offers and ASINs) you can create in a given week until you establish a sales history with Amazon. As you increase your sales, your capacity will increase. We encourage you to prioritize the products you are listing to increase your sales quickly.

Additionally, if you are an established seller and have created a high number of new listings, we reserve the right to temporarily remove your ability to create new listings. We will reevaluate your status on a weekly basis.

If you think your listing creation privileges have been removed in error, please contact Seller Support.

## Duplicate ASIN creation policy

Creating a new ASIN when the same product already exists in Amazon's catalog is prohibited and can result in your ASIN creation or selling privileges being temporarily suspended or permanently removed.

Matching your products to existing products in Amazon's catalog helps drive a high-quality customer experience. Matching to an existing product instead of creating a duplicate listing allows you to more fully benefit from buyer interest and traffic for that product.

**Exhibit 2 to Declaration of Mark Schlachet – page 11**

# How are duplicates created?

Duplicates are most commonly created when one or more of the following happens:

- You incorrectly use the UPC, EAN, ISBN, ASIN, or JAN not belonging to the product (such as from another product) to identify the product you are selling.
- You introduce distinct UPCs, EANs, ISBNs, or JANs for identical products. For example:
  ○ You assign a product a new UPC or EAN in each Amazon marketplace where you sell the product.
  ○ You assign a new UPC or EAN for compatible products such as a laptop charger that is compatible with multiple laptops.
- You are a Brand Registry seller using an alternative key attribute to list your products. If you use multiple key attribute values to list the same product, a new ASIN will be created for each key attribute value.
- You have received a product identifier exemption for a product that actually has a product identifier. Listing it without an identifier will create a duplicate.

# Tips to avoid creating duplicate ASINs

Ensure that you always use the appropriate UPC, EAN, ISBN, ASIN, or JAN code when listing a product. The codes are reliable data that can be used to match your products to existing products in the catalog. Using incorrect UPC, EAN, ISBN, ASIN, or JAN codes to list a product is prohibited and can result in your ASIN creation privileges being suspended or permanently removed. Listed below are alternatives to help you list your product if it does not have one of these standard product identifiers:

### Register your brand with Amazon

If you are the brand owner or manufacturer of your own products and if you can uniquely identify each product with other attributes such as model number or style number, you might be eligible to register your brand with the Amazon Brand Registry, which allows you to use an alternative product identifier. Visit Amazon Brand Registry: Eligibility and Application Process for more information.

### Request a brand or SKU-level UPC exemption

**Exhibit 2 to Declaration of Mark Schlachet – page 12**

If the product you are listing has been confirmed to have no known UPC, EAN, ISBN, ASIN, or JAN code and if you are listing a unique selection, you may request a brand or SKU-level UPC exemption. Visit How to List Products That Do Not Have a GTIN for eligibility information.

### Provide fitment data to Amazon

For fitment-related products such as Automotive and Power Sports, visit The Automotive and Powersports Part Finder to learn more about how to provide fitment data to Amazon. You may apply for brand or SKU-level UPC exemptions to list these types of products.

### Register for Amazon Custom

If you are listing print-on-demand or customizable products, you might be eligible to join the Amazon Custom program, which allows you to offer customized products. Using Amazon Custom to list your products can improve your discoverability among buyers, improve your search relevance and listing efficiency, and also help you manage your inventory better. Additionally, one product with multiple designs requires only a single UPC exemption. Visit Amazon Custom for more information.

## Variation policy

The following prohibited practices are misuses of variations (also known as parent-child relationships). They create a negative customer experience and can result in your ASIN creation or selling privileges being temporarily or permanently removed:

- Adding incorrect child variations that are not true variations of the parent product. This includes but is not limited to:
  - Adding incorrect variation to ASINs you created.
  - Adding products that are fundamentally different from the parent ASIN.
  - Adding products that are newer versions or models of the parent ASIN.
- Changing the parent product's detail page so it does not match the children.
- Adding multi-pack variations that aren't manufacturer-created to an already existing parent.
  - If you've created a multi-pack listing that is not directly sold by the manufacturer, you must match your listing to an identical multi-pack

**Exhibit 2 to Declaration of Mark Schlachet – page 13**

X-29

product detail page. If an identical multi-pack detail page doesn't exist, you must create a new product detail page with its own unique UPC.

- Adding multi-pack children by bundling two or more of the same manufacturer products, that is, bundling two three-packs to create a package quantity of six. Multi-pack children must be packaged by the manufacturer. If a customer wants to buy two or more of the same product, they can select that quantity for purchase.

> **Note:** For more detailed information on variation best practices, please visit the Variation help page.



| Was this article helpful? | ○ Yes  ○ No |
| --- | --- |

**Related articles**

Category, product, and listing restrictions

Product detail page rules

Prohibited seller activities and actions

Prohibited Content

Condition guidelines

Drop Shipping Policy

ASIN creation policy

Supply Chain Standards

Standards for Brands Selling in the Amazon Store

**Exhibit 2 to Declaration of Mark Schlachet – page 14**

X-30

Imaging and Video Services
Terms and Conditions

Japanese Consumption Tax

Need more help? 💬

See more on Seller Central

Visit Seller Forums



## Reach Hundreds of Millions of Customers

Start Selling On Amazon

© 1999-2019, Amazon.com, Inc. or its affiliates

**Exhibit 2 to Declaration of Mark Schlachet – page 15**

Case 1:18-cv-00689-LMB-TCB    Document 34-3    Filed 01/10/19    Page 1 of 5 PageID# 402

6/8/2018                                           False Infringement Claims are Rife on Amazon



McCabe Exhibit 1,  Page 1

**Exhibit 2 to Declaration of Mark Schlachet – page 16**

X-32

6/8/2018                                   False Infringement Claims are Rife on Amazon

View Amazon Selling Tools Now

### amazon   A Quick History of Notice Claim Queues

We know that Amazon never gives out anything beyond an email address and does not vet the party submitting the form, but why is this? Because policy is that investigators don't look beyond the form itself, unless it is to prevent Amazon getting involved in dispute mediation.

Amazon assumes no liability for identifying true versus false rights owners. They merely assess the documents in front of them as complete, look for the named seller storefronts and selected ASINs, and warn or suspend the targeted seller. They refuse to get involved beyond that line unless compelled legally. You're directed to take your legal disputes elsewhere.

> 66 *Amazon assumes no liability for identifying true versus false rights owners*

Remember that Amazon teams have trouble keeping up with the number of forms coming in each day. Notice forms roll in constantly, often with no definitive proof of true rights ownership. Listings are cancelled, sellers are warned, top-selling ASINs drop out of active listings and increasingly, sellers find themselves suspended first, with questions asked later.

Amazon has to avoid any chance that they could be missing reports of fake products or counterfeit items, and needs to take every step possible to err on the side of aggression. But the net effect on the marketplace itself is to undermine a seller's sense of any protection or any real control of this entire process

### What is a Rights Owner Infringement, Anyway?

There are different kinds of infringement complaints submitted to Amazon for review and action. It's important to differentiate between counterfeit and rights owner infringement because Amazon treats them differently.

For a counterfeit complaint, Amazon asks the alleged counterfeiter for supply chain documentation. If you're accused of selling inauthentic products, and especially if there's a test buy involved from the buyer or accusing seller, you'll need to provide as much documentation leading back to the brand or manufacturer as possible. If this means adding a letter from your distributor asserting, on their company letterhead, where they sourced the items, then so be it.

> 66 *Broad account reviews don't just shut down groups of listings but entire accounts*

For rights owner complaints submitted via this form, Amazon removes the listing pending contact from the complainant. They need to hear directly from the rights owner in order to reinstate your listing. A rights owner complaint could be due to a patent, copyright, or trademark infringement. A patent infringement on Amazon means selling, or offering to sell, a patented invention without the permission of the patent owner.

A copyright infringement is using other people's images or text without authorization to use it on Amazon. Product listings, physical products, and packaging cannot include copyrighted content or images. Submission of a form indicating a copyright violation results in a listing removal and warning, at the very minimum. Enough of these could result in a suspension.

Trademark infringement concerns symbols or words that are registered to a specific company or product. These may not be used or reproduced (i.e. counterfeit) without authorization. Some recent trademark claims, even for first time offenders, have resulted in suspensions if the brand is sufficiently hot-button, like Apple. So, whether you get a warning or an outright account suspension can depend on the brand that submits the complaint.

There's evidence that all brands are paying a lot more attention to sales of their products on Amazon. Some want sellers off their listings and others are using the process to try to control their distribution, expecting action to be taken against seller accounts.

Unfortunately, broad account reviews by investigation teams don't just shut down groups of listings but entire accounts all the time. If you're repeatedly receiving Notices of Claimed Infringement then it's easier to force you to change your ways across the board and not just prevent you from selling certain brands.

### Amazon Changes their Tune on Disputing Notices

https://www.webretailer.com/lean-commerce/false-infringement-claims-amazon/                                      2/5

McCabe Exhibit 1,  Page 2

**Exhibit 2 to Declaration of Mark Schlachet – page 17**

6/8/2018                                           False Infringement Claims are Rife on Amazon

Long ago, in a galaxy a bit too close to all of us, some devious and over-competitive sellers looking for weak systems to exploit came up with an idea: why don't we accuse our competitors of violating our rights ownership? We'll just give Amazon a token email address and let them hammer our competition.

So, why is Amazon creating new teams around infringement abuse and listening more to sellers who dispute Notices of Claimed Infringement? Well, they need to make sure they prevent any potential litigation from brand owners, but they also can't maintain a marketplace where sellers are attacking each other based on the understanding that Amazon lets it happen.

> **"We'll just give Amazon a token email address and let them hammer our competition."**

Amazon does not require rights owners to have a seller account. So why not simply provide a freshly created email address as the contact point, and name the seller and the ASINs you want to bring down? Will Amazon find the time, or have the interest, to figure out whose really made the claim? Or, will they simply take the listings down, and warn the seller?

The answer came back definitively on one side. You could take shots at another seller from an email address not associated with a seller account, and watch your competition fail. If there are enough rights owner violations coming in naturally, investigators will suspend the account you've targeted. And, if anyone emails asking to resolve the claim, you could ignore it.

## 1. Finally, the motivation to change…

Amazon previously had little motivation to invest resources or invite legal liability by verifying the legitimacy of rights owner infringement claims. If Amazon Legal advised policy teams that they were not responsible for confirming proper rights ownership information, they ultimately wouldn't bear the burden. This view had been in place for several years, and no external pressures rose up to challenge their methods.

The newness of the Notice-Dispute teams shows some wear and tear on these aging strategies. Although, they were also needed to restore order, as the constant processing of fake infringement claims right alongside valid ones, without much observation of the differences, had cause things to spin out of control.

## 2. Low headcount, flooded email queues, no ability to scale

As with other parts of their policy-enforcement, Amazon is not interested in having dozens of investigators run down and check out who is truly the legal rights owner of a certain product's sale or distribution, and who is not. That would require additional training of their Notice squad, and new hires with legal or paralegal type backgrounds.

As it is, policy teams struggle to meet service level agreements on their main email queues and usually face criticism for auto-response level quality. Adding this kind of work would water down the quality of their investigations even further. They can't handle the liability nor the administrative costs, nor must they. You need to watch your own flank on this.

## 3. Is anyone really following this outside of Amazon sellers and lawyers?

Amazon has not received much bad press nor public commentary on this question, outside of the usual seller forums and Facebook groups. Those readers are usually sellers who are preaching to the choir. To Amazon seller consultants like me, it's an obvious area for public complaint. For sellers, it's a known problem that they pray will never affect them personally.

Word is out among those most interested in abusing these processes, and pushing through forms that don't reflect accurate or even good-faith rights ownership. Bad actors know that Amazon refuses to vet those forms beyond the above criteria, and also that Amazon won't reject claims because they only have a free email address to send to the unsuspecting target. Once sellers know that the party in the middle with all of the authority will not intervene, it's open season for everyone.

## 4. What plays out in the courts?

Not a lot that affects Amazon, thus far. If sellers sue each other claiming rights ownership violations, the only impact on Amazon is lost sales for a particular item. It's just one tiny drop in an ocean of feverish sales and commissions.

If Amazon itself is sued, they can come back with a well-funded legal team. Are many sellers planning to do that? If they do marshal the financial resources, how long will it take? Will they win? But if Amazon loses a high-profile lawsuit because they failed to protect a rights owner, or they took action based on an inaccurate rights ownership claim, you'll hear about it. Until then…

McCabe Exhibit 1,  Page 3

**Exhibit 2 to Declaration of Mark Schlachet – page 18**

6/8/2018                                                    False Infringement Claims are Rife on Amazon

Not from what I can see, until they are properly motivated or receive some incentive to do so. They've ignored improvement needs on both Seller Performance and Product Quality team matters for the last couple of years, and only recently have they shown any interest in commenting publicly on those shortcomings. They don't currently fear public discussion of this subject.

