RANDOLPH GAW (S.B. #223718)
 rgaw@gawpoe.com
MARK POE (S.B. #223714)
 mpoe@gawpoe.com
VICTOR MENG (S.B. #254102)
 vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

MARK SCHLACHET (*pro hac vice*)
markschlachet@me.com
3515 Severn Road
Cleveland, OH 44118
Telephone: (216) 225-7559
Facsimile: (216) 932-5390

CHRISTOPHER J. HAMMOND
(S.B. #150024)
chammond@bizlawpro.com
21540 Prairie Street, Unit A
Chatsworth, CA 91311
Telephone: (866) 625-2529
Facsimile: (866) 463-9285

Attorneys for Plaintiff Thimes Solutions Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| THIMES SOLUTIONS INC.<br><br>Plaintiffs,<br><br>v.<br><br>TP-LINK USA CORPORATION, and AUCTION BROTHERS, INC. d/b/a AMAZZIA<br><br>Defendant. | Case No. 2:19-cv-10374-SB (Ex)<br><br>**THIMES SOLUTIONS INC.'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS FOURTH AMENDED COMPLAINT**<br><br>Judge: Hon. Stanley Blumenfeld, Jr.<br>Courtroom: Courtroom 6C<br>Date: December 4, 2020<br>Time: 10:30 am |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

I.  LEGAL STANDARD.....................................................................................3

II.  TSI ADEQUATELY ALLEGES A RELEVANT MARKET. .........................3

   A.  The Complaint Adequately Alleges A Relevant Product Market..............4

   B.  The Product Market Is A Factual Determination for the Jury. ...................5

   C.  The Cases Defendants Cite Do Not Advance Their Argument. .................7

   D.  Defendants' Contentions Regarding TSI's Geographic Markets Fail as a
       Matter of Law...........................................................................................9

III.  TSI PLAUSIBLY ALLEGES DIRECT AND CIRCUMSTANTIAL
     EVIDENCE OF TP-LINK'S MARKET POWER. ........................................11

   A.  TSI Alleged Direct Evidence of TP-Link's Market Power. ....................11

   B.  TSI Alleged Circumstantial Evidence of TP-Link's Market Power.........13

       1.  TP-Link Surpasses The Market Power Threshold In The Relevant
           Markets............................................................................................14

       2.  The Court Must View TP-Link's Press Release In TSI's Favor. ........16

       3.  TSI Alleges High Entry Barriers.......................................................18

IV.  THE COMPLAINT ADEQUATELY ALLEGES ANTITRUST INJURY.....19

V.  TSI HAS A JUSTICIABLE "CASE OR CONTROVERSY" UNDER THE
    DECLARATORY JUDGMENT ACT ...........................................................22

   A.  Defendants' Actions Created an Actual Case or Controversy.................23

   B.  The Court Should Exercise Its Discretion To Settle All Aspects of the
       Controversy Between TSI and Defendants...............................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Advanced Thermal Scis. Corp. v. Applied Materials Inc.*,
  No. 07-cv-01384 JVS, 2009 WL 10671185 (C.D. Cal. July 20,
  2009) ................................................................................................. 17

*Allflex USA, Inc. v. Avid Identification Sys., Inc.*,
  No. 5:06-cv-01109-MRP-OP, 2010 WL 11405130 (C.D. Cal. Feb.
  16, 2010) .............................................................................................. 6

*Aluminium v. Hunter Eng'g Co.*,
  655 F.2d 938 (9th Cir. 1981) ................................................. 22, 23, 24

*Am. States Ins. Co. v. Kearns*,
  15 F.3d 142 (9th Cir. 1994) ................................................................ 22

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) ............................................................ 21

*In re ATM Fee Antitrust Litig.*,
  No. C 04-2676 CRB, 2010 WL 2557519 (N.D. Cal. June 21, 2010) ................. 12

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  No. 17CV205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June
  19, 2018) ............................................................................................. 10

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
  No. 18-CV-00933-MMC, 2019 WL 6327203 (N.D. Cal. Nov. 26,
  2019) ................................................................................................... 21

*Beech-Nut Nutrition Corp. v. Gerber Prod. Co.*,
  69 F. App'x 350 (9th Cir. 2003) ........................................................... 3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................... 3, 12

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
  941 F. Supp. 2d 1227 (C.D. Cal. 2013) ................................................ 6

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ................................................................. 3

*Cat Tech LLC v. TubeMaster, Inc.*,
   528 F.3d 871 (Fed. Cir. 2008) ............................................................... 25

*Chesebrough-Pond's, Inc. v. Faberge, Inc.*,
   666 F.2d 393 (9th Cir. 1982) ........................................................... 23, 24

*Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) ............................................. 12, 13

*City of Oakland v. Wells Fargo & Co.*,
   972 F.3d 1112 (9th Cir. 2020) ................................................................. 3

*CollegeNET, Inc. v. Common Application, Inc.*,
   711 Fed. Appx. 405 (9th Cir. Oct. 23, 2017) ......................................... 2

*Cost Mgmt. Servs. v. Washington Natural Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) ............................................................. 13, 14

*Datagate, Inc. v. Hewlett-Packard Co.*,
   941 F.2d 864 (9th Cir. 1991) ................................................................. 3

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
   136 F.3d 554 (8th Cir. 1998) ................................................................. 6

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.D. Cal. 2008) ................................................ 9

*Found. for Interior Design Educ. Research v. Savannah College of Art & Design*,
   244 F.3d 521 (6th Cir. 2001) ................................................................. 6

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003) ............................................................... 20

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1989) ............................................................. 22

*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ............................................................. 15

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

*Hearn v. R.J Reynolds Tobacco Co.*,
   279 F. Supp. 2d 1096 (D. Ariz. 2003) ................................................................. 17

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (2018) ........................................................................................ 8

*Hurst Int'l, LLC v. Sinclair Sys. Int'l, LLC*,
   No. 17-cv-8070-VAP (ASX), 2018 WL 4961908 (C.D. Cal. May
   18, 2018) ............................................................................................................. 9

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ............................................................ 2, 7, 18, 21

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) .............................................................................. 4

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) .............................................................................. 3

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
   No. SACV 07-1052-DOC, 2008 WL 11338443 (C.D. Cal. Feb. 11,
   2008) ............................................................................................................. 6, 7

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) .......................................................................................... 22

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) .......................................................................... 15

*Nationwide Power Solutions Inc. v. Eaton Elec. Inc.*,
   No. SACV 07-883-JVS, 2008 WL 11408997 (C.D. Cal. Oct. 10,
   2008) ................................................................................................................. 15

*Newcal Indus. Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .............................................................. 4, 5, 6, 8

*In re NFL Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) .......................................................................... 20

*Novation Ventures, LLC v. J.G. Wentworth Company, LLC*,
   156 F.Supp.3d 1094 (C.D. Cal. 2015) ......................................................... 21, 22

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) .......................................................................... 2, 13

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ................................................................. 9

*Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*,
  526 F.2d 1196 (9th Cir. 1975) ...................................................... 14, 15

*PNY Tech. v. SanDisk Corp.*,
  No. C-11-04689-YGR, 2012 WL 1380271 (N.D. Cal. April 20,
  2012) ....................................................................................................... 15

