1    RANDOLPH GAW (S.B. #223718)        MARK SCHLACHET (*pro hac vice*)
2     rgaw@gawpoe.com                    markschlachet@me.com
     MARK POE (S.B. #223714)            43 West 43d Street, Suite 220
3     mpoe@gawpoe.com                    New York, New York 10036
4    VICTOR MENG (S.B. #254102)         Telephone: (216) 225-7559
      vmeng@gawpoe.com                   Facsimile: (216) 932-5390
5    GAW | POE LLP
6    4 Embarcadero Center, Suite 1400
     San Francisco, CA 94111
7    Telephone: (415) 766-7451
8    Facsimile: (415) 737-0642

9    Attorneys for Plaintiff and Counter-Defendant
     Thimes Solutions Inc.
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14   THIMES SOLUTIONS INC.            Case No. 2:19-CV-10374-SB-E

15              Plaintiff,            **PLAINTIFF AND COUNTER-
                                      DEFENDANT THIMES SOLUTIONS
16      v.                            INC.'S MEMORANDUM OF
                                      CONTENTIONS OF LAW AND
17   TP-LINK USA CORPORATION,         FACT**
     and AUCTION BROTHERS, INC.
18   d/b/a AMAZZIA                    Judge: Hon. Stanley Blumenfeld, Jr.
19              Defendant.            Trial Date:   January 9, 2023
20                                    Time:         8:30 a.m.
                                      Courtroom:    6C
21
22                                    Pretrial Conf.:  January 3, 2023

23   TP-LINK USA CORPORATION.

24              Counterclaimant,

25      v.

26   THIMES SOLUTIONS INC.

27              Counter-Defendant.

28

1    Pursuant to Local Rule 16-4, Plaintiff and Counter-Defendant Thimes

2  Solutions Inc. hereby submits its Memorandum of Contentions of Fact and Law.

3  **I.     SUMMARY STATEMENT OF THIMES'S CLAIMS, TP-LINK'S**

4  **COUNTERCLAIM AND THIMES' AFFIRMATIVE DEFENSES**

5  **THERETO.**

6    The Court dismissed Thimes's claims for trade libel and intentional

7  interference with prospective economic advantage upon granting TP-Link USA

8  Corporation's motion for summary judgment.  (ECF No. 244.)  The Court

9  dismissed all claims against defendant Auction Brothers, Inc. d/b/a Amazzia

10  pursuant to settlement.  (ECF No. 249.)

11    The only claim remaining is TP-Link's counterclaim for trademark

12  infringement and counterfeiting under the Lanham Act, 15 U.S.C. § 1114.

13  Thimes's affirmative defenses to that counterclaim are (1) the first sale doctrine and

14  (2) unclean hands.

15  **II.    ELEMENTS REQUIRED TO ESTABLISH TP-LINK'S**

16  **COUNTERCLAIM**

17    To prevail on its trademark infringement counterclaim, TP-Link must prove

18  each of the following elements by a preponderance of the evidence:

19    1.    TP-LINK® is a valid, protectable trademark;

20    2.    TP-Link owns TP-LINK® as a trademark; and

21    3.    Thimes used TP-LINK® without the consent of TP-Link in a manner

22  that is likely to cause confusion among ordinary consumers as to the source,

23  sponsorship, affiliation, or approval of the goods.

24  *See* Manual of Model Jury Instructions for the Ninth Circuit ("Ninth Circuit Model

25  Instruction") 15.6 (2022).

26    A.    Valid, protectable trademark

27    Thimes does not contest this element.

28

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1

B.      Ownership of trademark

2

Thimes does not contest this element.

3

C.      Likelihood of Confusion

4

The "core element of trademark infringement" is "[p]rotecting against a

5

likelihood of confusion," which helps to "ensur[e] that owners of trademarks can

6

benefit from the goodwill associated with their marks" and "that consumers can

7

distinguish among competing producers." *Adobe Systems Inc. v. Christenson*, 809

8

F.3d 1071, 1081 (9th Cir. 2015).