I've detected no new evaluation of the notice queues, the teams that handle them, or any interest in making the marketplace a platform where sellers can sell without fear of account closure from false infringement forms. Sellers are on their own and left to their own devices, legal or otherwise. Unless an external party forces Amazon to confront this nightmare, they don't need to allocate resources, financial or otherwise, to rectify this gaping hole.

## OK, So What Do I Do? My 5 Point Plan

What can you, as an Amazon seller and not a mini-god, do to reduce the chance that Amazon will take your entire account down after illegitimate claims of infringement? In an atmosphere where Amazon deflects any attempt to involve them in a rights-owner dispute, you may need to consider multiple avenues towards resolution.

### 1. Try to contact the rights owner

Try to contact the rights owner at the address provided, just in case they do in fact reply with any additional or helpful information. If you can resolve it with the alleged rights owner and they are willing to contact Amazon to retract the form, that is the best of all outcomes. If you can fix the problem in the short and sweet way, do it.

### 2. Hire a lawyer who knows what's going on, legally and in Amazonland

In the absence of any reply from the supposed rights owner, have an attorney who is competent resolving right's owner disputes and in dealing with Amazon teams that will make a difference.

Ask them to draft a letter on law firm letterhead to send to that party (or their attorney), and gauge the response. If there's no reply and there's no evidence that the rights owner has anything to show for their ownership, move on to contacting Amazon and challenging their action via Notice-Dispute teams.

### 3. Find and contact the real rights owner

If you're attacked by a non-legitimate "rights owner" it is worth asking your supplier if they can give you the real rights owner's information. You can then ask the legitimate rights owner to supply you with a letter of authorization or even get them to contact Amazon on your behalf. If the supplier will not give you this information, a quick search on the USPTO database may help you identify the rights owner.

If you aren't sure that the alleged rights holder can substantiate your claims, you might need to retain an attorney to make sure that you aren't a victim of a bully or troll. Get the real rights owner to contact Amazon directly for you, to clarify this misuse and abuse of the Notice system.

### 4. Send Amazon Notice Teams a legal letter

You didn't hear from the would-be rights owner, so you've now emailed Notice teams and Amazon legal. Are they responsive? Do they ignore you or your attorney?

Each attorney will have a different take on this, but make sure you're using someone who knows what they're doing, and understands the work itself. There are a lot of quick buck artists out there currently plaguing the Amazon seller marketplace, plugging their expertise on both sides of the rights owner infringement equation. Investigate each attorney thoroughly.

### 5. Initiate a legal escalation to rectify misses by the Notice-Dispute teams

Are you suspended by Amazon based on wrongly filed rights owner forms? Many of you are as I write this. Have you considered taking legal action to compel Amazon to dismiss the party reporting you for a false infringement?

You may have decided that you'll simply appeal, promising never again to violate another party's rights, but that represents only a short term solution. This could easily happen to you again and each time you're suspended, it will get tougher and tougher to get your account back.

*For more on responding to Notices of Claimed Infringement, see How to Fight Amazon Rights Infringement Claims, which covers*

McCabe Exhibit 1,  Page 4

**Exhibit 2 to Declaration of Mark Schlachet – page 19**

Case 1:18-cv-00689-LMB-TCB   Document 34-3   Filed 01/10/19   Page 5 of 5 PageID# 406

6/8/2018                                           False Infringement Claims are Rife on Amazon

## Where does that leave us?

Amazon has countered seller complaints about the Notice process by alternating between providing directions for reporting false infringement claims or forcing you to resolve notice disputes with the reporting party.

Make sure you're looking out for yourself, taking the right steps, and not waiting for Amazon to take care of anything for you. Ultimately it's not up to them. It will be up to you.

Chris McCabe can be contacted via ecommerceChris.com. ecommerceChris shows Amazon sellers how to keep their accounts healthy, or, if the worst should happen, how to get their account back from a suspension.

---

amazon | **The best tools for your Amazon business**
Automate pricing, request feedback and reviews, improve your marketing & SEO and a lot more. Amazon consultants help with difficult issues like suspension, or help grow your business. All in the Web Retailer directory.

View Amazon Selling Tools Now

---

Related Posts:









**How to Fight Amazon Rights Infringement Claims**

**Amazon Making Sellers Squeal on Product Review Abusers**

**Dirty Tricks Pulled by Amazon Sellers... on Other Amazon Sellers**

**How To Use Amazon Suspension Appeal Escalations The Right Way**

McCabe Exhibit 1,  Page 5

**Exhibit 2 to Declaration of Mark Schlachet – page 20**

X-36

Technology   5 mins read

### Fake Law Firm Duped Amazon Into Suspending a Product

An allegedly fake law firm duped Amazon into suspending Brushes4Less, a seller of replacement toothbrush heads, just before Prime Day.

 Rechelle Ann Fuertes
Sep 11



*Simon | Pixabay.com*

*A fake law firm tricked Amazon into suspending a merchant product shortly before the company's Prime Day sale held in July.*



**Exhibit 2 to Declaration of Mark Schlachet – page 21**

According to gathered reports, the owner of the **Brushes4Less** store on Amazon's online marketplace received a suspension notice for his popular and best-selling product–an electric toothbrush head replacement–citing a complaint filed through an alleged **fake law firm**.

The notice arrived a few days before the much awaited **Amazon Prime Day** in July and as per the Brushes4Less owner, cost him around $200,000 USD in sales losses.

> #Amazon merchant lost $200,000 USD after Amazon issued suspension notice due to a complaint from a fake law firm!
>
> CLICK TO TWEET

The suspension notice stated that Brushes4Less must get in touch with a law firm that goes by the name **Wesley & McCain** in Pittsburg. The poor store owner was given the contact information of the firm but immediately knew something was wrong because the firm is non-existent.

It appears that the notice was part of an elaborate scheme to dupe Amazon into removing legitimate items from its online marketplace through complaints filed with a fake law firm.



DiamondWhite Sonicare Replacement Toothbrush Heads - Get 1 Free! - Order Today and Get an Extra Brush for FREE! Replacement for Philips HX6053 HX6064 ProResults, EasyClean,...   DiamondWhite
★★★★☆   162 customer reviews  |  18 answered questions

*A Brushes4Less product on Amazon

The Brushes4Less tootbrush head replacement that was removed on Amazon because of a fake law firm complaint. Brushes4Less | Amazon.com

**Exhibit 2 to Declaration of Mark Schlachet – page 22**

X-38

**Uncovering the Fake Law Firm**

In a report from **CNBC**, the owner of Brushes4Less, who refused to identify himself due to privacy reasons, that an email arrived in his inbox saying that his product was being delisted from the site because of an intellectual property violation.

He immediately contacted the law firm Wesley & McCain in Pittsburgh to settle the problem and get his product reinstated from the popular online marketplace. However, he began suspecting something was wrong when the contact number was unreachable.

The merchant then checked the website under **wesleymccain.com** URL and found it to contain profiles of five law practitioners. Using Google image, it was later discovered that the five lawyers were working under Brydon, Swearengen & England law firm based in Jefferson City, Missouri.

On the other hand, the physical address of the fake law firm Wesley & McCain was said to belong to another Pittsburg firm called Robb Leonard Mulvihill. The person who allegedly filed the complaint was also not registered to practice law in Pennsylvania.

If that information was not enough to confirm that Wesley & McCain was a fake law firm, a section of its site was said to be stolen from the website of the Colby Law Office.

*"Just five minutes of detective work would have found this website is a fraud, but Amazon doesn't seem to want to do any of that,"* the owner said. *"This is like the Wild Wild West of intellectual property complaints."*

To date, Amazon has over a million registered stores in its massive global marketplace, that use the platform for reaching out to customers from different parts of the world. Apparently, as the company's dominance across online commerce expands, the seller complaints have also increased.

It should be remembered that ahead of last year's **Black Friday** and **Cyber Monday** rush, numerous Samsung device sellers were also suspended due to inaccurate claims of infringement. Merchants selling other hot brands such as Nike and Michael Kors also confirmed that they'd received violation claims and suspension notices even if they're buying products from legitimate distributors.

**Paul Dworianyn**, the founder of **Dynamic Tech Solutions**, was quoted as saying:



**Exhibit 2 to Declaration of Mark Schlachet – page 23**

*"Virtually any person can push the right buttons to get Amazon's attention for particular issues."*

Dworianyn who helps brands on Amazon also said that just recently, a seller of Keurig coffee pods got reinstated after being suspended due to a fake complaint filed by a competitor.

In an interview with CNBC, the owner of Brushes4Less said that he generates about $2 million in annual sales on Amazon. His product line includes *"brushes for cleaning auto parts as well as wine tote bags, a camera lens and a set of microfiber towels."*

Tuesday last week, Brushes4Less' issue with Amazon was finally resolved after two months of waiting. The owner further suspects that a competitor filed the complaint.

*"Due to the complainant's failure to respond to our attorney's attempts at contact (or even confirm receipt), we believe these complaints are baseless and were filed in bad faith,"* the Brushes4Less owner wrote in a memo to Amazon.

In an email sent to CNBC, Amazon made the following statement:

*"Fraud is prohibited on Amazon.com. If we discover that bad actors have abused our systems, we work quickly to take action on behalf of our customers, which includes sellers. If a seller believes we've made a decision that requires further review, we encourage them to contact us directly so we can investigate and take the appropriate action."*

Brydon Swearengen also released a statement citing that it has nothing to do with the fake law firm.

*"Brydon, Swearengen & England P.C. has no association with the 'Wesley McCain' web site which has misappropriated attorney photographs from our web site,"* the law firm wrote in an email. *"We have brought this matter to the attention of the Missouri Bar and the Pennsylvania Bar Association."*

**Chris McCabe,** a former Amazon employee who now helps sellers get reinstated and stay compliant, said that seller problems are putting Amazon's reputation at great risk. He said:



**Exhibit 2 to Declaration of Mark Schlachet – page 24**

1/4/2019    Case 1:18-cv-00689-LMB-TCB    Document 34-4    Filed 03/12/19    Page 5 of 5 PageID# 411

*"If Amazon continues to process brand or buyer complaints as they are now, suspended accounts will continue to spike. It undermines faith in the marketplace."*

*Do you think Amazon has shortcomings when it comes to protecting the interest of its merchants from fraudulent complaints? Let us know in the comment section below!*

---

### Found this article interesting?

Let Rechelle Ann Fuertes know how much you appreciate this article by clicking the heart icon and by sharing this article on social media.

---



**Rechelle Ann Fuertes**

Rechelle is an SEO content producer, technical writer, researcher, social media manager, and visual artist. She enjoys traveling and spending time anywhere near the sea with family and friends.



**Comments (0)**                                                    Most Recent ⌄

You     Share your thoughts...

---

**Exhibit 2 to Declaration of Mark Schlachet – page 25**



**EXCLUSIVE**

# PRIME AND PUNISHMENT

*Dirty dealing in the $175 billion Amazon Marketplace*

By Josh Dzieza | Dec 19, 2018, 8:31am EST

*Illustrations by BloodBros.*

Last August, Zac Plansky woke to find that the rifle scopes he was selling on Amazon had received 16 five-star reviews overnight. Usually, that would be a good thing, but the reviews were strange. The scope would normally get a single review a day, and many of these referred to a different scope, as if they'd been cut and pasted from elsewhere. "I didn't know what was going on, whether it was a glitch or whether somebody was trying to mess with us," Plansky says.

As a precaution, he reported the reviews to Amazon. Most of them vanished days later — problem solved — and Plansky reimmersed himself in the work of running a six-employee, multimillion-dollar weapons accessory business on Amazon. Then, two weeks later, the trap sprang. "You have manipulated product reviews on our site," an email from

**Exhibit 2 to Declaration of Mark Schlachet – page 26**

Amazon read. "This is against our policies. As a result, you may no longer sell on Amazon.com, and your listings have been removed from our site."

**Exhibit 2 to Declaration of Mark Schlachet – page 27**

X-43

1/4/2019 Case 1:18-cv-00689-LMB-TCB Amazon's marketplace scams. Filed freed Material Page 9 of 30 PageID# 414

# KEY FINDINGS



- Amazon's Marketplace, the company's third-party platform, has almost twice the sales as Amazon retail — and it's growing far faster

- Getting suspended from the platform can have severe financial repercussions for sellers and land them in a bewildering appeals system

- The suspension process has given rise to an industry of consultants who specialize in writing Amazon

https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement                3/30

**Exhibit 2 to Declaration of Mark Schlachet – page 28**

X-44

appeals and getting sellers back
on the platform

- Sellers use Amazon's own rules
  against each other, devising
  intricate schemes to get their
  rivals suspended

- Schemes include buying fake
  five-star reviews for their
  competitors, filing false
  intellectual property reports,
  reclassifying their rivals' listings in
  unrelated categories, and
  tampering with trademark files at
  the patent office

- There is a black market for
  internal Amazon data on
  customers and sellers, seller
  accounts, and reinstatement

**Exhibit 2 to Declaration of Mark Schlachet – page 29**

A rival had framed Plansky for buying five-star reviews, a high crime in the world of Amazon. The funds in his account were immediately frozen, and his listings were shut down. Getting his store back would take him on a surreal weeks-long journey through Amazon's bureaucracy, one that began with the click of a button at the bottom of his suspension message that read "appeal decision."