*Porter v. Jones*,
  319 F.3d 483 (9th Cir. 2003) .................................................................... 3

*Procter & Gamble Co. v. CAO Grp., Inc.*,
  No. 1:13-CV-337, 2013 WL 5353281 (S.D. Ohio Sept. 24, 2013) ..................... 6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ...................................................................... 6

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ........................................................... *passim*

*Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*,
  41 F. Supp. 3d 906 (C.D. Cal. 2014) ...................................................... 18

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
  No. 12-CV-05847-JST, 2013 WL 3242245 (N.D. Cal. June 25,
  2013) ....................................................................................................... 14

*Rhoades v. Avon Prods., Inc.*,
  504 F.3d 1151 (9th Cir. 2007) ................................................................ 23

*San Diego County Credit Union v. Citizens Equity First Credit Union*,
  344 F. Supp. 3d 1147 (S.D. Cal. 2018) ........................................... 16, 23

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  No. 18-CV-06720-LHK, 2020 WL 5408056 (N.D. Cal. Sept. 9,
  2020) ....................................................................................................... 17

*Signature MD, Inc. v. MDVIP, Inc.*,
  No. 14-cv-5453 DMG, 2015 WL 3988959 (C.D. Cal. Apr. 21, 2015) ............... 14

*Sobini Films v. Tri-Star Pictures Inc.*,
No. 01-cv-06615 ABC, 2001 WL 1824039 (C.D. Cal. Nov. 21,
2001) ......................................................................................... 22, 24

*Staley v. Gilead Sciences, Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) ....................................... 7

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ................................................ 3

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ................................................ 17

*Theme Promotions, Inc. v. News Am. Marketing FSI*,
546 F.3d 991 (9th Cir. 2008) ............................... 7, 12, 14, 21

*Thompson v. 1-800 Contacts, Inc.*,
No. 2:16-CV-1183-TC, 2018 WL 2271024 (D. Utah May 17, 2018) .................. 9

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .................................................. 6

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
No. 14-cv-01664 JVS, 2015 WL 12765461 (C.D. Cal. May 19,
2015) ..................................................................................... 20

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
No. 14-cv-01664 JVS, 2016 WL 6822191 (C.D. Cal. Jan. 21, 2016) ................ 19

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
No. SA-15-CA-32, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) .................... 10

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
No. 15-cv-07490 SJO, 2016 WL 3919487 (C.D. Cal. Apr. 6, 2016) ............. 13, 14

*Wong v. Hard Drive Prods., Inc.*,
No. 12-cv-469-YGR, 2012 WL 1252710 (N.D. Cal. Apr. 13, 2012) ................. 24

**Other Authorities**

Fed. R. Civ. P. 8(a)(2)............................................................ 3

Fed. R. Civ. P. 12(b)(6) ....................................................... 4, 6

**INTRODUCTION**

The aim of Defendants' motion to dismiss is not to demonstrate that Plaintiff Thimes Solutions Inc. ("TSI") has failed to state claims for relief, but rather that TSI is not capable of proving those claims at this juncture of the case based on Defendants' extrinsic evidence, which they go on to present in the light most favorable to them.  Unsurprisingly, Defendants are unable to cite any cases dismissing antitrust claims at the pleading stage under analogous circumstances, leaving them to largely resort to relying on cases stating general pronouncements of antitrust law.  These arguments may or may not work on a motion for summary judgment, but they unquestionably are inappropriate for a motion to dismiss.

Thus, the relevant questions at this stage of the lawsuit are not whether TP-Link's press release says something other than what it says, or whether doorbells are akin to wireless routers.  The only relevant questions before the Court are whether TSI has made allegations in its Fourth Amended Complaint ("4AC") plausibly entitling it to relief, or whether it could cure any deficiencies with additional allegations.  To start, TSI alleges that Defendants conspired to eliminate TSI and other re-sellers offering TP-Link's WLAN products below the manufacturer's minimum advertised price from the Amazon Marketplace, the largest e-commerce platform in the United States and globally.  (4AC ¶¶ 5-10, 20-21, 27.)  The scheme consisted of having Amazzia, under the guise of "brand protection," lodge a barrage of complaints to Amazon falsely accusing the re-seller of selling counterfeit products.  (*Id.* ¶¶ 29-47.)  Defendants were aware that Amazon rubberstamps these types of complaints and abused the process to eliminate 90% of TP-Link's competitors on Amazon.  (*Id.* ¶¶ 25-27, 30, 38.)  This scheme allowed TP-Link to reduce the availability of lowered priced WLAN products these resellers offered to consumers, thereby forcing consumers to pay TP-Link's supracompetitive, minimum advertised price.  (*Id.* ¶ 63.)  TSI supports its allegation that TP-Link's prices are supracompetitive by alleging that TSI was able to maintain a high profit

margin despite selling TP-Link products at a price considerably lower than TP-Link's minimum advertised price. (*Id.* ¶¶ 20-21.) Because resellers like TSI carry multiple brands, Defendants' eliminating them from Amazon also reduced consumer choice of alternative WLAN products. (*Id.* ¶ 64.) Thus, TSI's complaint plausibly alleges direct evidence of TP-Link's exercise of market power and of injury to competition. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("[i]f the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power.")

Controlling precedent further dictates that market definition and market power are factual questions inappropriate for resolution on a motion to dismiss. *Oahu Gas Serv., Inc. v. Pac. Res., Inc.,* 838 F.2d 360, 363 (9th Cir. 1988) ("Our previous decisions establish that both market definition and market power are essentially questions of fact."). *See also CollegeNET, Inc. v. Common Application, Inc.*, 711 Fed. Appx. 405, 407 (9th Cir. Oct. 23, 2017) (quoting *Oahu Gas*) (unpublished). Similarly, TSI has adequately alleged antitrust injury because it pled facts showing that it lost sales due to Defendants' wrongful acts. *See Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) ("plaintiff can establish antitrust injury by showing that it would have earned an even higher profit but for antitrust injury"). Defendants may be able to one day convince the Court or a jury to see things their way. But at the motion to dismiss stage, TSI need only state a plausible claim.

Given Defendants' conduct alleged in the complaint, it is also reasonable for TSI to apprehend that TP-Link will do anything to prevent TSI from selling TP-Link products on the Amazon Marketplace or other distribution channels. TSI thus has a justiciable "case or controversy" under the Declaratory Judgment Act, and dismissal is neither warranted nor appropriate as a matter of law.

The Court should deny Defendants' motion to dismiss in its entirety.

1    **I.    LEGAL STANDARD**

2          To survive a motion to dismiss, a complaint need only satisfy Rule 8(a)(2)'s

3    minimal notice pleading requirement of a short and plain statement. *Porter v.*

4    *Jones*, 319 F.3d 483, 494 (9th Cir. 2003); Fed. R. Civ. P. 8(a)(2).  "The standard at

5    this stage of the litigation is not that plaintiff's explanation must be true or even

6    probable. The factual allegations of the complaint need only 'plausibly suggest an

7    entitlement to relief.'"  *Starr v. Baca*, 652 F.3d 1202, 1216-1217 (9th Cir. 2011).