9

"In assessing the likelihood of confusion here, we therefore ask 'whether

10

consumers doing business with [Thimes] might mistakenly believe that they are

11

dealing with [TP-Link].'" *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228,

12

1252 (9th Cir. 2021) (citation omitted).  This element is also required for a

13

counterfeiting claim.  *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079

14

(9th Cir. 2020) (holding that "a counterfeit claim requires a showing of likelihood

15

of confusion under Section 1114.").  There is no presumption of confusion for a

16

counterfeit mark.  *See Arcona, Inc.*, 976 F.3d at 1080-81.  Instead, courts must

17

"review the product as a whole in determining whether an allegedly counterfeit

18

product will likely cause confusion."  *Id.* at 1080; *State of Idaho Potato Comm'n v.*

19

*G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) ("[i]n order to

20

invoke § 1117's special civil monetary remedies against counterfeiting, [a plaintiff]

21

must establish that" a defendant's use of a "counterfeit mark in commerce ... was

22

likely to confuse or deceive.").

23

The 8-factor *Sleekcraft* test is used to determine whether a defendant's use of

24

a trademark is likely to cause confusion about the source of the plaintiff's or the

25

defendant's goods.  *Lodestar Anstalt*, 31 F.4th at 1252.  Those factors are:

26

(1) Strength or Weakness of the Plaintiff's Mark.  The more the

27

consuming public recognizes the plaintiff's trademark as an indication

28

of origin of the plaintiff's goods, the more likely it is that consumers

- 3 -

1  would be confused about the source of the defendant's goods if the

2  defendant uses a similar mark.

3  (2) Defendant's Use of the Mark.  If the defendant and plaintiff use

4  their trademarks on the same, related, or complementary kinds of

5  goods there may be a greater likelihood of confusion about the source

6  of the goods than otherwise.

7  (3) Similarity of Plaintiff's and Defendant's Marks.  If the overall

8  impression created by the plaintiff's trademark in the marketplace is

9  similar to that created by the defendant's trademark in [appearance]

10  [sound] [or] [meaning], there is a greater chance [that consumers are

11  likely to be confused by defendant's use of a mark] [of likelihood of

12  confusion].  [Similarities in appearance, sound or meaning weigh

13  more heavily than differences in finding the marks are similar.]

14  (4) Actual Confusion.  If use by the defendant of the plaintiff's

15  trademark has led to instances of actual confusion, this strongly

16  suggests a likelihood of confusion. However actual confusion is not

17  required for a finding of likelihood of confusion.  Even if actual

18  confusion did not occur, the defendant's use of the trademark may still

19  be likely to cause confusion.  As you consider whether the trademark

20  used by the defendant creates for consumers a likelihood of confusion

21  with the plaintiff's trademark, you should weigh any instances of

22  actual confusion against the opportunities for such confusion.  If the

23  instances of actual confusion have been relatively frequent, you may

24  find that there has been substantial actual confusion.  If, by contrast,

25  there is a very large volume of sales, but only a few isolated instances

26  of actual confusion you may find that there has not been substantial

27  actual confusion.

28  (5) Defendant's Intent.  Knowing use by defendant of the plaintiff's

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1    trademark to identify similar goods may strongly show an intent to

2    derive benefit from the reputation of the plaintiff's mark, suggesting

3    an intent to cause a likelihood of confusion.  On the other hand, even

4    in the absence of proof that the defendant acted knowingly, the use of

5    plaintiff's trademark to identify similar goods may indicate a

6    likelihood of confusion.

7    (6) Marketing/Advertising Channels.  If the plaintiff's and defendant's

8    [goods] [services] are likely to be sold in the same or similar stores or

9    outlets, or advertised in similar media, this may increase the

10   likelihood of confusion.

11   (7) Consumer's Degree of Care.  The more sophisticated the potential

12   buyers of the goods or the more costly the goods, the more careful and

13   discriminating the reasonably prudent purchaser exercising ordinary

14   caution may be.  They may be less likely to be confused by

15   similarities in the plaintiff's and defendant's trademarks.

16   (8) Product Line Expansion. When the parties' products differ, you

17   may consider how likely the plaintiff is to begin selling the products

18   for which the defendant is using the plaintiff's trademark. If there is a

19   strong possibility of expanding into the other party's market, there is a

20   greater likelihood of confusion.

21   *See* Manual of Model Jury Instructions for the Ninth Circuit ("Ninth Circuit Model

22   Instruction") 15.18 (2022) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-

23   49 (9th Cir. 1979)).