When you buy something on Amazon, the odds are, you aren't buying it from Amazon at all. Plansky is one of 6 million sellers on Amazon Marketplace, the company's third-party platform. They are largely hidden from customers, but behind any item for sale, there could be dozens of sellers, all competing for your click. This year, Marketplace sales were almost double those of Amazon retail itself, according to Marketplace Pulse, making the seller platform alone the largest e-commerce business in the US.

For sellers, Amazon is a quasi-state. They rely on its infrastructure — its warehouses, shipping network, financial systems, and portal to millions of customers — and pay taxes in the form of fees. They also live in terror of its rules, which often change and are harshly enforced. A cryptic email like the one Plansky received can send a seller's business into bankruptcy, with few avenues for appeal.

Sellers are more worried about a case being opened on Amazon than in actual court, says Dave Bryant, an Amazon seller and blogger. Amazon's judgment is swifter and less predictable, and now that the company controls nearly half of the online retail market in the US, its rulings can instantly determine the success or failure of your business, he says. "Amazon is the judge, the jury, and the executioner."

Amazon is far from the only tech company that, having annexed a vast sphere of human activity, finds itself in the position of having to govern it. But Amazon is the only platform that has a $175 billion prize pool tempting people to game it, and the company must constantly implement new rules and penalties, which in turn, become tools for new abuses, which require yet more rules to police. The evolution of its moderation system has been hyper-charged. While Mark Zuckerberg mused recently that Facebook might need an analog to the Supreme Court to adjudicate disputes and hear appeals, Amazon already has something like a judicial system — one that is secretive, volatile, and often terrifying.

**Exhibit 2 to Declaration of Mark Schlachet – page 30**

X-46

Amazon's judgments are so severe that its own rules have become the ultimate weapon in the constant warfare of Marketplace. Sellers devise all manner of intricate schemes to frame their rivals, as Plansky experienced. They impersonate, copy, deceive, threaten, sabotage, and even bribe Amazon employees for information on their competitors.

And what's a seller to do when they end up in Amazon court? They can turn to someone like Cynthia Stine, who is part of a growing industry of consultants who help sellers navigate the ruthless world of Marketplace and the byzantine rules by which Amazon governs it. They are like lawyers, only their legal code is the Amazon Terms of Service, their court is a secretive and semiautomated corporate bureaucracy, and their jurisdiction is an algorithmically policed global bazaar rife with devious plots to hijack listings for novelty socks and plastic watches. People like Stine are fixers, guides to the cutthroat land of Amazon, who are willing to give their assistance to the desperate — for a price, of course.



Photographed by Laura Buckman for The Verge

**S**tine runs a 25-person company out of the den of her one-story house in a leafy neighborhood of East Dallas. Each day, sitting before dual monitors and jotting notes on her tablet, she takes calls from distraught sellers who have received the dreaded email from Amazon. On her walls: photos of her family and the families of her support staff in the Philippines; a pegboard with packing tape and

**Exhibit 2 to Declaration of Mark Schlachet – page 31**

shipping labels, vestiges of her past life as an Amazon seller; and a sign that says "COFFEE... until it's time for WINE."

She's outgoing and cheerful, happy to digress into war stories about the time an algorithm change suspended a swath of the Jewish Orthodox pearl dealing industry or a years-long "bloodbath" between two sellers of electric wheelchair batteries. But on the phone, she listens patiently as sellers rattle off their list of grievances. "You've got to get them off the ledge, and one of the ways to do that is for them to get heard," Stine says. "Amazon won't give you that. They're not going to talk to a human."

She calls the scheme that got Plansky a "dirty seller trick," and she's seen it before. As Amazon has escalated its war on fake reviews, sellers have realized that the most effective tactic is not buying them for yourself, but buying them for your competitors — the more obviously fraudulent the better. A handful of glowing testimonials, preferably in broken English about unrelated products and written by a known review purveyor on Fiverr, can not only take out a competitor and allow you to move up a slot in Amazon's search results, it can land your rival in the bewildering morass of Amazon's suspension system.

**Exhibit 2 to Declaration of Mark Schlachet – page 32**



And Stine's team had bad news: the only way back from suspension is to "confess and repent," she says, even if you don't think you've done anything wrong. "Amazon doesn't like to see finger-pointing."

Amazon calls them "appeals," which suggests that there's a possibility of having the verdict overturned. In reality, they're more like a plea bargain crossed with a business memo, the core of which is a "plan of action" — an explanation of how you'll make things right. And to make things right, you need to admit to having done something wrong. So Plansky sat down with Stine's team and looked for something, *anything*, to confess to. In his appeal, he admitted to providing discounts for reviews before Amazon banned the practice, and to sending customers emails about printing out shooting targets that the algorithm might have mistaken for bribes.

"It was crazy," he says. "I felt like I was in prison for a crime I didn't commit, and the only way out was to plead guilty."

**Exhibit 2 to Declaration of Mark Schlachet – page 33**

In a way, Plansky had it easy. He at least knew what he had to confess to, even if he hadn't done it. Many sellers can't even figure out what Amazon is accusing them of. A suspension message will typically list an item along with a broad and tangentially related category of an infraction, like "used sold as new." Understandably, sellers respond by sending invoices that show that the items are, in fact, new. Actually, Stine says, the suspension usually has nothing to do with the item being used, but with something like a peeling label on the box. "The thing Amazon wants you to fix is the buyer perception," Stine says. "Just proving to Amazon that your goods are new is not good enough because Amazon wants you to address *why* the buyers *thought* they were used." One seller described the typical process as Amazon saying, "I'm putting you in jail but not telling you what you did, now give me a justification for why I should let you out and you won't do it again."

## "A Kafkaesque bureaucracy with bad writing"

The appeals process is so confounding that it's given rise to an entire industry of consultants like Stine. Chris McCabe, a former Amazon employee, set up shop in 2014. CJ Rosenbaum, an attorney in Long Beach, New York, now bills himself as the "Amazon sellers lawyer," with an "Amazon Law Library" featuring *Amazon Law, vol. 1* ($95 on Amazon). Stine's company deals with about 100 suspensions a month and charges $2,500 per appeal ($5,000 if you want an expedited one), which is in line with industry norms. It's a price many are willing to pay. "It can be life or death for people," McCabe says. "If they don't get their Amazon account back, they might be insolvent, laying off 10, 12, 14 people, maybe more. I've had people begging me for help. I've had people at their wits' end. I've had people crying."

Much of Stine's work involves translating Amazon's cryptic suspension messages and then digging through every review, metric, and message in a seller's account just to find the infraction she needs to design a remedy for. Sitting at her workstation, she clicks around the seller interface like a mechanic fiddling under the hood, talking mostly to herself. She looks at a warning message. "Amazon mad." She sees a listing for dog toys that people complained were too chewy for their dogs. "This right here is going to trigger Amazon's freak-o-meter real soon."

**Exhibit 2 to Declaration of Mark Schlachet – page 34**

The actual infraction can be as slight as the indictment is broad. Stine has a client whose listing for a rustic barn wood picture frame was deemed unsafe and taken down; it turned out the offense was a single customer review that mentioned getting a splinter. (The customer had actually given it five stars.) The seller was allowed back when he promised to add "wear gloves when installing" to his listing. Another seller was suspended for selling Nike shoes that were "not as described." After he'd filed appeal after appeal proving the shoes were genuine Nikes, Stine's team figured out the problem: some buyers complained the shoes were too small. That seller was let back on after promising to add a line to the listing recommending customers wear thin socks.

### "Amazon is a clear monopoly that is somehow being allowed to destroy industry after industry."

"That's what we call 'speaking Amazon,'" Stine says. "In my mind, I imagine a checklist, and it doesn't even have to make sense. It's just that the previous appeals hadn't included this all-important proactive step they were going to take to prevent the complaint that the shoe was too tight."

JC Hewitt, whose law firm frequently works with Amazon sellers, calls the system's mandatory guilty pleas, arbitrary verdicts, and obscure language "a Kafkaesque bureaucracy with bad writing." Inscrutable rulings emerge as if from a black box. The Performance team, which handles suspensions, has no phone number; there's no one to ask for clarification. The only way to interact with them is by filing an appeal, and when it's rejected, sellers often have no idea why. Sellers can call another Amazon department, Seller Support, but those workers can't provide information about the Performance team and can offer only generic advice about what the seller might have done wrong.

The secrecy can be so frustrating that sellers have traveled to Seattle or Amazon's London office to try to find a human, to no avail. One seller flew to Seattle from Shengzhou, China, and lived out of a Honda Pilot he bought on Craigslist while he wandered around Amazon's offices trying to find someone to hear his case. The receptionist gave him the same phone number for Seller Support he'd been trying for weeks.

**Exhibit 2 to Declaration of Mark Schlachet – page 35**



# TYPES OF ATTACKS

**The five-star bomb:** A seller pays someone to write obviously fraudulent five-star reviews for a competitor's listings and hopes Amazon cracks down

**Hijacking:** Sellers who have their own brand should have their listings to themselves, but they often battle rivals who have obtained or counterfeited their products. The next-level move?

https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement

**Exhibit 2 to Declaration of Mark Schlachet – page 36**

Hijack not just the product, but the entire brand.

**Defacement:** Sellers armed with the accounts of Amazon distributors (sometimes legitimately, sometimes through the black market) can make all manner of changes to a rival's listings, from changing images to altering text to reclassifying a product into an irrelevant category, like "sex toys."

**Phony fires:** Sellers will buy their rival's product, light it on fire, and post a picture to the reviews, claiming it exploded. Amazon is quick to suspend sellers for safety claims.

Exhibit 2 to Declaration of Mark Schlachet – page 37

Kevin Harmon, who sells books and DVDs from his warehouse in Charlotte, North Carolina, calls his suspension last July "the worst month of his life." His account was suspended and the $20,000 in it frozen over a damaged *Lilo & Stitch* DVD and nine other items. After laying off employees and starting to liquidate his inventory, he railed against the company on Facebook. "Amazon is a clear monopoly that is somehow being allowed to destroy industry after industry," he wrote. "They don't crush you when you're small. They wait until you've got employees and lease obligations and business loans and warehouses full of product, and THEN they reveal that they don't need you anymore."

But ultimately, it wasn't the suspension that was most galling. It was the way Amazon kept responding with the same request for more information whenever he appealed. "I was caught in some kind of AI gear," he says.

In reality, there were likely humans reading Harmon's appeal, but they're part of a highly automated bureaucracy, according to former Amazon employees. An algorithm flags sellers based on a range of metrics — customer complaints, number of returns, certain keywords used in reviews, and other, more mysterious variables — and passes them to Performance workers based in India, Costa Rica, and other locations. These workers choose between several prewritten blurbs to send to sellers. They may see what the actual problem is or the key item missing from an appeal, but they can't be more specific than the forms allow, according to Rachel Greer, who worked as a fraud investigator at Amazon before becoming a seller consultant. "It feels like it's a bot, but it's actually a human who is very frustrated about the fact that they have to work like that," she says.

The Performance workers' incentives favor rejection. They must process approximately one claim every four minutes, and reinstating someone who later gets suspended again counts against them, according to McCabe and others. When they fall behind, Stine says, they'll often "punt" by sending requests for more information, as Harmon experienced.

Asked about complaints that the suspension process is harsh and confusing, Amazon responded with a statement saying the company supports the businesses that sell through its platform. "In order to protect both customers and sellers, we have selling policies that all sellers agree to and we take swift action against those that violate them," the company wrote. "We have an appeals process where sellers can explain how they

**Exhibit 2 to Declaration of Mark Schlachet – page 38**

will prevent the violation from happening in the future or let us know if they believe they were compliant."

There are plenty of justified suspensions. The prospect of an easily accessible global market attracts counterfeiters, money launderers, and fencers of stolen goods. Stine had a client who was suspended for trying to sell hand grenades, and another who thought he'd found the deal of a lifetime buying bagfuls of children's costumes out of a warehouse in Salt Lake City, only to get suspended when the rightful owner reported the costumes stolen. She got him back on a technicality: the company had contacted the seller on the Amazon platform, a violation in itself. A typical seller, she says, he was more concerned about getting back on Amazon than about the fact that police might be waiting for him when he returned to the US from vacation.