8    "A claim has facial plausibility when the plaintiff pleads factual content that allows

9    the court to draw the reasonable inference that the defendant is liable for the

10   misconduct alleged."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The

11   Court must accept all factual allegations in the complaint as true and construe them

12   in the light most favorable to TSI.  *City of Oakland v. Wells Fargo & Co.*, 972 F.3d

13   1112, 1121-22 (9th Cir. 2020).

14         "There is no special rule requiring more factual specificity in antitrust

15   pleadings."  *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir.

16   1991).  *See also Beech-Nut Nutrition Corp. v. Gerber Prod. Co.*, 69 F. App'x 350,

17   351 (9th Cir. 2003) (same).  A Sherman Act plaintiff need only "sketch the outline

18   of the injury to competition with allegations of supporting factual detail . . . [and]

19   [s]uch allegations must raise a reasonable expectation that discovery will reveal

20   evidence of an injury to competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d

21   1192, 1198 (9th Cir. 2012) (internal citations and quotations omitted).  An antitrust

22   claim may be dismissed "only if proof of no set of facts outlined by the complaint

23   would justify relief."  *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d

24   504, 507 (9th Cir. 1989).

25   **II.    TSI ADEQUATELY ALLEGES A RELEVANT MARKET.**

26         Defendants first argue that TSI's antitrust claims fail because it fails to

27   adequately allege the existence of a relevant market.  (Mot. at 4-5.)  As Defendants

28   correctly note, the "relevant market" includes a "product" and a "geographic"

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

component.  (*Id.* at 5.)  The Ninth Circuit applies a lenient standard on assessing whether a "relevant market" is sufficiently pled.  *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  A Sherman Act claim will only be dismissed under Rule 12(b)(6) where "the complaint's 'relevant market' definition is facially unsustainable." *Id.*

### A.   The Complaint Adequately Alleges A Relevant Product Market.

TSI alleges the product market to be "direct-to-consumer sales of new / factory-sealed consumer WLAN products during the year 2018."  (4AC ¶ 58.) Defendants first contend that the defined product market is "impermissibly broad" because TSI did not allege facts regarding "reasonable interchangeability of use or cross-elasticity of demand" and "makes no attempt to identify which products fall into the 'new/factory-sealed consumer WLAN products' market."  (Mot. at 5-6.) TP-Link also attempts to define the product market itself to include wide and disparate products such as laptops, lightbulbs, thermostats, and doorbells based on a self-administered Amazon search.  (Mot. at 1 n.1 & 6-7.)

Setting aside the dubiousness of basing a product market definition upon the results of Amazon search engine queries, this is all extrinsic evidence not subject to judicial notice and thus cannot be considered on a motion to dismiss.[1] *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  In any event, as TSI alleges, "WLAN products" is a term *TP-Link itself uses* to describe its own products and the market it competes in.  (4AC ¶ 19, 58.a.)  According to TP-Link's own press release, it holds the "dominant position as the market leader in WLAN products for the 29th consecutive quarter."  (*Id.*)  And TP-Link's press release appears to take its definition of "WLAN products" from the IDC Quarterly Wireless LAN Tracker. (Request for Judicial Notice ("RJN") Ex. A.)  The Fact Sheet for that quarterly report shows that WLAN products is defined to consist of "controller[s],"

---

[1] *See also* concurrently filed Opposition to Request for Judicial Notice.

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

"router[s]," "switch[es]," and "AP [access points]."  (RJN Ex. B.)  Nowhere in the Complaint does TSI allege any facts that, if construed in the light most favorable to it, would result in an inference that TSI is lumping TP-Link's routers together with lightbulbs and doorbells.

Defendants do not cite a single case holding that an antitrust plaintiff is required to plead facts specifically identifying what products are, or are not, interchangeable with the defendant's products.  In any event, TSI's allegations, especially when reasonable inferences are drawn from them, clearly set forth "the product at issue as well as all economic substitutes for the product."  *Newcal Indus. Inc.*, 513 F.3d at 1045.  TSI repeatedly alleges that Defendants' anticompetitive conduct barred TSI from selling the "TP-Link AC5400 routers" in its inventory and referenced the term "router" extensively throughout the complaint.  (4AC ¶¶ 39-49, 59-61.)  No reasonable person could draw an inference from the Complaint that this dispute somehow involves light bulbs or doorknobs, or that those products are interchangeable with a wireless router whose sole function is to remotely connect a user to the Internet so that they can browse or otherwise utilize it for personal purposes.  Thus, as is apparent from the Complaint, the WLAN product market has a commonsense definition of wireless routers, "all economic substitutes," and products that enjoy "reasonable interchangeability of use."  *Newcal Indus. Inc.*, 513 F.3d at 1045.[2]

### B.   The Product Market Is A Factual Determination for the Jury.

Defendants' argument that there are "hundreds" or "thousands" of products found on Amazon that are interchangeable with WLAN products (Mot. at 2 n.1, 6,

---

[2] Should the Court feel it necessary, TSI can easily amend the complaint to expressly state that consumer WLAN products refers to consumer-oriented WiFi routers, adapters, controllers, switches, access points, and similar products.  (Standing Order § 7.a. ("In general, the Court must provide leave to amend upon granting a motion to dismiss unless it is clear the complaint is not correctible.") (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996).)

14 n.6.) also amounts to nothing more than factual critiques that are inappropriate on a motion to dismiss. *Newcal*, 513 F.3d at 1045 ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."). Courts in the Ninth Circuit (and elsewhere) agree that the determination of a relevant market is a factual question that requires discovery and cannot be resolved at the pleading stage. *See id.*; *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1232 (C.D. Cal. 2013) ("The inquiry into whether [certain products] are 'reasonably interchangeable' with [the products at issue] is a factual issue that cannot be determined at the pleading stage."); *Allflex USA, Inc. v. Avid Identification Sys., Inc.*, No. 5:06-cv-01109-MRP-OP, 2010 WL 11405130, at *9 (C.D. Cal. Feb. 16, 2010) ("the relevant market definition is a fact question, which will be decided later in the litigation. At the motion to dismiss stage, the Court is concerned only with whether Allflex's definition is facially sustainable.").[3] Indeed, an antitrust plaintiff may refine its market definition with the benefit of discovery. *Procter & Gamble Co. v. CAO Grp., Inc.*, No. 1:13-CV-337, 2013 WL 5353281, at *8 (S.D. Ohio Sept. 24, 2013) ("The ultimate determination of the market definition need not be finalized at the pleading stage.").

    *Magnetar Techs. Corp. v. Intamin, Ltd.*, No. SACV 07-1052-DOC, 2008 WL

---

[3] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market"); *Found. for Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery"); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (discussing the relevant market and noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers").