24          D.    Actual Damages

25          TP-Link has informed Thimes that it does not seek actual damages, but will

26   instead seek statutory damages and disgorgement.  With respect to disgorgement,

27   TP-Link has the burden of proving Thimes's sales of infringing products and

28   Thimes must prove all elements of cost or deduction claimed.  15 U.S.C. § 1117(a).

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1    Key Evidence in Opposition to TP-Link's Trademark Infringement Claim

2         •    Thimes founder Avraham Eisenberg will testify that he is not aware of

3    any of Thimes's customers having the mistaken belief that they were purchasing

4    TP-Link products directly from TP-Link as opposed to Thimes.

5         •    TP-Link has no evidence of any consumer confusion as reflected in its

6    initial and supplemental responses to Thimes's contention interrogatory

7    (specifically Interrogatory No 24), as well as in its internal documents.

8         E.    Counterfeiting / Statutory Damages

9         As part of its trademark infringement claim, TP-Link seeks statutory

10   damages for counterfeiting.  Under the Lanham Act, a "counterfeit mark" is either:

11        (i) a counterfeit of a mark that is registered on the principal register in

12        the United States Patent and Trademark Office for such goods or

13        services sold, offered for sale, or distributed and that is in use,

14        whether or not the person against whom relief is sought knew such

15        mark was so registered; or

16        (ii) a spurious designation that is identical with, or substantially

17        indistinguishable from, a designation as to which the remedies of this

18        chapter are made available by reason of section 220506 of title 36;

19   15 U.S.C. § 1116(d)(1)(B).  *See also* 15 U.S.C. § 1117(b) & (c) (specifying that

20   "counterfeit" mark is defined under section 1116(d)); *Louis Vuitton Matteltier, S.A.*

21   *v. Akanoc Solutions, Inc.*, 658 F.3d 936, 945 (9th Cir. 2011) (same).

22        The term "counterfeit" in section 1116(d)(1)(B)(i) is itself defined to mean as

23   "a spurious mark which is identical with or substantially indistinguishable from, a

24   registered mark."  15 U.S.C. § 1127.  For the meaning of "spurious," the Ninth

25   Circuit has defined it thusly: "When a genuine trademark is **affixed** to a counterfeit

26   product, it becomes a spurious mark.  A 'spurious' mark is one that is false or

27   inauthentic." *U.S. v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997) (emphasis

28   added).  As for subsection (ii), a "counterfeit mark" is expressly defined to exclude

- 6 -

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1  "any mark or designation used on or in connection with goods or services of which

2  the manufacture[r] or producer was, **at the time of the manufacture or**

3  **production in question** authorized to use the mark or designation for the types of

4  goods or services so manufactured or produced, by the holder of the right to use

5  such mark or designation."  15 U.S.C. § 1116(d)(1)(B) (emphasis added).

6       Accordingly, under to establish a claim for counterfeiting, TP-Link must

7  prove that Thimes actually applied TP-LINK® onto another good.  *See Louis*

8  *Vuitton Malletier*, 658 F.3d at 946 (a counterfeit mark is "(1) a non-genuine mark

9  identical to the registered, genuine mark of another, where (2) the genuine mark

10  was registered for use on the same goods to which **the infringer applied the**

11  **mark**.") (emphasis added).  *See also Nautilus, Inc. v. Hempel*, No. CV 12-07430

12  DMG (EX), 2013 WL 12133877, at *6 (C.D. Cal. June 20, 2013) ("a counterfeit

13  mark is more than a design that is likely to cause confusion with the plaintiff's

14  mark—even if the defendant intended the confusion. Rather, a counterfeit mark is

15  an unauthorized duplication or something proximal.").

16       By definition, the re-sale of genuine good—even if the re-sale is

17  unauthorized—is not "counterfeiting."

18       <u>Key Evidence in Opposition to TP-Link's Counterfeiting Claim</u>

19  •    Thimes founder Avraham Eisenberg will testify that all TP-Link

20  products re-sold by Thimes were genuine and that Thimes has never applied TP-

21  LINK® to any product.

22  •    TP-Link has no evidence that Thimes ever sold a non-genuine TP-Link

23  product, or that Thimes ever applied TP-LINK® to any product, as reflected in its

24  initial and supplemental responses to Thimes's contention interrogatories

25  (specifically Interrogatory Nos. 6, 10, and 24).