Amazon's ability to hide the chaos of its Marketplace from consumers is part of what made the company successful early on, says Marketplace Pulse's Juozas Kaziukėnas. While eBay is obviously a bazaar, Amazon looks like a traditional retailer. In reality, a growing share of Amazon is also an open marketplace, one with mechanics that foster both intense competition and a retail-like experience. With Fulfillment by Amazon, all sellers have to do is ship their goods to Amazon's warehouses; Amazon handles storage and delivery and bestows a Prime checkmark on their listing, a promise of speedy free shipping and easy returns. Behind the scenes, sellers compete with each other on price and a range of other metrics — mostly having to do with customer satisfaction — to "win the Buy Box" and become the default seller on a listing. Margins drop to zero so quickly on a popular listing that sellers seek out greener, more obscure pastures: niche categories like microfiber car wash mitts or gas fireplace logs.

## "Dear Mr. Bezos," they wrote. "We desperately need your help."

Stine started playing this game in 2010. She was running a small public relations firm and needed an extra $1,500 a month to pay tuition for her son, who has special needs. So she turned to the decision-making process she'd learned from a Tony Robbins cassette course 19 years earlier, when she grew tired of living in a basement in Queens and dating non-committal men and moved to Dallas: visualize the solution. The answer turned out to be buying books from libraries and closeouts, and reselling them on Amazon. She soon realized she could sell pretty much anything at all, so she hit up local

**Exhibit 2 to Declaration of Mark Schlachet – page 39**

Targets armed with a barcode scanner on her lanyard and a phone in her armband. She used an app to check prices on Amazon to find goods she could resell for a profit. She became, in the language of the industry, a "scanner monkey."

There are two types of sellers on Amazon. The first is the resellers: scanner monkeys like Stine, along with their cousins the product diverters, re-importers, and grey market tycoons. They play a hidden but important role in making Amazon the "everything store." Brands that refuse to work with Amazon often find their products on the platform anyway through these back channels.

The second type is the "private label" seller. Rather than compete with dozens of other sellers all selling the same product on the same listing, they make their own brand, which gives them a listing of their own. Some of these sellers come up with original products and resemble traditional businesses, albeit based almost wholly on Amazon, but many simply slap a logo on a mix of trending goods sourced from China, creating eclectic catalogs of fidget spinners and cowboy boots, adult coloring books and survival gear. The result has been a Cambrian explosion of brands found only on Amazon selling largely identical products. Recently, their ranks have been reinforced by yet another generation of sellers, these ones based in China and with more direct access to factories.

### "These schemes really require the mind of someone whose depravity knows no bounds."

Though private label sellers still face competition from other sellers buying or counterfeiting their products and hopping on their listing, they are largely freed from fighting over the Buy Box. Instead, they find themselves competing in a new arena: Amazon's search rankings. About 70 percent of searches on Amazon are for generic products, like "running shoes" or "milk frother," rather than brands, and Amazon has made buying things so easy that customers often purchase the first thing with Prime shipping they see. If a seller can game Amazon's algorithm to win a high spot for their brand, they can out-sell household names. But search placement is everything. Greer says there's a common joke: where's the best place to bury a dead body? On the 10th page of Amazon's search results, because no one ever goes there.

**Exhibit 2 to Declaration of Mark Schlachet – page 40**

Just as competition over the Buy Box spilled over into a proliferation of generic brands, the competition over search rank is creating its own unintended consequences: sellers competing not on price and quality, but on who can best sabotage the listing above theirs. And if the saboteur is skilled enough in the ways of Amazon, they can trap their rival in the surreal limbo of Amazon court.

Plansky had reported the fake five-star reviews as soon as he'd gotten them, and after he was suspended, he'd played by Amazon's rules and confessed to everything that could possibly be considered review manipulation. But in the end, it wasn't enough. Several days after filing his appeal, he received an email saying it had been rejected. Amazon won't read the same appeal twice, so now Plansky had to find another infraction to confess to. Unable to think of anything and utterly exasperated, he and Stine's team decided to email Amazon CEO Jeff Bezos — a last resort. "Once you've gone to Jeff, there's nowhere else to go," Stine says.

## Where people used to mostly game Amazon's platform to rank higher, Stine says, now they game it to take each other out

Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or as Stine prefers, a Jeff Letter. "Dear Mr. Bezos," they wrote. "We desperately need your help."

It's probably not Bezos reading the emails, though McCabe says that during his time at Amazon, he was forwarded several appeals with only a question mark written on them, a signal of Bezos' displeasure. Generally, fortunate sellers will have a member of Bezos' staff take pity and respond.

Plansky's Jeff letter was never answered, but after he'd sent it, a fellow Amazon seller at a local meet-up gave him the name of someone "high up" in the company. He emailed them, and shortly afterward, he got his account back. (Stine maintains that it was the Jeff letter that did it.) All told, he estimates his suspension cost him about $150,000 in sales.

Stine is aware that the suspension system is often unfair and needlessly bewildering, but she has faith in the system overall. Sometimes she likens it to Darwinian evolution, or the way governments shape societies through taxes and penalties. Except, in Amazon's case, the ultimate goal is a "better buyer experience," something so good you'll never

**Exhibit 2 to Declaration of Mark Schlachet – page 41**

think of going to a brick-and-mortar store. The company, she says, has a "god's-eye view," and everyone it suspects is guilty of something, even if only out of naïveté. She sees herself as doing Amazon's work, showing sellers how to reform their businesses to align with "the Amazon way."

"Compliance," she is fond of saying, "is the foundation of growth."

But she's begun encountering more and more cases like Plansky's, ones where sellers are innocent even according to Amazon's strange rules. They've been framed.



**J**ohn Harris knew selling on Amazon was a "state of constant warfare," and he had taken defensive measures. He sold survival gear — firestarters, compasses, combination firestarter-compass-watches with paracord wristbands — and in the world of Amazon, his account was a locked-down bunker with a panic room. He had trademarked his wares and registered his brand with Amazon, giving him a streamlined method for booting hijackers off his listings. He'd even built his own software to instantly send out cease-and-desist letters the moment someone tried to steal his Buy Box.

Typically, the prompt legal threats were enough to scare off competitors, but one September morning last year, he woke to see an interloper had remained on his listings through the night. Strangely, Harris realized, they had also found a way to steal his own

**Exhibit 2 to Declaration of Mark Schlachet – page 42**

X-58

seller name, SharpSurvival. His account had been transformed into the generic Seller123. He reported the imposter to Amazon, as he'd done countless times before. But this time, nothing happened.

Over the following days, Harris came to realize that someone had been targeting him for almost a year, preparing an intricate trap. While he had trademarked his watch and registered his brand, Dead End Survival, with Amazon, Harris hadn't trademarked the name of his Amazon seller account, SharpSurvival. So the interloper did just that, submitting to the patent office as evidence that he owned the goods a photo taken from Harris' Amazon listings, including one of Harris' own hands lighting a fire using the clasp of his survival watch. The hijacker then took that trademark to Amazon and registered it, giving him the power to kick Harris off his own listings and commandeer his name.

### "All of a sudden brands could take people down like *that*," Stine says, snapping her fingers

"This was very, very, very well orchestrated and researched," says Harris, a pseudonym he wanted to use in order to avoid further attacks from rivals. "From a customer's perspective, the scam was very seamless. The customers thought they were still buying the stuff from us."

Instead, according to court documents, customers began receiving shoddy knock-offs of Harris' survival gear, and pillorying his products in their reviews. He sent dozens of emails and appeals to Amazon trying to explain the situation as he watched his wares fall in Amazon's search, only to be told he'd have to work things out with the rightful brand owner. Then came the retaliation: tired of Harris's futile attacks, the imposter booted Harris off his listings entirely, reporting him to Amazon for infringing on his own brand. "We consider allegations of intellectual property infringement a serious matter," warned an email from Amazon.

Attacks like this are increasingly common on Amazon. More customers and more sellers mean more competition for the top search result and more to gain by winning it. There may be half a billion products on the platform, but there are only so many high search slots and Amazon Best Seller badges. Last year only about 20,000 sellers — 0.3 percent — had more than a million dollars in sales a year, which is the point at which Kaziukenas

**Exhibit 2 to Declaration of Mark Schlachet – page 43**

says it becomes a viable full-time business. Where people used to mostly game Amazon's platform to rank higher, Stine says, now they game it to take each other out.



In the intensely competitive world that Amazon has built, any efforts by the company to clean up seller misbehavior are quickly turned into weapons for sellers to wield against each other. The crackdown on fake five-star reviews begat the five-star bomb Plansky was hit with. After hoverboards started exploding in 2016 and Amazon became more vigilant about safety claims, sellers started buying each other's products, setting them on fire, and posting photos in the reviews. The scheme that ensnared Harris made use of a program called "brand registry," which Amazon overhauled last year to give companies more effective ways to guard against counterfeiting. Any seller with a trademark can register their brand with Amazon and get tools for quickly taking down sellers they claim are infringing.

"All of a sudden, brands could take people down like *that*," Stine says, snapping her fingers. "I don't know why Amazon naïvely thought that that was all they would do, that

**Exhibit 2 to Declaration of Mark Schlachet – page 44**

X-60

people wouldn't use it to take down their enemies."

Scammers have effectively weaponized Amazon's anti-counterfeiting program. Attacks have become so widespread that they've even pulled in the US Patent and Trademark Office, which recently posted a warning that people were making unauthorized changes through its electronic filing system, likely "part of a scheme to register the marks of others on third-party 'brand registries.'" Scammers had begun swapping out the email addresses on their rival's trademark files, which can be done without a password, and using the new email to register their competitor's brand with Amazon, gaining control of their listings. As Harris encountered, Amazon appears not to check whether a listing belongs to a brand already enrolled in brand registry. Stine has a client who had trademarked their party supply brand and registered it with Amazon, only to have a rival change their trademark file, register with Amazon, and hijack their listing for socks, which had things like "If you can read this, bring coffee" written on the soles.

Exhibit 2 to Declaration of Mark Schlachet – page 45

1/4/2019 Case 1:18-cv-00689-LMB-TCB Document 17-3 Filed 01/14/19 Page 84 of 30 PageID# 432



# SAFE SHOPPING ON AMAZON

## According to Stine, look out for:

**Newly launched sellers**, especially if the account hasn't been around for at least six months. They could be a pop-up that will vanish after you order.

**Long shipping times.** If a product

https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement                    21/30

**Exhibit 2 to Declaration of Mark Schlachet – page 46**

will take several weeks to ship, without a clear reason, it's a sign the seller could be a dropshipper, or that they plan to take the money and run.

**An unusually high number of reviews.** Reviews are typically 1 to 2 percent of actual sales, Stine says, so unless a product has been around for years or is a huge seller, it's unlikely to have thousands of real ones. Also make sure that the reviews are about the product listed. Some sellers find abandoned listings and repurpose them.

**Details that seem a little off.** Know what the product you're buying is supposed to look like, especially if it's a popular toy, luxury good, or easy-to-manufacture commodity. Double-check yours when it arrives

Exhibit 2 to Declaration of Mark Schlachet – page 47

X-63

1/4/2019   Case 1:18-cv-00689-LMB-TCB   Document 17-2   Filed 01/10/19   Page 23 of 30 PageID# 434

Double-check yours when it arrives.

Asked about seller attacks, Amazon said bad actors represent a small fraction of activity on the site, and that the company uses machine learning and other tools to stop them. Regarding the brand registry attacks, Amazon said it is "working closely with brands, the USPTO, and others to continue to strengthen our protections and stay ahead of these bad actors."

"These schemes really require the mind of someone whose depravity knows no bounds," says Brad Tucker, who handles most of the infringement claims for Stine. His previous job was investigating credit card fraud; the schemes he's seen on Amazon are more devious, more creative. One of his recent favorites involved a mug that read "recently promoted to grandpa." Someone reported the main photo of the mug for IP infringement, causing it to be taken down and an image of a grandpa in a rocker to become the main image, which was a violation of *another* Amazon policy that doesn't allow images without a white background. As the listing fell in Amazon's search results, the mug pirate made their own listing, with the original image, priced slightly higher. Brad thinks the plan was to fill any orders from the demoted listing, netting a couple dollars in profit.

There are more subtle methods of sabotage as well. Sellers will sometimes buy Google ads for their competitors for unrelated products — say, a dog food ad linking to a shampoo listing — so that Amazon's algorithm sees the rate of clicks converting to sales drop and automatically demotes their product. They will go on the black market and purchase or rent seller accounts with special editing privileges and use them to change the color or description of their rival's products so they get suspended for too many customers complaining about the item being "not as described." They will exile their competitor's listings to an unrelated category — say, move a product with a "Best Seller" badge in the office category to lawn care, taking the badge for themselves.

"They took a kids toy made for six to 12 year olds and they changed it to a sex toy," one outraged seller told me. This is a common move, as Amazon hides products in that category unless the customer clicks a button saying they're over 18. Another seller who had been battling counterfeiters of his childproof locks and outlet covers received a threat in Chinese saying that, while it is hard to build a listing like his, it would be easy to

**Exhibit 2 to Declaration of Mark Schlachet – page 48**

X-64

destroy. "Be cautious," the message warned. Later, he too was banished to sex toys. "It's suppressed from search results unless you literally search for a "sexual child proof door lock," he says. (He had no sales.)