11338443 (C.D. Cal. Feb. 11, 2008) is instructive.  The defendant there likewise argued that plaintiff's definition of the relevant market "d[id] not satisfy the requirement of 'reasonably interchangeability of use and cross-elasticity of demand' because the alleged product markets for brakes and rides are not interchangeable." *Id.* at *3.  Judge Carter rejected this contention and noted that "defining a product market involves identification of the field of competition" and is "a factual inquiry for the jury," and held that "[t]he determination of … 'reasonable interchangeability of use and cross-elasticity of demand' is a question of fact that must be resolved in favor of plaintiff for the purposes of this 12(b)(6) motion."  *Id.*

Moreover, precedent also holds that the "definition of the relevant market is a question of fact for the jury."  *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1002 (9th Cir. 2008); *Image Tech. Servs.*, 125 F.3d at 1203 ("Ultimately what constitutes a relevant market is a factual determination for the jury.").

## C.    The Cases Defendants Cite Do Not Advance Their Argument.

*Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578 (N.D. Cal. 2020) is distinguishable.  The court rejected plaintiffs' definition of the market for "cART [combination antiretroviral therapy] drugs generally" because the cART treatment regimen consists of a "cocktail" of multiple drugs, manufactured by defendant and generics, each with independent uses, and plaintiffs did not explain "how there is reasonable interchangeability of use with respect to different cART drugs."  *Id.* at 586, 617.  In contrast, TSI alleges a market consisting of a single product (wireless routers) and its economic substitutes (reasonably interchangeable consumer WLAN products).  More specifically, it is unclear in *Staley* as to which combination of drugs would make up a cART and thus serve as an economic substitute, whereas here, it would be glaringly obvious whether a product allows a consumer to

1    wirelessly connect to and browse the Internet, or not.[4]

2        *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (2018) is likewise inapposite.  *Hicks*

3    affirmed the district court's finding the proposed product markets (defined as "the

4    national market for the endorsement of products and services by participants in

5    professional golf tournaments" and "the national market for in-play or in-action

6    commercial advertising at professional golf events between commercial breaks" to

7    be "facially unsustainable" because plaintiffs attempted to "omit many economic

8    substitutes"—in that case, various alternative forms of advertisement targeted

9    towards golf fans—from its market definition.  *Id.* at 1114-15, 1121-1122.  Indeed,

10   the contrived nature of those proposed product markets made them "'not natural,'

11   'artificial,' and 'contorted to meet [Plaintiffs] litigation needs.'"  *Id.* at 1121.  *Hicks*

12   would apply here if TSI had defined the product market to consist only of "wireless

13   routers sold on Amazon in response to a search query for TP-Link routers," but TSI

14   did nothing of the sort here.

15       Also relying on *Hicks*, Defendants falsely contend that TSI's market

16   definition "attempts to limit the product market by sales channel (i.e., to online or to

17   the Amazon Marketplace)" and fails to "encompass economic substitutes such as

18   physical stores or other well-known websites."  (Mot. at 8.)  As alleged, TSI's first

19   two markets include both online and physical stores.  (4AC ¶¶ 58.a-58.b.)  It is the

20   third and fourth markets that are limited to e-commerce only, (*see id.* ¶¶ 58.c-58.d),

21   but the Ninth Circuit has recognized the existence of economically distinct

22   submarkets.  *Newcal*, 514 F.3d at 1045.  It is at least a question of fact as to whether

23   a product sold through electronic commerce is a distinct species of trade from that

24   _____

25   [4] Regarding TSI's exclusion of enterprise products from its product market
     definition, Defendants' argument that such products are economic substitutes for
26   consumer products is a fact question for expert witnesses to battle over.  Moreover,
     by definition, consumers often lack access to purchasing enterprise products.  As for
27   the issue of supply elasticity, *Rebel Oil* makes it clear that determining the degree of
     supply elasticity is also a question of fact.  *Rebel Oil*, 51 F.3d at 1436.
28

product sold through a traditional bricks and mortar retailer.  *See, e.g.*, *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 WL 2271024, at *9 (D. Utah May 17, 2018) (holding that plaintiff adequately alleged that the relevant product market is the "online retail market for contact lenses"); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1031-32 (N.D. Cal. 2008) (holding it was a fact question whether a proposed "market for online auctions" was too narrow).

### D.   Defendants' Contentions Regarding TSI's Geographic Markets Fail as a Matter of Law.

Defendants next attack the adequacy of TSI's proposed geographic markets: (1) global; (2) United States and New York; (3) the global, United States, and New York online markets; and (4) the global, United States, and New York Amazon Marketplaces.  (Mot. at 8-9; 4AC ¶¶ 58.a-58.d.)  Defendants concede that TSI adequately alleged that consumer WLAN products "are sold on the Amazon platform and on U.S. retailer platforms and brick and mortar stores."  (Mot. at 8.) But they contend that "[t]here is no factual basis … to support a global or New York geographic market" because "[t]here are no allegations that Plaintiff sold WLAN products overseas or in New York."  (*Id.*)  Thus, Defendants argue that geographic market should be limited solely to the entire United States.  (*Id.* at 9.)

First, Defendants' proposed exclusion of the New York market is absurd on its face, given that TSI is located and operates in New York.  And if necessary, TSI can allege facts as to where its past customers were geographically located.  But it is not necessary because in the Ninth Circuit, the geographic market "extends to the 'area of effective competition' . . . where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (ellipsis in original).  A plaintiff is ***not*** required to "be present in a geographic area for that area to be included within the relevant market definition"— "any area where companies compete to sell the relevant product … may properly be included within the definition of the relevant market." *Hurst Int'l, LLC v. Sinclair Sys. Int'l,*

*LLC*, No. 17-cv-8070-VAP (ASX), 2018 WL 4961908, at *3 (C.D. Cal. May 18, 2018) (rejecting argument that plaintiff's definition of nationwide relevant market is "hopelessly muddled" and "inconsistent" with state-level allegations).

Here, TSI alleges that TP-Link itself claims to hold "a 44.08% *global* market share for all WLAN products," and boasts that it is "the *world's* number one provider of consumer Wi-Fi networking devices." (4AC ¶¶ 19, 58.a (emphasis added).)  TSI further alleges that "North America is the largest market for consumer WLAN products, with the United States holding a dominant share of this geographic region," that "the ubiquity of e-commerce" has created a separate "online marketplace," and that the Amazon Marketplace is "utterly dominant in e-commerce."  (*Id.* ¶¶ 58.b-58.d.)  TSI further alleges that TP-Link maintains "at least a 50% market share" in the four alleged markets.  (*Id.* ¶¶ 58.a-58.d.)  Given these allegations, which must be accepted as true and construed in the light most favorable to TSI, it is reasonable to infer that the "area of effective competition" includes all of TSI's proposed geographic markets.

TSI also notes that Defendants fail to cite any authority to support its argument that TSI was required to allege facts such as "buyers cannot purchase WLAN products from another state if there is no supply available in New York." (Mot. at 9.)  Apart from it being unclear as to what that phrase even means from an antitrust perspective, Defendants appear to have simply invented their own rule and claimed that TSI did not follow it.  Certainly, TSI is not aware of any case holding that a geographic market is properly defined only if the product is unavailable outside of that market; to the contrary, courts routinely acknowledge that plaintiffs may allege the existence of smaller geographic submarkets *in addition to* a larger, encompassing geographic market.  *See, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2018 WL 3032552, at *20 (S.D. Cal. June 19, 2018) (plaintiff adequately stated existence of national market and regional submarkets); *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No.