26

27

28

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1  III.   **THIMES'S AFFIRMATIVE DEFENSES AND THE ELEMENTS**
2         **THEREOF**

3         Thimes had the right to use TP-Link's trademark under the first sale doctrine.
4  Separately, TP-Link acted with unclean hands in enforcing any trademark rights it
5  might possess.

6         A.     First Affirmative Defense: First Sale Doctrine

7         "[T]rademark law generally does not reach the sale of genuine goods bearing
8  a true mark even though such sale is without the mark owner's consent." *NEC*
9  *Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (1987). "[T]he right of a
10  producer to control distribution of its trademarked product does not extend beyond
11  the first sale of the product." *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
12  53 F.3d 1073, 1074 (9th Cir. 1995).

13         The Ninth Circuit holds that the first sale doctrine "is not rendered
14  inapplicable merely because consumers erroneously believe the reseller is affiliated
15  with or authorized by the producer." *Id.* at 1076. Rather, "[i]t is the essence of the
16  'first sale' doctrine that a purchaser who does not more than stock, display, and
17  resell a producer's product under the producer's trademark violates no right
18  conferred upon the producer by the Lanham Act." *Id.* "When a purchaser resells a
19  trademarked article under the producer's trademark, and nothing more, there is no
20  actionable misrepresentation under the statute." *Id.* "[T]he unauthorized resale of
21  genuine goods presents an easy case for protecting a downstream seller." *Bluetooth*
22  *SIG Inc. v. FCA US LLC*, 30 F.4th 870, 872 (9th Cir. 2022).

23         After the first sale, TP-Link can establish infringement only if it establishes
24  either the "repackaging notice" or "quality control" exceptions. *Enesco Corp. v.*
25  *Price/Costco Inc.*, 146 F.3d 1083, 1085-87 (9th Cir. 1988). The "repackaging
26  notice" exception applies if the re-seller had re-packaged the original product and
27  failed to disclose on the product that it, and not the trademark holder, had
28  performed the re-packaging, as that might cause confusion by the public as to the

- 8 -

1    re-seller's role in re-packaging that product. *Id.* at 1085-86. The "quality control"

2    exception applies if there is "some defect (or potential defect) in the product itself

3    that the customer would not be readily able to detect" and thus "the public is likely

4    to be confused as a result of the lack of quality control" and perceive that the defect

5    was caused by the trademark holder, not by the re-seller. *Id.* at 1087 (cleaned up).

6          Thimes anticipates that TP-Link will argue that because it does not honor its

7    manufacturer's warranty when its products are resold by an unauthorized

8    distributor, the "quality control" exception applies to the first sale doctrine. Apart

9    from failing to demonstrate the existence of any undetectable defects, this argument

10   is already foreclosed by the Ninth Circuit, as the first sale doctrine applies to resales

11   of genuine goods even if the manufacturer's servicing and warranty guarantees do

12   not cover the resold products. *See NEC Electronics*, 810 F.2d at 1508 & 1510 ("If,

13   as NEC–USA alleges, Abco sales agents mislead their buyers about the availability

14   of NEC–USA servicing, then Abco may be liable in contract or tort, but not in

15   trademark"). Moreover, as Thimes operated its business from New York and TP-

16   Link sold its products in New York, the provisions of New York General Business

17   Law § 369-b would apply: "A warranty or guarantee of merchandise may not be

18   limited by a manufacturer doing business in this state solely for the reason that such

19   merchandise is sold by a particular dealer or dealers[.]"

20          <u>Key Evidence in Support of Application of the First Sale Doctrine</u>

21       •      Thimes's owner Avraham Eisenberg will testify that all TP-Link

22   products re-sold by Thimes were genuine and that Thimes did nothing more than

23   re-sell those products.

24       •      TP-Link's witness and documents will establish that TP-Link test

25   bought products from Thimes and confirmed for itself that the TP-Link branded

26   products Thimes sold on the Amazon Marketplace were genuine, factory-sealed,

27   and unadulterated.

28

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1      • Mr. Eisenberg will testify to Thimes's high customer rating and

2  satisfaction on the Amazon Marketplace.

3      • There is no evidence of any defects or potential defects in any TP-Link

4  products re-sold by Thimes.