The viciousness of competition can be surprising given the items being fought over, but Amazon's scale changes the traditional dynamics of counterfeiting. Rather than knock off a luxury good, it can be lucrative to go after the mundane commodities people buy every day without much thought: USB cables, cutlery organizers, various extruded plastic things. Stine has a client whose shoe tree business was barraged with phony infringement claims, hijackings, and threatening phone calls that she ended up referring to the FBI. Surveying crib cushions and safety locks of Amazon's "baby" category, Stine sees a world of chaos and conflict. "All of these sweet little products are definitely potential targets," she says. "We tell people: whenever you're successful on the Amazon, you have a target on your back."



Exhibit 2 to Declaration of Mark Schlachet – page 49

X-65

Paul Miller has built a good business selling padded over-ear headphones and has nothing but praise for Amazon, which he says rescued him after his restaurant business went under. Nevertheless, he must constantly battle phony infringement claims and threats. He lost $10,000 when he was taken out for infringement right before Prime Day which, along with Black Friday, always sees a surge in attacks. Recently, Miller reported an imposter for infringing on his cartoon unicorn headband headphones and was hit with a retaliatory infringement claim citing an unrelated patent for a plush unicorn toy. "Our technical team will return a devastating blow to CozyPhones," warned a message in Chinese. "The Amazon circle is very small. Evil deeds must be returned in kind."

Recently, the fierce competition of Amazon's Marketplace has given rise to outright bribery. In September, *The Wall Street Journal* reported that Amazon was investigating employees in the US and China for leaking internal data to sellers in exchange for bribes. A month later, the paper reported that one employee had been fired, and customers who had their emails leaked had been notified.

*The Verge* has viewed screenshots of WeChat posts offering troves of Amazon data and spoken with sellers who have encountered brokers offering internal access, some after Amazon announced it had fired the employee. In one conversation viewed by *The Verge*, sellers shared what appeared to be customer emails and phone numbers, valuable to sellers as a way of contacting shoppers and trying to get them to change their reviews. Several price lists viewed by *The Verge* included offers of customer contact information and data on their orders, new seller accounts, and data on other sellers. Another offer of internal reports advertised itself with the promise "Spy on your competitors!"

"That's the kind of information Amazon will never give you and would be worth its weight in gold," Stine says, after viewing the price lists. It's how a seller might end up singling out a particular pair of novelty socks as a lucrative candidate for hijacking. "They'll get this data, and it will be their target list."

*The Verge* has also spoken with a broker promising guaranteed reinstatement in three working days through contacts on the Performance team, and viewed screenshots of the interface the Performance team uses while suspending and reinstating sellers. Stine has heard rumors of sellers paying thousands of dollars to get reinstated instantly, something that could only happen with intervention from someone inside the company.

**Exhibit 2 to Declaration of Mark Schlachet – page 50**

Asked about the apparent market in internal data and reinstatements, Amazon responded with a statement saying the company has a strict code of conduct for employees and audits access to information. "We have zero tolerance for abuse of our systems and if we find bad actors who have engaged in this behavior, we will take swift action against them, including terminating their selling accounts, deleting reviews, withholding funds, and taking legal action," the company wrote.

This black market is the only thing consultants like Stine and McCabe can't compete with. "If you're a seller, why wouldn't you just want to pay a lot of money, if somebody can guarantee 'I will have you back up by tomorrow'? Most sellers would pay almost anything," Stine says. "We can't promise that."



**O**f the two-dozen sellers I spoke with, all of them described their time in suspension court as nightmarish and said they planned to get back to selling on Amazon as soon as they could. "Not being on Amazon doesn't feel like an option," Plansky says. His listings have dropped in search rank during his time offline. To regain his place, he's buying Amazon ads.

The trap Harris had been caught in was too sophisticated to resolve with Amazon, and Stine referred him to an Army-prosecutor-turned-patent-attorney named Jeff Breloski. Based in Atlanta, Breloski stumbled into the world of Amazon after speaking at a seller conference, and he now estimates that Amazon cases represent 80 percent of his

**Exhibit 2 to Declaration of Mark Schlachet – page 51**

practice. He'd actually encountered Harris' hijacker before, a man named Georgi Marhasin who lives in Toronto and had used a similar strategy to steal the listings of a shoehorn seller in Passaic, New Jersey, and a seller of magic tricks in Brandon, South Dakota. (Shoe paraphernalia, for whatever reason, seems to be a favorite target of the Amazon underworld.)

In May, the District Court of Northern Georgia ordered a temporary restraining order forbidding Marhasin from selling the knock-off watches and firestarters, which he ignored. Amazon, too, would only act on a final court order. On October 31st, more than a year after Harris' listings were first hijacked, the court ordered a default judgment against Marhasin, awarding Harris $2 million in statutory damages. Harris says he can once again sell on his listings, but Amazon won't re-register his brand until the patent office website updates, so he's had to deal with hijackers. He has little hope of recovering the damages.

Marhasin did not respond to repeated requests for comment sent to the emails listed on his trademark applications and to his profile on LinkedIn. An email sent to the address listed on the site for MarhasinWarehouse, a bare-bones page with photos of Harris' and other goods for "today's fast paced, digital world," bounced. The site now appears to be offline.

### "I figure I'm going to get everything I can out of it while the getting's good"

For most sellers and a growing number of traditional businesses, Amazon is so big, so much the default place people go to shop, that they find ways to tolerate constant sabotage as just another cost of doing business. In a sense, the chaos of the platform fuels its own growth. The only way to get the tools to police your brand on Amazon is to join, as Nike did last year, after years of resistance. When sellers get in trouble for customer complaints or attacks from counterfeiters, the solution is often to more fully meld with Amazon — to enroll in its fulfillment program, to purchase Amazon's labels to make sure product isn't being diverted, or even make their brand exclusive to Amazon, which brings special protections. Many sellers come to Amazon looking for a new distribution channel for their retail business or a way to jump-start their company, but they find that Amazon has become their advertising firm and their storefront, their

**Exhibit 2 to Declaration of Mark Schlachet – page 52**

warehouse and their shipper. For some, it's their bank and the intermediary that collects their sales taxes. It makes the rules and enforces them.

It's an arrangement that suits Amazon, which is able to outsource the costs of managing inventory and vendor relationships. Revenue from seller commissions and other fees is growing far faster than Amazon's online sales overall, with the company taking in about $19 billion in the first half of this year, a 41 percent increase over the same period the year before and representing about 18 percent of the company's total revenue. Where antitrust concerns have arisen, they chiefly concern Amazon's practice of competing against other sellers with its own brands. It's harder for regulation to grasp a company that, rather than monopolizing a market, has become the market itself.

As for Stine, business is booming, and she says Amazon has been a force for good in her life. She uses it constantly for everything from groceries to appliances. As we're speaking, she gets a Kindle alert for a new James Patterson novel. Selling on its platform got her out of a tight spot. She published books on Amazon selling using Amazon's tools. Now she's built a business interpreting its rules and systems, and she's flying around the world to speak at gatherings of Amazon sellers. She thinks the company will only grow, that it will expand its business supply marketplace, providing coffee to offices and machinery to factories, and that one day, we'll wake up, and it will be like *Demolition Man*, says Stine, a sci-fi fan, where Sylvester Stallone's character comes out of hibernation to find every restaurant is Taco Bell.

She recently learned that Amazon may make seller consultants like her part of the site. She doesn't know exactly what it will look like yet — maybe a list of Amazon-approved finance, advertising, and other support services on the seller dashboard — but she's eager to join. She's done several interviews explaining her business already, even flying to Seattle of her own volition to meet with Amazon representatives. She's also wary. She knows how Amazon works, and she's given the company a lot of data about her business.

"I figure I'm going to get everything I can out of it while the getting's good," she says, reaching for another sci-fi reference. "I mean it's like the Borg. Someday, we will all be assimilated." ∎

**Exhibit 2 to Declaration of Mark Schlachet – page 53**



**EXCLUSIVE**

Amazon says 100 million Alexa devices have been sold — what's next?

**US & WORLD**

Hundreds of German politicians' chats, financial details, and other personal information leaks online

**POLICY & LAW**

The Weather Channel app unlawfully obtained user location data, says prosecutor

View all stories in Tech

**Exhibit 2 to Declaration of Mark Schlachet – page 54**

Case 2:19-cv-10374-SB-E   Document 90   Filed 02/14/20   Page 71 of 114   Page ID #:578

Exhibit 2 to Declaration of Mark Schlachet – page 55

X-71

amazon seller central

| English | | Sign in | | **Sell on Amazon** |

---

This article applies to selling in: **United States**

Help / Policies and agreements / Intellectual property for Rights Owner

# Intellectual property for Rights Owner

Amazon is dedicated to ensuring that goods do not violate or infringe a Rights Owner's intellectual property (IP). Rights Owners can report infringing content they find on Amazon and share answers to frequently asked questions on how Amazon handles infringement complaints.

> **Note:** The following information does not contain legal advice. You should consult a lawyer if you have specific questions about your IP rights or the IP rights of others.

*If you are a Rights Owner with a registered trademark, you may be eligible to enroll your brand in the Amazon Brand Registry. Amazon Brand Registry provides access to powerful tools including proprietary text and image search, predictive automation based on your reports of suspected intellectual property rights violations, and increased authority over product listings with your brand name. To learn more and start the enrollment process, click here.*

## Reporting Infringement

To submit a notice of IP infringement, you must be the Rights Owner who owns the IP being reported or an agent with permission from the Rights Owner to submit notices on his or her behalf. Do not forget to provide your contact details (name, address, phone number, email address, secondary contact details) when you report infringement.

If your brand is enrolled in Amazon Brand Registry, you can submit a report via the Report a Violation (RAV) tool or through our Report Infringement form. Rights Owners who do not have a brand enrolled in Amazon Brand Registry can submit via the Report Infringement form. In addition, it is a

**Exhibit 2 to Declaration of Mark Schlachet – page 56**

requirement that a notice submitter be logged into an Amazon account in order to use the Report Infringement form or Brand Registry's RAV tool.

You can submit a trademark, copyright, patent, or other IP claim.

You should include the following information in your report:

- Specific identification of the IP you believe is infringed: trademark, copyright, or patent registration number; written description of or link to copyrighted work; etc.
- Nature of infringement (whether infringement occurs on the physical product, physical product packaging, image on the product detail page, or text on the product detail page).

  > **Note:** A product detail page allows customers to view a specific product available on Amazon with information common to all sellers' offers for that product, such as the product's title, brand, images, bullet points, descriptions, variations (such as size or color) and customer reviews. It can include one or more offers from both sellers or Amazon.

- List of infringing products (either Amazon Standard Identification Numbers (ASINs) or URLs for the product detail page of the specified product). If you believe that only a subset of sellers are infringing, and you are not accusing the entire product detail page, click the checkbox next to the name of each seller you are reporting in the Report Infringement form or RAV.
- Any additional information that will help Amazon in processing your complaint (such as order IDs for any test buys on the products you are reporting).
- Your contact details (name, address, phone number, email address, and secondary contact details that we can share with affected sellers).

## Best Practices

**Do not** submit more than **one** type of IP violation per notice. In order to ensure quality and quick resolution of your notices, we will only process the specific complaint type you have chosen in the Report Infringement form or RAV (such as, patent, trademark, or copyright). The following are examples of submissions that contain more than one complaint type within a notice:

**Exhibit 2 to Declaration of Mark Schlachet – page 57**

X-73

- Selecting trademark infringement and discussing copyright issues in the submission. The notice will be processed as a trademark complaint only. If you want to report infringement of a trademark and a copyright, file separate notices.
- Indicating two trademark numbers in one notice, as only the first trademark number will be considered for that notice. If you want to report infringement of separate trademarks, file separate notices.

**Do not** submit retractions of complaints through the Report Infringement form or Brand Registry. A seller may reach out to you requesting a retraction, and if relevant, you can notify Amazon through the appropriate email queue (as provided by the seller).

# Main types of IP

### Trademark

A trademark is a word, symbol, or design (such as a stylized brand name or logo) that a company uses to identify its goods or services and to distinguish them from other companies' goods and services. Generally, trademark laws exist to prevent customer confusion about the source of goods or services.

A trademark owner usually protects a trademark by registering it with a country-specific trademark office (such as the United States Patent and Trademark Office). In some cases, a person or company might have trademark rights based on only the use of a mark in commerce, even though the mark was never registered with a country-specific trademark office. Those rights are known as "common law" trademark rights and can be more limited.

**Example:** Trademarks are often displayed on Amazon's product detail pages in the form of product and brand names listed on a product detail page. For example, the "Pinzon" by Amazon trademark appears above the product title in the brand value portion of the product detail page shown below.