SA-15-CA-32, 2015 WL 6994438, at *4 (W.D. Tex. Oct. 15, 2015) (same).

## III.   TSI PLAUSIBLY ALLEGES DIRECT AND CIRCUMSTANTIAL EVIDENCE OF TP-LINK'S MARKET POWER.

Defendants next argue that TSI's antitrust claims should be dismissed because it fails to adequately allege that TP-Link possesses the requisite market power. (Opp. at 9.)  An antitrust plaintiff may establish the defendant's market power through *either* direct or circumstantial evidence.  *Rebel Oil*, 51 F.3d at 1434.  Thus, so long as TSI has sufficiently pled TP-Link's market power through either means, the Court cannot grant Defendants' motion to dismiss on market power-related grounds.  And here, TSI had adequately pled both types of evidence.

### A.   TSI Alleged Direct Evidence of TP-Link's Market Power.

"If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, ***and thus, of the actual exercise of market power***."  *Rebel Oil*, 51 F.3d at 1434 (emphasis added).

Defendants assert that TSI "does not allege any reduction in TP-Link's output, let alone a reduction significant enough to increase *marketwide* prices of consumer WLAN products."  (Mot. at 10 (emphasis in original).)  They also argue that TSI's allegations "only extend to reducing its own ability to resell TP-Link branded products," and that TSI "does not allege that TP-Link's prices are higher than any others in the relevant market."  (*Id*. at 10, 12.)  They also again improperly rely on extrinsic evidence.  (*Id*. at 12.)  None of these arguments hold water given TSI's allegations made in the Complaint:

- "TP-Link's primary goal was to eliminate price competition for its WLAN products, so it could continue to profitably charge artificially inflated prices for those products" (4AC ¶ 34);

- TP-Link "achieve[d] that goal" by "[g]etting rid of 90% of all third-party sellers on the Amazon Marketplace that were re-selling TP-Link WLAN products" (*id.*);
- Defendants' anticompetitive conduct allowed them "to reduce the output of [WLAN] products to consumers," eliminate "the option of a high quality, cheaper alternative for genuine TP-Link products" and "consumer choice for different consumer WLAN products," and "forc[e] end consumers to pay higher prices than they would pay in the absence of Defendants' conduct" (*id.* ¶¶ 10, 34, 63-64).

TSI further supports its allegation of TP-Link's supracompetitive prices by alleging that TSI is able to maintain a high profit margin (20% net) on its sales of TP-Link products, despite selling them at a "considerably lower" price than TP-Link's contractually enforced minimum advertised price. (*Id.* ¶¶ 6, 21.) Taken as true, TSI's allegations show that, by eliminating the vast majority of TP-Link's competitors and restricting the choice and availability of lower priced WLAN products to consumers, Defendants forced consumers to buy TP-Link's products at supracompetitive prices. TSI thus plausibly alleges direct evidence of TP-Link's exercise of market power. *See, e.g.*, *In re ATM Fee Antitrust Litig.*, No. C 04-2676 CRB, 2010 WL 2557519, at *10 (N.D. Cal. June 21, 2010) ("this prolonged period of substantially-above-cost pricing provides a strong indication that the Defendants and Star possess market power in the ATM Networks market.") *Cf. also Theme Promotions*, 546 F.3d at 1001 ("Evidence of restricted output and supracompetitive prices is direct evidence of market power."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct.").

Defendants' reliance on *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, 868 F. Supp. 2d 876 (N.D. Cal. 2012) is misplaced, as that case concerns the

sufficiency of *evidence* on a motion for summary judgment.  *Id.* at 896-897.

Specifically, *Church & Dwight* held that counter-defendant "offered no *evidence*

that [counter-claimant] has used such a program to restrict its own, and hence the

market's output," and that "the only *evidence* in the record" showed that counter-

defendant "has never attempted to restrict its supply."  *Id.* (emphasis added).  Of

course, the sufficiency of evidence is inapposite at the pleading stage, where the

only issue is the legal sufficiency of TSI's allegations.  *Supra* at 3.

At bottom, Defendants conflate the sufficiency of allegations at the pleading

stage with the sufficiency of evidence to prove a claim.  They argue that TSI was

obligated to "establish" that TP-Link "owns a dominant share of this market,"

"restricted its own output," and that "[its] prices are 'artificially high.'"  (Mot. at 9,

10, 12.)  There is no authority for that proposition.  Instead, controlling precedent

holds that "[t]he question of whether a party possesses monopoly power is

essentially one of fact," and thus not an issue to be determined at the pleading stage.

*Cost Mgmt. Servs. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 & n.14 (9th

Cir. 1996); *Oahu Gas Serv.,* 838 F.2d at 363 ("Our previous decisions establish that

both market definition and market power are essentially questions of fact.");

*Westlake Servs., LLC v. Credit Acceptance Corp.*, No. 15-cv-07490 SJO (MRWx),

2016 WL 3919487, at *9 (C.D. Cal. Apr. 6, 2016) ("[t]he question of whether a

defendant possesses monopoly or market power is one of fact.").  At this stage of

the litigation, TSI has adequately alleged direct evidence of TP-Link's exercise of

monopoly power, so Defendants' motion to dismiss on this basis must be denied.

**B.   TSI Alleged Circumstantial Evidence of TP-Link's Market Power.**

Circumstantial evidence of market power can be shown by: "(1) defin[ing]

the relevant market, (2) show[ing] that the defendant owns a dominant share of that

market, and (3) show[ing] that there are significant barriers to entry and show[ing]

that existing competitors lack the capacity to increase their output in the short run."

*Rebel Oil*, 51 F.3d at 1434.

As noted, TSI has adequately alleged the relevant market, and Ninth Circuit precedent says that the "definition of the relevant market is a question of fact for the jury." (*Supra* Section II.A); *Theme Promotions,* 546 F.3d at 1002.

### 1. TP-Link Surpasses The Market Power Threshold In The Relevant Markets.

Defendants argue that TSI fails to demonstrate that "TP-Link owns a *dominant* share of any of the allegedly relevant 'consumer WLAN product' markets," because "courts generally require a 65% market share" threshold. (Mot. at 13.) This is wrong for multiple reasons.

At the threshold, courts in the Ninth Circuit are "wary of dismissing section 2 claims at the pleading stage for failure to specify market power beyond the relevant percentage," because "[t]he question of whether a defendant possesses monopoly or market power is one of fact." *Signature MD, Inc. v. MDVIP, Inc.*, No. 14-cv-5453 DMG (SSx), 2015 WL 3988959, at *8 (C.D. Cal. Apr. 21, 2015); *Westlake Servs., LLC*, 2016 WL 3919487, at *9; *Cost Mgmt. Servs.*, 99 F.3d at 950 & n.14 ("[t]he question of whether a party possesses monopoly power is essentially one of fact."); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-JST, 2013 WL 3242245, at *13 (N.D. Cal. June 25, 2013) ("Whether monopoly power exists is a question of fact."); *Giuliano v. SanDisk Corp.*, No. 10-cv-02787 SBA, 2014 WL 4685012, at *6 (N.D. Cal. Sept. 19, 2014) ("whether a defendant actually possesses monopoly power is a factual question.").