5      B.      Second Affirmative Defense: Unclean Hands

6      Thimes contends that it is not liable for trademark infringement because TP-

7  Link acted with unclean hands.  To prevail on this defense, Thimes must

8  demonstrate that TP-Link's conduct is inequitable and that the conduct relates to

9  the subject matter of its claims.  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826

10  F.2d 837, 847 (9th Cir. 1987); *Metal Jeans, Inc. v. Metal Sport, Inc.*, 843 Fed.

11  Appx. 898, 899 (9th Cir. 2021).

12      Key Evidence in Support of Unclean Hands Defense

13      • Thimes's owner Avraham Eisenberg will testify that all TP-Link

14  products re-sold by Thimes were genuine and that Thimes did nothing more than

15  re-sell those products.

16      • TP-Link's own documents will show that it test bought products from

17  Thimes and confirmed for itself that the TP-Link branded products Thimes sold on

18  the Amazon Marketplace were genuine, factory-sealed, and unadulterated.

19      • Mikhail Fikhman, co-founder of Auction Brothers, Inc. d/b/a Amazzia,

20  will testify that at TP-Link's instruction, Amazzia submitted 73 complaints to

21  Amazon alleging that Thimes sold counterfeit TP-Link products without ever

22  having once examined the products at issue.

23      • TP-Link's own documents will show that it targeted Thimes

24  specifically because Thimes's offerings on the Amazon Marketplace was

25  undercutting TP-Link's ability to run sales promotions of its wireless router

26  products, not because of any counterfeiting or trademark infringement concerns.

27  **IV.    ANTICIPATED EVIDENTIARY ISSUES**

28      Thimes intends to bring motions *in limine* for orders:

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1       1.     to exclude TP-Link from introducing any evidence or argument that

2  contradicts or exceeds its interrogatory responses on the issue of whether Thimes

3  sold counterfeit TP-Link products on the Amazon Marketplace.

4       2.     to exclude any evidence of, or reference to, allegations that Thimes's

5  founder Avraham Eisenberg has been accused of defrauding investors in a

6  cryptocurrency scheme.

7      In addition, TP-Link has designated over 150 trial exhibits, many of which

8  are facially inadmissible.  Such exhibits include:

9       i.     Briefs, discovery requests, and discovery responses that were

10  submitted in the private arbitration between TP-Link and Amazon over Amazon's

11  suspension of TP-Link's account.  Beyond the lack of relevance and FRE 403

12  issues inherent in such documents, it appears that TP-Link intends to submit

13  Amazon's discovery responses and Amazon's witness declarations for the truth of

14  the matters asserted.  This is plainly hearsay, as are the arbitration hearing

15  transcripts also being submitted by TP-Link.  TP-Link also has designated the

16  arbitration award as an exhibit, and the Ninth Circuit has recently held that factual

17  findings in an arbitration award are inadmissible as a matter of law.  *Cerner Middle*

18  *E. Ltd. v. Belbadi Enterprises LLC*, 939 F.3d 1009, 1015 (9th Cir. 2019).  Some of

19  these documents also appear to allege that TP-Link sold counterfeit Samsung

20  products on the Amazon Marketplace, and are also thus inadmissible under FRE

21  404(b) as TP-Link appears to be using such allegations of Thimes selling a different

22  counterfeit product to bolster its argument that Thimes sold counterfeit TP-Link

23  products (which Amazon has never alleged Thimes to have done).

24       ii.    E-mails and screenshots purporting to be TP-Link customer service

25  personnel responding to requests for warranty service.  No witness has ever

26  submitted a declaration or provided any deposition testimony about these

27  documents, however, nor has there been any other evidence produced in this case

28  that would authenticate or explain these documents.  (Among other things, TP-Link

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

1  resisted Thimes's efforts to conduct a FRCP 30(b)(6) deposition.)  These

2  documents have never been referred to in an interrogatory response, let alone

3  authenticated.  And the sole TP-Link employee that it has designated to testify at

4  trial would not have any personal knowledge regarding any of these documents, or

5  even how to authenticate them.  Many of these documents also post-date the events

6  that are in question for TP-Link's counterclaim (some by several years) and none of

7  these documents concern any TP-Link products sold by Thimes, and thus they are

8  all irrelevant.