**Exhibit 2 to Declaration of Mark Schlachet – page 59**



## Copyright

A copyright protects original works of authorship, such as videos, movies, songs, books, musicals, video games, paintings, etc. Generally, copyright law is meant to incentivize the creation of original works of authorship for the benefit of the public. To receive copyright protection, a work of authorship must be created by an author, and must have some amount of creativity. If someone is the author of an original work, then they typically own the copyright in that work.

A copyright owner usually protects the copyrighted material by registering the material with a country-specific copyright office (for example, US Copyright Office). However, a Rights Owner does not necessarily need a formal copyright registration to receive protection. You can generally use your own copyrighted images on product detail pages to sell a product; however, you should not take images from other sources and add them to product detail pages without the Rights Owner's permission.

> **Note:** When you add your copyrighted image to a product detail page, you grant Amazon and its affiliates a license to use the material. For more information, see the Amazon Services Business Solutions Agreement. Other sellers can list their identical products for sale on pages to which you have added your copyrighted images, even if you no longer sell that product.

**Example:** The owner of the Pinzon brand took the photos of the towels shown below and owns the copyright of the sheets images. If a seller were to copy these images to sell their product on another product detail page, that seller could be violating the Rights Owner's copyright of the sheets images.

**Exhibit 2 to Declaration of Mark Schlachet – page 59**



## Patent

A patent is a form of legal protection for inventions. An issued patent grants its owner the right to exclude others from making, using, or selling the invention for a fixed number of years. In the United States, there are two principal types of patents: Utility patents and Design patents.

Utility patents, the most common kind of patent, can be granted for the following:

- A new machine
- Article of manufacture
- Composition of matter, process, or improvement to any of those
- Protects the structure and functions of a product (rather than how it looks)

A utility patent is different from a trademark in that it protects an invention (such as a new machine) rather than a word or logo used to identify the source of the product. A utility patent is different from a copyright in that it does not protect the expressive content of a creative work like a book or a picture, but instead protects a specific invention, such as a new method of printing books or a new type of camera.

Design patents are granted for the unique look of a product, but do not cover the functions of a product. In the United States, design patent numbers begin with the letter "D."

# Submit an IP infringement notice to Amazon

**Exhibit 2 to Declaration of Mark Schlachet – page 60**

A Rights Owner can report an ASIN, seller, or product detail page content when submitting an IP infringement notice. The following are the different types of infringement notices:

## Trademark Infringement

**ASIN-Level Infringement:** If a product available on Amazon bears your trademark but you do not make that product, then you may report the entire ASIN, or entire product detail page, for trademark infringement.

**Seller-Level Infringement:** If you believe a particular seller is offering a product that infringes your trademark, then you may report that offer as infringing. However, expect the product detail page and ASIN to remain live if you report an offer. When you report an offer, and not an entire ASIN, you are only referring to the offer for infringement, not the entire ASIN or product detail page. It is also helpful to provide a test buy with a valid Order ID to support your report.

**Product detail page Infringement:** If your trademark is being used on the product detail page, but the product being sold is not your product, you may report use of the trademark on the product detail page as infringing.

> **Important:** If the trademark you are reporting is used to indicate compatibility with your product, we may reject your notice.

## Copyright Infringement

**ASIN-Level Infringement:** If a product or its packaging is using your copyrighted work, such as text or images, without your permission, then you may report the entire ASIN for copyright infringement.

**Seller-Level Infringement:** If you believe a particular seller is offering a product that infringes your copyright, then you may report that offer as infringing. However, expect the product detail page and ASIN to remain live if you report an offer. When you report an offer, and not an entire ASIN, you are only referring to the offer for infringement, not the entire ASIN or product detail page. It is also helpful to provide a test buy with a valid Order ID to support your report.

**Image or Text Infringement:** If your copyrighted image is used on a product detail page without your permission, then you may report the image as infringing. However, expect the product detail page and ASIN to remain live

**Exhibit 2 to Declaration of Mark Schlachet – page 61**

if you report an image or text. When you report an image or text, and not an entire ASIN, you are only referring to the image or text for infringement, not the entire ASIN or product detail page.

### Patent Infringement

**Design:** If an ASIN or product on Amazon is infringing your design patent, then you may report the entire ASIN. If we accept your report, we will remove the ASIN.

**Utility:** If an ASIN or product on Amazon is infringing your utility patent, then you may report the entire ASIN. It is helpful to provide a court order or an International Trade Commission order finding infringement of the reported patent with your notice.

## Types of notices not accepted on Amazon

**Exclusive Distribution and Minimum Advertised Price (MAP) Agreements:** Amazon respects a manufacturer's right to enter into exclusive distribution agreements for its products. However, violations of such agreements do not constitute intellectual property rights infringement. As the enforcement of these agreements is a matter between the manufacturer and the resellers, Amazon does not assist in this type of enforcement activity.

**Compatibility:** Amazon does not enforce notices seeking to remove true statements indicating compatibility with trademarked products. If a product detail page clearly and truthfully states the product being sold on that page is compatible with a trademarked product, Amazon will not take action on a notice directed to the use of the trademarked term.

**Location:** If you are reporting infringement of a registered trademark or patent, your registered trademark or patent must be registered in the country where you are reporting the infringement. Amazon does not take action on intellectual property notices concerning registered trademarks or patents from countries other than the country for which takedown is requested. For example, if you have a trademark registered in Italy, and you ask Amazon to remove an ASIN from Amazon.com in the United States, Amazon will likely reject your notice.

> **Note:** Abuse of the notice submission process, which includes but is not limited to impersonating another brand, tampering with product detail page language, and repeatedly reporting sellers who are not infringing,

**Exhibit 2 to Declaration of Mark Schlachet – page 62**

> will not be tolerated. Rights Owners who are found to be abusive may
> lose their selling privileges.

**Parallel Import:** Amazon does not accept notices directed to parallel import
claims in the United States.

# When to use the Report a Violation tool or the Report Infringement form based on brand enrollment

If you are a brand enrolled in Amazon Brand Registry, use the Report a
Violation tool.

If your brand is not enrolled in Amazon Brand Registry, use our public-facing
Report Infringement form.

# How to obtain seller IDs when reporting infringement

If a seller's offers are infringing on your intellectual property or a product
sold on Amazon is infringing your intellectual property, you can use RAV or
the Report Infringement form to report one of the following:

1. All sellers listing on the ASIN (product)
2. Specific sellers' offers

Once you have determined what ASINs to report, the seller IDs are
automatically populated in our systems by the Report Infringement form
and RAV.

Both RAV and the Report Infringement form will auto-populate a list of
sellers that are listing an ASIN or product detail page once you provide either
an ASIN or URL. Select either **ALL sellers** or the **Specific sellers** option when
submitting your report of intellectual property infringement.

# Result from submitting a notice of infringement

**Exhibit 2 to Declaration of Mark Schlachet – page 63**

X-79

You will receive a confirmation message that we are reviewing your notice. We will send you a follow-up message once your notice has been processed.

If your notice is valid, we will inform the responsible sellers about your claim and share your secondary contact information with them should they have any follow-up questions.

> **Note:** If your secondary contact information is not available, then we will share your primary contact information with the seller.

If your notice of infringement is accepted, we will remove the content you reported and take appropriate action against the responsible sellers. However, specific actions are confidential.

If your notice of infringement is rejected, we will not remove the content you reported and we will not take action on the seller. You will receive a notification with the reason for rejection of your notice.

> **Important:** The continuous submission of inaccurate or fake notices could lead to the removal of your submission privileges.

**Was this article helpful?**   ○ Yes   ○ No



**Related articles**

IRS Reporting Regulations on Third-Party (3P) Payment Transactions

Amazon Services Business Solutions Agreement

Selling on Amazon Fee Schedule

**Exhibit 2 to Declaration of Mark Schlachet – page 64**

X-80

Amazon Handmade fee schedule

Amazon Intellectual Property Policy

**Intellectual property for Rights Owner**

Selling Policies and Seller Code of Conduct

Recalls & Product Safety

Restricted products

Product guidelines

Countries accepted for seller registration

Get Paid Faster service terms for invoiced orders

Tax policies

Tax Registration Agreement VAT Agreement

Subscribe With Amazon Program Agreement

How Amazon Tax Exemption Program (ATEP) Works

Keeping Your Account Information Secure

California regulations

Australia Goods and Services Tax on Low-Value Imports

**Exhibit 2 to Declaration of Mark Schlachet – page 65**

Jewelry Quality Assurance
Standards

Handmade Guidelines

Amazon Launchpad Program
Terms

---

**Need more help?** 💬

See more on Seller Central

Visit Seller Forums

---



**Reach Hundreds of Millions of Customers**

Start Selling On Amazon

© 1999-2019, Amazon.com, Inc. or its affiliates

Exhibit 2 to Declaration of Mark Schlachet – page 66

# EXHIBIT 3

# Copy of a Transcript of Proceedings of May 23, 2019 in *Eternity Mart, Inc. v. Nature's Sources, LLC* 1:19-cv-02436 (N.D. IL 2019)

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
     ETERNITY MART, INC., d/b/a      )
 4   GREAT DEALS OF TEXAS,           )
                                     )
 5                     Plaintiff,    )
                                     )
 6   -vs-                            )  Case No. 19 C 2436
                                     )
 7   NATURE'S SOURCES, LLC,          )  Chicago, Illinois
                                     )  May 23, 2019
 8                     Defendant.    )  9:56 a.m.

 9
                        TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE JOHN J. THARP, JR.

11   APPEARANCES:

12   For the Plaintiff:      LAW OFFICE OF JEFFREY E. CRANE, LLC
                             BY:  MR. JEFFREY E. CRANE
13                            1363 Shermer Road
                             Suite 222
14                            Northbrook, IL  60062

15   For the Defendant:      SMITHAMUNDSEN, LLC
                             BY:  MR. GARY ZHAO
16                            150 N. Michigan Avenue
                             Suite 3300
17                            Chicago, IL  60601