Defendants also misstate the law regarding the purported "65% market share" requirement. (Mot. at 13.) The Ninth Circuit has held that a 45-70% share of the market was sufficient to show market power in a monopolization claim, where competitors were fragmented, and none had more than a 12% share. *Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975). Noting that "past decisions have required larger percentages to show monopoly power," the Ninth Circuit held that "it is now well settled that market share, while

being perhaps the most important factor, does not alone determine the presence or absence of monopoly power." *Id*.; *see Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990) (noting that *Sunkist Growers* "held that a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors."). In any event, the Ninth Circuit has held that a sub-50%, not a sub-65%, market share is the threshold for a presumption of a lack of market power in an actual monopolization claim. *Rebel Oil*, 51 F.3d at 1438. And here, TSI has plausibly alleged facts showing why TP-Link has at least a 50% market share in all of the relevant markets. (4AC ¶ 58.a-58.d.)

Furthermore, for an attempted monopolization claim, the Ninth Circuit has held that a market share of 44% is sufficient as a matter of law to support a finding of market power. *Rebel Oil*, 51 F.3d at 1439. *See also PNY Tech. v. SanDisk Corp.*, No. C-11-04689-YGR, 2012 WL 1380271, at *9 (N.D. Cal. April 20, 2012) (40% market share enough to establish market power for attempted monopolization claim); *Nationwide Power Solutions Inc. v. Eaton Elec. Inc.*, No. SACV 07-883-JVS, 2008 WL 11408997, at *10 (C.D. Cal. Oct. 10, 2008) (30% market share could be sufficient to establish market power for attempted monopolization claim).

In any event, the Ninth Circuit is "reluctant to apply such bright-line rules regarding market share in deciding whether a defendant has market power," *id.* at 1438, holding that "[n]o precise standard exists for determining when a firm … controls enough of a market that its actions might cause anticompetitive effects." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1155 (9th Cir. 2011). The "far wiser approach" is to "carefully analyz[e] certain telltale factors in the relevant market:  market share, entry barriers and the capacity of existing competitors to expand output." *Rebel Oil*, 51 F.3d at 1438.

TSI sufficiently alleges such "telltale factors"—*i.e.*, that TP-Link maintains "at least a 50% market share" in the four alleged markets (4AC ¶¶ 58.a-58.d), that new entrants face significant entry barriers in the form of high capital and time

costs and entrenched buyer preferences favoring sellers with high customer ratings (*id.* ¶ 65), and that existing competitors lack the capacity to expand because Defendants' anticompetitive conduct eliminated 90% of them from the Amazon Marketplace, which is by far the most dominant e-commerce platform in the world. (*id.* ¶¶ 7, 14, 34, 64).

In particular, TSI's allegations regarding TP-Link's dominance of the e-commerce market and the Amazon Marketplace (*id.* ¶ 58.c-58.d) are especially important given the ever-increasing size of the U.S. e-commerce market. As the Court may be aware, the Majority Staff of the House Judiciary Committee released its Report and Recommendations on the ongoing Investigation of Competition in Digital Markets. (RJN, Ex. C.) This government report estimates that Amazon controls 65-70% of all U.S. online marketplace sales. (*Id.* at 256.) The report also states that "Amazon has monopoly power over most third-party sellers and many of its suppliers" and that alternative marketplaces simply did not exist in e-commerce. (*Id.* at 258.) TP-Link forcing out TSI and other third-party sellers from the Amazon Marketplace is nothing less than a further consolidation of its market power there, as well as the e-commerce market in general.

2.   The Court Must View TP-Link's Press Release In TSI's Favor.

Defendants do not dispute the allegation that TP-Link claims (1) to be "the world's number one provider of consumer Wi-Fi networking devices," and (2) to hold the "dominant position as the market leader in WLAN products for the 29th consecutive quarter." (*See* Mot. at 13.) Nor do they contest the allegation that TP-Link's own press release states that it had "a 44.08% global market share for WLAN products for the year 2017." (*Id.*) Instead, Defendants try to side-step these allegations by contending that the press release refers not to TP-Link but to "the global TP-Link entity." (*Id.*) This argument fails for two separate reasons.

*First*, Defendants provide no support for their assertion that the press release refers to "the global TP-Link entity." (*Id.*) They cite only to TSI's complaint,

which specifically alleges that TP-Link—not the purported "global TP-Link entity"—possesses the "44.08% global market share for WLAN products."  (Mot. at 13 (citing 4AC ¶ 19).)

*Second*, even assuming *arguendo* that Defendants' press release is unclear as to which entity is referenced therein, the Court must make all reasonable inferences and resolve any ambiguities in TSI's favor on a motion to dismiss.  *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995) ("What is clear is that on a motion to dismiss we should make all reasonable inferences in favor of [plaintiff] and should not resolve the interpretation of the press release against [plaintiff]."); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, No. 18-CV-06720-LHK, 2020 WL 5408056, at *11 (N.D. Cal. Sept. 9, 2020) (noting that the court "must adopt Plaintiff's interpretation" of any ambiguities in defendant's statements "because the Court may not resolve any disputes about the actual meaning of the statement in this procedural posture"); *Advanced Thermal Scis. Corp. v. Applied Materials Inc.*, No. 07-cv-01384 JVS (JWJx), 2009 WL 10671185, at *4 n.4 (C.D. Cal. July 20, 2009) (finding it proper to construe the ambiguity in the document incorporated by reference in the non-movant's favor); *Hearn v. R.J Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1102  (D. Ariz. 2003) ("At this stage of the litigation, however, the district court must resolve any ambiguities in the considered documents in the plaintiff's favor.").

Here, the press release refers only to "TP-Link," and does not distinguish between TP-Link and the global entity.  (RJN, Ex. A.)  Defendants provide no explanation why the press release must be interpreted to mean that it referred only to the "global TP-Link entity."  Defendants' reading of its own press release would make sense only if the Court finds the press release to be ambiguous as to which entity it is referencing.  But in that case, such interpretation is a factual dispute that is not properly resolved on a motion to dismiss.  *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, No. 18-CV-06720-LHK, 2020 WL 5408056, at *11 (N.D. Cal. Sept. 9, 2020)

1   (noting that the court "must adopt Plaintiff's interpretation" of any ambiguities in

2   defendant's statements "because the Court may not resolve any disputes about the

3   actual meaning of the statement in this procedural posture").[5]

4                    3.      TSI Alleges High Entry Barriers.

5           Defendants next argue that TSI's antitrust claims fail because TSI failed to

6   sufficiently allege significant barriers to entry to the consumer WLAN product

7   market.  (Mot. at 14-16.)  This is yet another mischaracterization of TSI's complaint.

8   TSI alleges that the consumer WLAN products market has "high barriers to entry,"

9   including (1) "high capital costs" to stock "sufficient quantities of new, factory-

10  sealed consumer WLAN products" to "become even a barely visible option for

11  consumers," (2) entrenched customer preferences that favor sellers with "an

12  overwhelming amount of positive reviews," and (3) the "many years" needed to

13  gather a "high enough customer rating to attract customers."  (4AC ¶¶ 64-65).  Such

14  allegations adequately state a claim.  *See Image Tech. Servs.*, 125 F.3d at 1208

15  ("Common entry barriers include: … entrenched buyer preferences, high capital

16  entry costs and economies of scale.").