9          iii.     E-mails sent by Thimes's customers to Thimes requesting to return a

10  TP-Link product they had purchased from Thimes, as well as the purported reason

11  for the return (usually a problem with the product itself).  Apart from the e-mails

12  being hearsay (because TP-Link is introducing the statements of those purported

13  problems for the truth of the matter asserted), they are irrelevant because the fact

14  that a customer wants to return a product is not proof of trademark infringement or

15  counterfeiting.  They also engender FRE 403 issues because purported problems

16  with an electronic product are often the result of user error, Thimes's product

17  returns were a miniscule percentage of its overall sales, and fairness would dictate

18  an examination by Thimes of the number of defects and product returns that TP-

19  Link customarily gets for its products.

20          Finally, TP-Link has indicated that it may choose to use, for non-

21  impeachment purposes, the transcript of a deposition taken of Avi Eisenberg in the

22  arbitration proceeding between Amazon and TP-Link.  An arbitration proceeding,

23  however, is not a "federal or state court action" and thus is not applicable to the

24  Federal Rules of Civil Procedure governing the use of depositions taken outside of

25  the pending action.  *See* Fed. R. Civ. P. 32(a)(8).

26  **V.     KEY ISSUES OF LAW**

27          1.     Whether Thimes is entitled to judgment as a matter of law on TP-

28  Link's counterfeiting claim, given that it never created a duplicate of TP-Link's

- 12 -

1  mark nor even applied TP-Link's mark to any products. *See Louis Vuitton*

2  *Malletier, S.A.*, 658 F.3d 946 (holding that a counterfeit mark is "(1) a non-genuine

3  mark identical to the registered, genuine mark of another, where (2) the genuine

4  mark was registered for use on the same goods to which the infringer applied the

5  mark.")

6  • Thimes's Position: Thimes is entitled to judgment as a matter of law

7  because the evidence will establish that Thimes sold only genuine, factory-sealed

8  products manufactured by TP-Link and Thimes never duplicated or applied TP-

9  Link's mark to any other products.

10  2. Whether Thimes's sales of TP-Link's products are insulated from TP-

11  Link's counterfeiting claim under the first sale doctrine, given that Thimes

12  purchased and resold genuine, factory-sealed products manufactured by TP-Link

13  that Thimes purchased on the open market, as Ninth Circuit precedent holds that "a

14  purchaser may 'stock, display, and resell a producer's product under the producer's

15  trademark' without infringing on the producer's trademark." *Sebastian Int'l, v.*

16  *Longs Drug Stores*, 53 F.3d at 1076.

17  • Thimes's Position: Thimes's sales are insulated from TP-Link's

18  counterfeiting claim as a matter of law under the first sale doctrine.

19  3. Whether Thimes is entitled to judgment as a matter of law because TP-

20  Link has no evidence of consumer confusion.

21  • Thimes's Position: Thimes is entitled to judgment as a matter of law

22  because TP-Link has no evidence of consumer confusion, and is barred from

23  belatedly introducing such evidence because it was never identified in their

24  responses to Thimes's contention interrogatories.

25  4. Whether TP-Link has unclean hands.

26  • Thimes's Position: TP-Link has unclean hands as it repeatedly lodged

27  false complaints with Amazon that Thimes sold counterfeit TP-Link products when

28  TP-Link had no factual basis to make such allegations.

THIMES'S MEMO OF CONTENTIONS
OF FACT AND LAW
CASE NO. 2:19-CV-10374-SB-EX

## VI. BIFURCATION OF ISSUES

Thimes submits that bifurcation is not necessary or appropriate.

## VII. JURY TRIAL

TP-Link demanded a jury trial in the counterclaim it filed on May 27, 2022 (ECF No. 175.) In its Answer, Thimes similarly demanded a jury trial on the counterclaim. (ECF No. 195.)

## VIII. ATTORNEYS' FEES

In "exceptional cases," the court may award reasonable attorney fees to the prevailing party in a trademark infringement action. *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620 (9th Cir. 1993); 15 U.S.C. § 1117(a). Awards are "never automatic and may be limited by equitable considerations." *Lindy Pen Co., Inc. v. BIC Pen Corp.*, 982 F.2d 1400, 1405, 1409 (9th Cir. 1993).

## IX. ABANDONMENT OF ISSUES

Thimes does not anticipate abandoning any issues.


Dated: December 9, 2022                    GAW | POE LLP


By: _____

Randolph Gaw
Attorneys for Plaintiff and
Counter-defendant Thimes
Solutions Inc.