18

19

20

21

22   Court Reporter:         KELLY M. FITZGERALD, CSR, RMR, CRR
                             Official Court Reporter
23                            United States District Court
                             219 South Dearborn Street, Room 1420
24                            Chicago, Illinois  60604
                             Telephone:  (312) 818-6626
25                            kmftranscripts@gmail.com
```

**Exhibit 3 to Declaration of Mark Schlachet – page 1**

2

1    (Proceedings heard in open court:)

2            THE CLERK:  Eternity Mart v. Nature's Sources, 19 CV

3    2436.

4            MR. CRANE:  Good morning, Your Honor.  Jeffrey Crane

5    on behalf of the plaintiff.

6            MR. ZHAO:  Good morning, Your Honor.  Gary Zhao on

7    behalf of defendant Nature's Sources.

8            THE COURT:  All right.  Good morning.

9            I think you're here, we have an initial status

10   conference set in June already, but defendant filed a motion

11   to dismiss.  That's basically an argument that the allegations

12   of the complaint don't satisfy *Twombly* and *Iqbal*.

13           That motion is denied.  The complaint specifically

14   alleges that the defendant falsely told Amazon that goods were

15   counterfeit on February 6th of 2019.  That's pretty specific.

16   That's not conclusory allegations.  I mean, that is one

17   specific allegation.  There's a lot more context around that.

18           So the idea that this does not state a plausible

19   claim simply because it's pled conclusorily I don't agree

20   with.  There were no legal arguments other than failure to

21   meet the pleading standards that were offered in the motion.

22           So with respect to its adequacy in terms of pleading

23   the claims, I find that it is adequate, and I deny the motion

24   to dismiss.  There's no need to respond to that motion.

25           I don't -- because the defendant filed a motion, you

**Exhibit 3 to Declaration of Mark Schlachet – page 2**

X-85

3

1    have not answered the complaint, correct?

2            MR. ZHAO:  We have not answered, Your Honor.

3            THE COURT:  Okay.  You've got 14 days to answer the

4    complaint, which would be what date?

5            THE CLERK:  14 days, June 6th.

6            THE COURT:  All right.  Answer due on June 6th.

7            That date will trigger the mandatory initial

8    disclosure clock, the 30-day clock to get those initial

9    disclosures exchanged.

10           I'm going to strike the initial status conference in

11   June.  Since I've had the opportunity to review the complaint

12   and the motion, I'm factually up to speed on what the case is

13   about.

14           I'm going to refer you for further discovery,

15   supervision, and scheduling to Magistrate Judge Harjani who is

16   the assigned magistrate judge.  So you'll hear from him to set

17   a discovery status and talk about a schedule.  You should talk

18   about that schedule between yourselves before you see the

19   magistrate judge.  If you come to a reasonable agreement, I'm

20   sure he'll be happy to go along with that in terms of

21   discovery.

22           And you don't have to wait for any formal order from

23   Judge Harjani or myself to start issuing formal discovery once

24   you've complied with your mandatory initial disclosure

25   obligations.  But you will hear from him I think in relatively

**Exhibit 3 to Declaration of Mark Schlachet – page 3**

4

1    short order.

2           Any non-discovery matters will still come to me.  And

3    once discovery has run its course, we'll reconvene here and

4    talk about dispositive motions or pretrial schedule and that

5    sort of thing.

6           Anything else we need to address this morning?

7           MR. CRANE:  Your Honor, if the Court is canceling the

8    initial status conference, do you still want the initial

9    status report that we would submit?

10          THE COURT:  Yes, I do.  Thank you.  Good question.

11   And I want it because I want written confirmation.  I think

12   one issue in terms of -- and I can't remember, frankly, if

13   it's in the complaint or -- well, it must be in the complaint

14   because we don't have the status report yet.

15          I think it's diversity is pled with respect to the

16   defendants, that none of them are residents of Texas.

17   Residency is not determinative of citizenship.  And I want

18   confirmation at least on information and belief in writing

19   that there is diversity based on domicile of the parties, not

20   based on residence, which may or may not -- domicile may or

21   may not be residence.

22          So do file the initial status report, but I'll strike

23   the hearing date.

24          Anything else?

25          MR. ZHAO:  No, Your Honor.

**Exhibit 3 to Declaration of Mark Schlachet – page 4**

5

1          MR. CRANE:  No, Your Honor.

2          Thank you very much.

3          THE COURT:  Okay.  Thank you.

4      (Which were all the proceedings heard.)

5

6                    CERTIFICATE

7    I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9    /s/Kelly M. Fitzgerald          February 5, 2020

10   _____     _____

     Kelly M. Fitzgerald                   Date
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 3 to Declaration of Mark Schlachet – page 5**

X-88

# EXHIBIT 4

**Copy of a Transcript of Motions Hearing of January 18, 2019 in *Johnson v. Incopro, Inc. et al*, 1:18-cv-00689 (E.D. VA)**

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CYNTHIA JOHNSON, doing          .    Civil Action No. 1:18cv689
business as The Little Surf     .
Shack,                          .
                                .
          Plaintiff,            .
                                .
     vs.                        .    Alexandria, Virginia
                                .    January 18, 2019
ASHLY E. SANDS; INCOPRO, INC.,. 10:40 a.m.
a Delaware Corporation; and     .
WOWWEE USA, INC.; a Delaware    .
Corporation,                    .
                                .
          Defendants.           .
                                .
.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:           LANCE G. JOHNSON, ESQ.
                             Johnson Legal PLLC
                             12545 White Drive
                             Fairfax, VA 22030

FOR DEFENDANT ASHLY E.       EVE GRANDIS CAMPBELL, ESQ.
   SANDS:                     O'Hagan Meyer PLLC
                             411 East Franklin Street
                             Suite 500
                             Richmond, VA 23219

FOR DEFENDANT INCOPRO, INC.: JAY W. BROWN, ESQ.
                             PAUL J. SAFIER, ESQ.
                             Ballard Spahr LLP
                             1909 K Street, N.W.
                             12th Floor
                             Washington, D.C. 20006

(APPEARANCES CONT'D. ON PAGE 2)

(Pages 1 - 16)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**Exhibit 4 to Declaration of Mark Schlachet – page 1**

2

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR DEFENDANT WOWWEE          CARTER T. KEENEY, ESQ.
         USA, INC.:                Carter & Shands PC
 3                                 9030 Stony Point Parkway
                                   Suite 530
 4                                 Richmond, VA 23235

 5   OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Third Floor
 6                                 401 Courthouse Square
                                   Alexandria, VA 22314
 7                                 (703)299-8595

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 4 to Declaration of Mark Schlachet – page 2**

X-91

3

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Civil Action 18-689, Cynthia Johnson v.
 3   John Does, et al.  Would counsel please note their appearances
 4   for the record.
 5          MR. JOHNSON:  Lance Johnson, counsel for plaintiff,
 6   Your Honor.
 7          THE COURT:  Good morning.
 8          MR. BROWN:  Good morning, Your Honor.  Jay Brown for
 9   defendant Incopro; and, Your Honor, I have with me my
10   colleague, Paul Safier, whose motion for admission pro hac vice
11   has been granted by the Court; and I would ask the Court to
12   hear from Mr. Safier on Incopro's behalf.
13          THE COURT:  All right, that's fine.  Good morning.
14          MR. SAFIER:  Good morning, Your Honor.
15          THE COURT:  And for WowWee?
16          MR. KEENEY:  Good morning, Your Honor.  I'm Carter
17   Keeney here on behalf of WowWee USA, Inc.
18          THE COURT:  All right.  And lastly, for Ms. Sands?
19          MS. CAMPBELL:  Yes, ma'am.  Eve Campbell on behalf of
20   Ashly Sands.
21          THE COURT:  All right.  Well, before the Court today
22   are the motions of the defendants to dismiss.  Now, we have in
23   the court now the second amended complaint, so that is the
24   operative complaint, and my understanding is the defense were
25   satisfied that their present motions to dismiss were adequate,
```

**Exhibit 4 to Declaration of Mark Schlachet – page 3**

X-92

4

1    because this is the -- I'm deeming those to be motions to

2    dismiss the second amended complaint so there's no question

3    about that.

4           And I want to take up Ms. Sands' motion first because

5    that's a motion addressing the issue, I think, primarily of

6    personal jurisdiction.  Mr. Johnson, I don't think you have

7    personal jurisdiction over this defendant.  My understanding,

8    unless you have any other evidence, is that Ms. Sands is an

9    attorney who is licensed and practices in New York.  As far as

10   I know from the record, she's had one case in the Eastern

11   District of Virginia, and that was in Richmond, and I think she

12   was pro hac in that case.

13          She's not admitted to practice in Virginia as far as

14   we can tell from the record, and the only contacts that she's

15   had related to this case were as a result of contacts initiated

16   from the plaintiff on behalf of the plaintiff from Virginia

17   into New York.  It's not as if she was contacting you sua

18   sponte.

19          Do you have any other evidence of personal contacts

20   between Ms. Sands and this jurisdiction that would support

21   personal jurisdiction?

22          MR. JOHNSON:  As a point of clarification, Your

23   Honor, the response e-mail was to Incopro.  We didn't know

24   Ms. Sands existed.

25          THE COURT:  I'm sorry, okay.

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

**Exhibit 4 to Declaration of Mark Schlachet – page 4**

X-93

5

```
1          MR. JOHNSON:  Ms. Sands then called to Virginia.
2   That was the first contact I had with her -- or that the
3   plaintiff had with her.  I have no other information at this
4   point about her contacts in Virginia.  I know she's involved
5   with an enforcement action for counterfeit Fingerlings products
6   in Richmond.  I do not know if that case arose out of this same
7   complaint to Amazon.
8          I am somewhat reluctant to suggest that a pro hac
9   admission would be sufficient, but at this point, without
10  additional jurisdictional discovery, I have no additional
11  facts.  As I mentioned under the Telco case, there is some
12  leeway about minimum contacts, but the further contact or the
13  further touch in Virginia that was required by that case, at
14  this point I do not have that evidence, and I would require
15  jurisdictional discovery in order to find it.
16         THE COURT:  Well, the Fourth Circuit has -- recently
17  actually has a case where -- involving one of my cases, talks
18  about the right of a plaintiff to take limited jurisdictional
19  discovery on the issue of personal jurisdiction.  In the last
20  case that I had involving that, where I was pretty satisfied
21  based on the record that's before -- that was before me that
22  there really was no basis to continue to pursue the issue, I
23  did allow that plaintiff to have brief jurisdictional
24  discovery.  However, I warned the plaintiff, because I didn't
25  think it really was going to pan out, that if at the end of the
```

**Exhibit 4 to Declaration of Mark Schlachet – page 5**

X-94

6

```
 1   discovery they were unsuccessful in showing that there was any
 2   basis for personal jurisdiction, the costs which the defendant
 3   had to incur in that discovery would be -- have to be paid by
 4   the plaintiff, all right?
 5           In other words, basically it forces a plaintiff to
 6   think -- or plaintiff's counsel to think wisely about whether
 7   it's worth pursuing personal jurisdiction discovery.  And so
 8   I'm going to impose that same ruling in this case; that is, the
 9   motion to dismiss for failure to establish personal
10   jurisdiction within the complaint will be denied without
11   prejudice.
12           If the -- and I will allow the plaintiff brief
13   jurisdictional discovery as to Ms. Sands.  If you choose to go
14   that route and you are unsuccessful in developing evidence that
15   results in the Court finding personal jurisdiction, then the
16   expense which Ms. Sands will have to incur in terms of, you
17   know, having an attorney respond to discovery, etc., you and
18   your client will have to cover.
19           Do you understand that?
20           MR. JOHNSON:  I do.
21           THE COURT:  All right.
22           MR. JOHNSON:  And if agreed to a stipulation of
23   dismissal now, I take it that would avoid that procedure --
24           THE COURT:  That's correct.
25           MR. JOHNSON:  -- and Ms. Sands will be dismissed.
```

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

**Exhibit 4 to Declaration of Mark Schlachet – page 6**

X-95

```
                                                                    7
 1              THE COURT:  That is correct.  So I'll give you that

 2    option as well, all right?  All right.

 3              Now, the other two motions that are pending before

 4    the Court both involve 12(b)(6) issues, and they also involve

 5    an interesting issue about litigation privilege.  I've looked

 6    at those papers.  I'm not satisfied on this early -- at this

 7    early point that either of them -- or any of those theories are

 8    sufficient to go forward at this point.

 9              The plaintiff has made, in my view, a very strong

10    preliminary allegation that the claim that the product the

11    plaintiff is selling through Amazon is counterfeit has no

12    factual basis and that Incopro did not conduct any kind of

13    reasonable investigation that would support having made that

14    kind of a representation to Amazon.

15              Although I read your papers and I know you tried to,

16    to indicate that it was counterfeit or infringing, if you look

17    at the totality, at least as I read them, of the information

18    sent to Amazon, that word "counterfeit" is very strong.  I

19    think it's sufficient at this point to make a claim of

20    defamation per se or defamation because when you allege that

21    somebody's product is counterfeit, I mean, frankly, there are

22    criminal statutes that sanction the selling of counterfeit

23    goods.

24              That's a very serious statement to be made unless

25    there's a genuine factual basis that supports that, and so I --
```

**Exhibit 4 to Declaration of Mark Schlachet – page 7**

8

1   at this point, I'm not going to dismiss the claims.

2          This issue about, you know, that there was a

3   privilege because these representations to Amazon were made in

4   anticipation of litigation, again, I'd have to see what the

5   evidence is before I would accept that argument.

6          So I'm going to require that these counts go forward,

7   all three counts.  The tortious interference with contract,

8   there's no question that there's been serious interference

9   between Ms. Johnson's business and Amazon as it's alleged in

10  the complaint.

11         I, frankly, don't understand why this case hasn't

12  settled, and I would be curious since you're all here to hear

13  more specifically from the defendants what your -- I guess it

14  should come from Incopro -- what the real theory is that -- of

15  wrongdoing that you allege the plaintiff has done.  In other

16  words, what are you really claiming is the intellectual

17  property violation that the plaintiff engaged in when she was

18  selling these products on Amazon?

19         Yeah.

20         MR. SAFIER:  Your Honor, my understanding is that at

21  the end of the day, the accusation is one of copyright

22  infringement.

23         THE COURT:  I don't think it's that.  The language

24  says "counterfeit."  That's the first word in that statement.