17          Defendants also contend that the alleged entry barriers are implausible

18  because, according to a few pages Defendants printed from the internet, "sellers are

19  able to enter the market for consumer WLAN products."  (Mot. at 16.)  Again, this is

20  impermissible extrinsic evidence, and a self-proclaimed "search" on Amazon is

21  hardly something that could support a motion for summary judgment, let alone a

22  motion to dismiss.  This is especially true given that "whether there are in fact

23  significant barriers to entry is not an issue appropriately decided on this Motion [to

24  dismiss]."  *Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*, 41 F. Supp. 3d 906,

25

26  ───────────────
    [5] Defendants also contend that the press release does not "cover[] any relevant
27  market" or "identify the specific products."  (Mot. at 13.)  It's hard to understand
    how these contentions are apt, as the salient issue is the sufficiency of TSI's
28  allegations, not TP-Link's press release.

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

917 (C.D. Cal. 2014).  *See also Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 14-cv-01664 JVS (DFMx), 2016 WL 6822191, at *7 (C.D. Cal. Jan. 21, 2016) ("Whether barriers to entry exist is usually a fact-intensive question.").

Furthermore, "the fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers," particularly if the new entrant lacks the capacity to take significant business away from the predator." *Rebel Oil*, 51 F.3d at 1440.  The Complaint explains exactly why new entrants or existing competitors "lack the capacity to expand their output to challenge [TP-Link's] anticompetitive conduct" (Mot. at 15): Defendants proactively eliminate the vast majority of them from the Amazon Marketplace, under the guise of "brand protection."  (4AC ¶¶ 7-10, 34, 63.)  TSI also alleges that Defendants' anticompetitive conduct "cripple[d] the[] business[es]" of "90% of all third-party sellers on the Amazon Marketplace that were re-selling TP-Link WLAN products," resulting in a "dearth of … small and medium sized businesses [from] selling [consumer WLAN products] … at competitive prices."  (4AC ¶¶ 10, 34, 63.)  Defendants' conduct stripped these smaller competitors of the means to generate revenue on the largest e-commerce platform in the United States and globally (*id.* ¶ 58.d), weakening existing competitors' capacity to expand their output and barring new entrants' ability to overcome the "high capital entry costs" and "entrenched buyer preferences."  *See Image Tech. Servs.*, 125 F.3d 1208 ("Common entry barriers include: … entrenched buyer preferences, high capital entry costs and economies of scale.").

## IV.   THE COMPLAINT ADEQUATELY ALLEGES ANTITRUST INJURY

Defendants finally argue that TSI has not adequately alleged antirust injury because "nothing is stopping [it] from selling TP-Link branded products … to other Amazon resellers … or through other distribution channels."  (Mot. at 17; *see also id.* at18 ("Plaintiff provides no explanation for why it failed to take any concrete steps to sell its inventory through any other distribution channels.").)  This argument fails for multiple reasons.

"To plead… antitrust injury, plaintiffs must allege that they were harmed by the injury to competition.  Further, plaintiffs must allege that their harm was caused directly by the antitrust violator."  *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1156 (9th Cir. 2019).  Though Defendants' motion is not exactly clear as to this topic, it appears they are challenging only the sufficiency of TSI's allegations of proximate causation, as opposed to the existence of injury to competition.  In any event, "[i]f the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition . . . ." *Rebel Oil*, 51 F.3d at 1434; *see also Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 14-cv-01664 JVS (DFMx), 2015 WL 12765461, at *2 (C.D. Cal. May 19, 2015) (holding that plaintiff's allegations of defendant's conduct causing supracompetitive prices and decreased output to consumers sufficiently "describe a plausible injury to competition, not merely an injury to [plaintiff] alone.").  Here, the entire gravamen of TSI's complaint is that TP-Link restricted the availability of WLAN products to consumers by eliminating its lower-priced competitors, which permitted it to maintain superficial demand for its contractually enforced supracompetitive prices.  (4AC ¶¶ 27, 34, 63-64.)  Additionally, another "form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'"  *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003).  TSI alleges that Defendants abused Amazon's Notice Infringement process—having Amazon "rubberstamp" false allegations that a third-party is selling counterfeit versions of its products—to eliminate 90% of re-sellers selling TP-Link products on Amazon, which allowed TP-Link to illegally "reduce the output of such products to consumers."  (4AC ¶¶ 8-10, 34, 63.) Because TSI and other re-sellers stock a variety of WLAN products, TP-Link's eliminating these resellers from Amazon reduced "consumer choice for different consumer WLAN products," and caused "some consumers to settle upon buying TP-Link consumer WLAN products directly from TP-Link due to a lack of

1    alternatives." (*Id.* at ¶ 64.)

2        As for the proximate causation element, all that requires is that "[t]he harm [

3    ] not be 'derivative and indirect' or 'secondary, consequential, or remote.'" *Theme*

4    *Promotions, Inc.*, 546 F.3d at 1003.  TSI easily satisfies this requirement as it

5    alleges that it lost sales because Defendants' anticompetitive conduct caused TSI's

6    expulsion from the Amazon Marketplace, the largest e-commerce platform in the

7    world. (4AC ¶¶ 14-17, 20-23, 66, 75.) *See Amarel v. Connell*, 102 F.3d 1494, 1509

8    (9th Cir. 1996) ("[W]e have held that a competitor of an alleged attempted

9    monopolist had standing where it was either driven out of busines or suffered

10   reduced profits because of the alleged anticompetitive acts of the attempted

11   monopolist.").  Defendants claim that proximate causation does not exist because

12   TSI can continue to sell TP-Link products to other Amazon resellers or through

13   other distribution channels. (Mot. at 17.)  But there is no requirement that a

14   competitor have lost the ability to conduct business. *See Amarel*, 102 F.3d at 1509.

15   *See also Image Tech. Serv.*, 125 F.3d at 1222 ("plaintiff can establish antitrust

16   injury by showing that it would have earned an even higher profit but for antitrust

17   injury") (citation omitted); *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No.

18   18-CV-00933-MMC, 2019 WL 6327203, at *3 (N.D. Cal. Nov. 26, 2019) ("Cytek

19   cites no authority for the proposition that a competitor, in order to show such harm,

20   must first go out of business. Moreover, existing authority would appear to hold to

21   the contrary.") (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

22   489 n.14 (1977) and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

23   585, 594-95 (1985)).

24       Defendants' reliance upon *Novation Ventures, LLC v. J.G. Wentworth*

25   *Company, LLC*, 156 F.Supp.3d 1094 (C.D. Cal. 2015), does not help its argument.