25         MR. SAFIER:  Right.  And what I was meaning to say

**Exhibit 4 to Declaration of Mark Schlachet – page 8**

9

```
 1    was as -- if this case goes discovery, that's what it will
 2    show.
 3            Now, what you have represented, which I think is
 4    fair, is that the word "counterfeit" is sufficiently prominent
 5    in the submission to Amazon that that argument doesn't carry
 6    the day at the 12(b)(6) stage, which I accept, but I think the
 7    absent privilege argument, though, is we sent a demand to
 8    Amazon and said to Amazon:  There is infringing material on
 9    your website.  Take it down.
10            THE COURT:  Okay.  Tell me, what's the infringing
11    material?
12            MR. SAFIER:  Well, we -- my understanding is what we
13    intended to convey was that it was copyright infringement, but
14    for purposes of the privilege, it doesn't matter.  We were
15    saying to Amazon:  We believe there is material on your website
16    that infringes our intellectual property.  We are making a
17    demand that you take it down.
18            And Amazon, as a party subject to demand letter, made
19    a poor business decision that it would take down the content,
20    and that's exactly what the litigation privilege --
21            THE COURT:  What is the copyright?
22            MR. SAFIER:  I believe it's an image of the specific
23    WowWee toy at issue.
24            THE COURT:  Does WowWee have a copyright of a
25    photograph?
```

**Exhibit 4 to Declaration of Mark Schlachet – page 9**

X-98

```
                                                                    10
  1           MR. SAFIER:  I believe they own the copyright to that

  2  image, yes.

  3           THE COURT:  You believe?  I mean, do you know it as a

  4  fact?

  5           MR. SAFIER:  That is my understanding of the facts,

  6  Your Honor.

  7           THE COURT:  So they have -- and why do you believe

  8  that it was the plaintiff that put that photograph up on

  9  Amazon?

 10           MR. SAFIER:  We didn't assert anything as to whether

 11  the plaintiff put it up or Amazon put it up.  The demand letter

 12  was to Amazon, and my point here is the absolute privilege --

 13  litigation privilege applies whether it's counterfeiting or

 14  copyright.

 15           What you do when you submit a demand letter to a

 16  website is you say:  We think there's infringing content on

 17  your website.  Investigate it, and decide what to do.

 18           Amazon did that, and what they decided to do was take

 19  it down.

 20           It would be no different than if, you know, we had

 21  sent a letter directly to Surf Shack and said:  We think

 22  there's infringing content on your website, and they took it

 23  down.  That would clearly fall within the litigation privilege,

 24  and there's no difference here.  It may feel different because

 25  Amazon is this gigantic behemoth that feels this sort of, you
```

**Exhibit 4 to Declaration of Mark Schlachet – page 10**

11

1  know, feels like a third party here, but the demand and

2  complaint was to Amazon about content on the Amazon website,

3  and under *Mansfield*, the Virginia Supreme Court decision, that

4  type of communication is subject to a litigation privilege if

5  it is only distributed to an interested party, which is what

6  happened here.

7          THE COURT:  Well, that may all down the road pan out,

8  but I think without discovery and actually seeing is there, in

9  fact, a copyright for this particular photograph or image that

10 was on the website, I'm not prepared to dismiss these cases --

11 this case at this point.

12         MR. SAFIER:  I appreciate that, Your Honor --

13         THE COURT:  Yeah.

14         MR. SAFIER:  -- but the privilege applies even if

15 it's a counterfeiting complaint.

16         Nothing about whether the privilege applies turns on

17 the complaint we were making.

18         THE COURT:  Well, only if it's a good faith -- if

19 it's a good faith, genuine basis for even claiming that there's

20 potential litigation.

21         And the other thing is, by the way, this issue was

22 raised in Ms. Sands' motion but I don't think WowWee or Incopro

23 raised it explicitly:  There's an interesting issue as to what

24 law is going to apply to this case.  Our preliminary position

25 is, is that most likely Washington law is more appropriate,

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

**Exhibit 4 to Declaration of Mark Schlachet – page 11**

12

```
 1    although it's very similar to Virginia, but I think at some
 2    point down the road, we're going to have to be 100 percent in
 3    agreement as to what law is applying to this case.
 4              In any case, I don't understand why this case can't
 5    be settled.  If, in fact, what I'm told from the complaint, the
 6    plaintiff is a legitimate business, who's not selling
 7    counterfeit goods, who goes to Walmart and other legitimate,
 8    you know, retailers and purchases these items and then offers
 9    them on Amazon as a secondary source of the items, as she's
10    represented in her paperwork, why she's being penalized and not
11    able to use Amazon to sell these goods I don't understand.
12              MR. SAFIER:  Your Honor, that's Amazon's decision,
13    though.
14              THE COURT:  Well, it's Amazon's decision only -- the
15    only problem is because you-all told Amazon that there was a
16    problem with what the plaintiff's product was -- what was going
17    on.
18              MR. SAFIER:  But Amazon took our demand letter and
19    investigated the situation and made a business decision about
20    how to handle it.  It's no different than any demand letter to
21    anyone.
22              I appreciate that if we had sent the demand letter
23    directly to Surf Shack, they would have probably told us to
24    pound sand, and Amazon didn't do that, but that's up to Amazon.
25    Amazon gets to make a decision about how it's going to handle
```

**Exhibit 4 to Declaration of Mark Schlachet – page 12**

13

1   demand letters.

2        And if you look at the *Mansfield* decision, the reason

3   the litigation privilege exists is to keep courts out of

4   settlement negotiations over demand letters.  Maybe Amazon made

5   an unwise decision, maybe they were rash, but it's ultimately

6   Amazon's decision about what to do with content on its website

7   when it receives a demand letter.

8        THE COURT:  All right.  Let me hear from you,

9   Mr. Johnson.

10        MR. JOHNSON:  Your Honor, as we mentioned in the

11   papers, the pre-litigation communications privilege doesn't

12   apply here.  No litigation was ever filed asserting or

13   enforcing even the copyright claim that Incopro asserts,

14   certainly not the counterfeit claim.

15        In the *Mansfield* case, it was an actual pleading.  It

16   was a draft complaint sent to the potential defendant seeking

17   settlement.  It wasn't sent to a third party, and it's not

18   entirely clear -- or it is clear at this point that the Amazon

19   procedures for handling those complaints have nothing to do

20   with litigation.  There is no published proceedings.  There are

21   no published procedures for how to proceed.

22        You know, the representations are presumed to be

23   accurate.  They act on them accordingly in a summary

24   proceeding, and it says if the guilty -- you know, the seller

25   is presumed guilty and must fight to clear its name, and in

**Exhibit 4 to Declaration of Mark Schlachet – page 13**

14

1  this case, it required a request to Incopro to, you know,

2  retract the complaint, which they refused.  There's no appeal

3  from that.

4          That's not a litigation, Your Honor.  None of the

5  safeguards associated with litigation are found in the Amazon

6  proceeding, so pre-litigation privilege does not apply.

7          THE COURT:  As I said, I think before we can resolve

8  this case, if you-all can't settle it among yourselves, is that

9  it is appropriate for there to be discovery on these issues as

10  to, you know, what the basis was for filing this case in the

11  first -- this complaint with Amazon in the first place, whether

12  there was ever any intent or plan to sue Amazon if they failed

13  to do it.  I mean, I think that would be relevant to the

14  pre-litigation situation.

15          And whether or not there is actually a real copyright

16  for this photograph, what the photograph was, was it, in fact,

17  a violation, you know, I think what kind of investigation was

18  done by Incopro, and to the extent that, you know, WowWee hires

19  Incopro to do this kind of work for them, I think under the

20  concepts of, you know, respondeat superior, there's enough at

21  this point, again, we're only at the pleading stage, to keep

22  WowWee in the case.

23          So I'm denying without prejudice the remaining

24  defendants' motions to dismiss, and again, as to Ms. Sands, if

25  you're going to take a voluntary dismissal, that's fine.  If

**Exhibit 4 to Declaration of Mark Schlachet – page 14**

15

1   you choose to do the option to get discovery, then as I said,

2   you'll have to face the potential for costs if it's not

3   successful.  All right?

4           MR. JOHNSON:  I understand that.

5           THE COURT:  All right.

6           MR. JOHNSON:  And if I might have a few minutes with

7   Ms. Campbell, I can probably resolve the Ms. Sands issue right

8   now.

9           THE COURT:  We'll need it in writing, so whatever.

10          Now, Judge Buchanan is the magistrate judge who's

11  assigned to this case, and again, this is one where I think,

12  you know, you might want to sit down and see whether or not

13  both sides can work this case out early and quickly.  I would

14  think that Ms. Johnson's main interest is to get back on Amazon

15  as quickly as possible and to, and to get this matter over

16  with, because litigation is expensive, and, and we will go

17  ahead and get a scheduling order issued to you today so that

18  that will get the discovery process started, because I don't

19  think one has been -- oh, yes, it is.  You already have one.

20          MR. JOHNSON:  Yes.  And we filed the 26(f) report.

21          THE COURT:  Right.  That's right.  So you're already

22  moving on that.

23          So we will move quickly, but still it's a couple of

24  months before the final resolution of this case if you are

25  unable to settle, but I think in this type of a case,

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

**Exhibit 4 to Declaration of Mark Schlachet – page 15**

X-104

```
                                                                    16
 1    settlement always -- it makes sense to try it.  It may not be

 2    successful because I don't know -- have there been any demands

 3    made?

 4            MR. JOHNSON:  Yes, we've had substantial discussions.

 5            THE COURT:  You have.

 6            MR. JOHNSON:  They rather stalled, but we are happy

 7    to discuss settlement and happy to have the assistance of Court

 8    in doing that.

 9            THE COURT:  Well, Judge Buchanan is an excellent

10    mediator, and if for any reason, because she may be out of

11    town, if you want to get something done quickly and she's not

12    available, although I know she's actually settled cases over

13    the phone, but Judge Nachmanoff or Judge Anderson, we have

14    several magistrate judges, all of whom are very, very good at

15    settling cases.  All right?

16            MR. JOHNSON:  Very good.

17            THE COURT:  Very good.  We'll recess court for the

18    day.

19                        (Which were all the proceedings

20                          had at this time.)

21                   CERTIFICATE OF THE REPORTER

22        I certify that the foregoing is a correct transcript of

23    the record of proceedings in the above-entitled matter.

24

25                              _____
                                          /s/
                                  Anneliese J. Thomson
```

**Exhibit 4 to Declaration of Mark Schlachet – page 16**

# EXHIBIT 5

## Copy of Defendant Auction Brothers, Inc. dba Amazzia's Amazon Seller Profile on Amazon.com as of January 20, 2020



# EXHIBIT 6

## Copy of Defendant Auction Brothers, Inc. dba Amazzia's online seller rating posted by Marketplace Rating, February 9, 2020

# Amazzia

2,934 reviews | 5.0 out of 5

Contact Amazzia on Amazon USA (https://www.amazon.com/gp/help/contact-seller/contact-seller.html?sellerID=A3T9U6F3CBS77R)

Amazzia Amazon USA ☑ (https://www.amazon.com/gp/aag/main?seller=A3T9U6F3CBS77R&tag=marketplaceratings07-20) is one of the TOP 10,000 sellers on Amazon USA.

Amazzia - an official **Fulfillment by Amazon (FBA)** seller. Like all FBA sellers, Amazzia transfer most of their warehouse operations to Amazon, where their products are packed, shipped and distributed to customers.

Last month reviews data shows, that Amazzia is in the 7,639th place. According to feedback numbers of the last year Amazzia was doing better - they were number 3,163rd.

The latest reviews available on their page on Amazon USA (https://www.amazon.com/gp/aag/main?seller=A3T9U6F3CBS77R&tag=marketplaceratings07-20).

Contact Amazzia on Amazon USA (https://www.amazon.com/gp/help/contact-seller/contact-seller.html?sellerID=A3T9U6F3CBS77R&tag=marketplaceratings07-20) seller if you have any questions about shipping, refunds, returns or product customization.

If you are interested in similar sellers please check the following: Boston Decal Works LLC (https://www.marketplacerating.com/amazon/usa/boston-decal-works-llc), School Specialty (https://www.marketplacerating.com/amazon/usa/school-specialty).

## A bundle built for you

A bundle built for your business. Explore our new Internet, Phone and TV bundle today.

Atlantic Broadband                                                    OPEN

No Products for Amazzia, Please Try Another Amazon USA (https://www.marketplacerating.com/amazon/usa) Seller.

Browse All Products on Amazon USA (https://www.amazon.com/s?merchant=A3T9U6F3CBS77R&tag=marketplaceratings07-20)

Marketplace Rating is a participant in the Amazon Services LLC Associates Program, an affiliate advertising program designed to provide a means for us to earn fees by linking to Amazon and affiliated sites.

© Marketplace Rating 2020. Drop us an Email (mailto:support@marketplacerating.com?Subject=Question) if you have any questions.

**Exhibit 6 to Declaration of Mark Schlachet – page 1**



(https://www.facebook.com/marketplacerating/)

(https://plus.google.com/110315929964372746620)

(https://twitter.com/marketplaceblog)

Privacy Policy (https://www.marketplacerating.com/privacy)

**Exhibit 6 to Declaration of Mark Schlachet – page 2**

X-110

# EXHIBIT 7

## Copy of Auction Brothers, Inc. dba Amazzia's personnel solicitation LinkedIn, as of January 20, 2020



# EXHIBIT 8

# Copy of a page from Amazon Seller Central advising that most account reviews conclude within 30 days, but Amazon retains discretion to extend that time frame in its discretion



**Oneida_Books**                                                                 Jan '13

SSssooooo many threads on this topic in the forum.

A quick search will give you many helpful threads … but about 30 days seems to be the average.

There are things to do to do to speed it up as mentioned in the other threads …

*Account reviews*

If at any time during an evaluation we find that your current sales volumes or inventory are not supported by buyer feedback or an established sales history, we may place your account under review. If your seller account is placed under review, a temporary hold will be placed on funds in your seller account and we may suspend your listings.

Any funds withheld for an account review are separate from amounts withheld for other purposes, including A-z claims, credit card chargebacks, and unshipped orders. Most reviews are completed within 30 days; however, we may extend the review period at our discretion.

We will notify you of our decision when the account review is complete.