26   As an obvious matter, a district court's opinion cannot override the Ninth Circuit

27   precedent established in *Amarel* and *Image Technical Services*.  Moreover,

28   Defendants falsely claim that *Novation* holds that an antitrust plaintiff must allege

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

facts showing it was foreclosed from competing in the same relevant product market.  (Mot. at 17.)  But as is clear from the opinion itself, *Novation* never holds that this is the standard; it just happened to be that specific plaintiff's specific allegation of antitrust injury.  156 F. Supp. 3d at 1102.  This is now the second time Defendants have made the exact same false representation about *Novation*'s holding even though TSI has already pointed out its incorrectness.  (ECF No. 119 at 21; ECF No. 121 at 12.)

## V.   TSI HAS A JUSTICIABLE "CASE OR CONTROVERSY" UNDER THE DECLARATORY JUDGMENT ACT

TSI has also stated a claim for declaratory relief.  The requirement for a "case of actual controversy" under the DJA is "identical to Article III's constitutional case or controversy requirement." *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994).  The DJA permits suit "once the adverse positions [of the parties] have crystallized and the conflict of interests is real and immediate." *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981).  "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  The difference between an actual controversy and one seeking an impermissible advisory opinion is "'necessarily one of degree,' and is determined on the totality of the circumstances." *Sobini Films v. Tri-Star Pictures Inc.*, No. 01-cv-06615 ABC (RNBx), 2001 WL 1824039, at *2 (C.D. Cal. Nov. 21, 2001).

For intellectual property disputes in the Ninth Circuit, a case or controversy exists when, because of the defendant's actions, the plaintiff has "a real and reasonable apprehension that [it] will be subject to liability" if it continues the conduct in dispute. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555-56 (9th Cir. 1989).  An explicit threat of litigation is not necessary

under the real and reasonable apprehension test.  *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007); *San Diego County Credit Union v. Citizens Equity First Credit Union*, 344 F. Supp. 3d 1147, 1155-56 (S.D. Cal. 2018).  Rather, this is a "flexible approach that is oriented to the reasonable perceptions of the plaintiff." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982).  As such, "[t]he acts of the defendant [are] ... examined in view of their likely impact on competition and the risks imposed upon the plaintiff." *Id.*

### A.   Defendants' Actions Created an Actual Case or Controversy.

*Societe de Conditionnement en Aluminium* is instructive.  655 F.2d at 940-941, 944-945.  The defendant there competed with plaintiff in manufacturing and selling metal working machinery and told a third-party buyer that plaintiff's equipment would infringe on defendant's forthcoming patent.  *Id.* at 940-941.  The Ninth Circuit held that the defendant's contacting the third-party buyer caused the plaintiff's reasonable apprehension of liability and therefore established a prima facie case or controversy.  *Id.* at 945.  The court further held that it was irrelevant that the defendant later withdrew the threat of litigation and found it significant that the defendant did not affirmatively agree to not sue the plaintiff.  *Id.* at 945.

The Ninth Circuit has also held that something less than an actual threat of lawsuit can create a reasonable apprehension of liability.  *Chesebrough-Pond's*, 666 F.2d at 397.  In *Chesebrough-Pond's*, the defendant sent the plaintiff a letter requesting it withdraw an application to register a trademark and stating that it would otherwise file an opposition proceeding in the Patent and Trademark Office. *Id.* at 396.  Although the letter did not threaten suit, the Ninth Circuit still held that the plaintiff "had a real and reasonable apprehension that such action would be taken," and allowed the declaratory judgment claim to proceed.  *Id.* at 397.

Under these principles, Defendants' unyielding barrage of complaints to Amazon falsely accusing TSI of selling counterfeit products was "sufficient to put [TSI] in a defensive posture with respect to its continued [sales of TP-Link

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

products]" and instilled in TSI a real and reasonable apprehension of liability. *Societe*, 655 F.2d at 944.  Further, despite complaining about "hypothetical future conduct" and TSI's failure to allege that "it is currently selling TP-Link branded products" (Mot. at 22), Defendants have pointedly refrained from stating that it would not pursue claims against TSI if it were to continue selling TP-Link products. (*See* Mot.)  "Indeed, even where a party has stated that it has no plans to sue for infringement, if its course of conduct demonstrates a preparedness and willingness to enforce its rights otherwise, a case or controversy exists."  *Wong v. Hard Drive Prods., Inc.*, No. 12-cv-469-YGR, 2012 WL 1252710, at *3 (N.D. Cal. Apr. 13, 2012).  As noted, courts must examine Defendants' conduct "in view of their likely impact on competition and the risks imposed upon the plaintiff."  *Chesebrough-Pond's*, 666 F.2d at 396.  Here, dismissing the declaratory judgment claim would only leave TSI with the "Damoclean threat" of liability hanging over its head, which is precisely what the DJA is designed to relieve.  *Societe*, 655 F.2d at 943 ("The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure or never.").

Thus, a present case and controversy exists.  Defendants' reliance on *Sobini Films* does not change this conclusion.  Unlike the plaintiff in that case, 2001 WL 1824039, at *17-18, TSI has taken "concrete steps to engage in present activity"—by having purchased 360 TP-Link routers for resale, and negotiating the sale of TP-Link products at wholesale—and is "immediately prepared" to start selling them. (4AC ¶¶ 39, 80.)  The Federal Circuit's decision in *Windsurfing Int'l, Inc. v. AMF Inc.* also does not help Defendants.  828 F.2d 755 (Fed. Cir. 1989).  There, AMF alleged that it was interested in using the contested mark but had avoided using it and instructed its dealers not to use the term.  *Id.* at 758.  The Federal Circuit concluded that AMF's "mere desire" to use the mark did not "constitute a course of conduct placing [it] in a legally adversarial conflict" with plaintiff.  *Id.* at 759.  TSI,

OPPOSITION TO JOINT MOTION TO DISMISS
FOURTH AMENDED COMPLAINT
CASE NO. 2:19-CV-10374-SB (Ex)

however, is not merely "interested" in selling TP-Link products.  It was actually doing so (successfully) before Defendants engaged in their unlawful conduct.

**B.    The Court Should Exercise Its Discretion To Settle All Aspects of the Controversy Between TSI and Defendants.**

The Court's exercising DJA jurisdiction is further supported by consideration of the prudential factors.  (Mot. at 21-22.)  Here, Defendants only argue that one of the prudential factors are at issue here; they contend that TSI's claim "would not settle all aspects of the controversy" because "[TSI's] allegations concern ***past*** and hypothetical ***future*** conduct that a declaratory judgment of non-infringement would not resolve."  (*Id* at 22.)  But as noted, there is nothing "hypothetical" about whether TSI wants to continue selling TP-Link products.   Here, a declaratory judgment will provide TSI immediate certainty regarding its legal rights as to its resale of the TP-Links products.  Absent a declaratory judgment, TSI will be left with the uncertainty of whether it can lawfully pursue a business activity that it has a right to do, *i.e.*, re-sell authentic, factory-sealed TP-Link products.  This is the type of "'dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'"  *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 883-884 (Fed. Cir. 2008).  The Court should exercise its discretion to entertain TSI's declaratory judgment claim.

Dated:  November 6, 2020

GAW | POE LLP

By: _____
　　　Randolph Gaw
　　　Attorneys for Plaintiff
　　　Thimes Solutions Inc.